UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FAIZ AHMED YAHIA SULIMAN
          Petitioner

    v.                  **Civil Action No. 06-cv-1758-RMC**

GEORGE BUSH, *et al*.
           Respondents

## PETITIONER'S OPPOSITION TO MOTION TO DISMISS OR TRANSFER FOR LACK OF JURISDICTION AND CROSS-MOTION FOR HABEAS HEARING AND RELATED RELIEF

Petitioner Faiz Ahmed Yahia Suliman ("Petitioner"), by and through his undersigned counsel, respectfully submits this memorandum of law in opposition to Respondents' motion to dismiss this case for lack of jurisdiction or, in the alternative, to transfer it to the Court of Appeals. Petitioner also cross-moves for additional related relief, including expedited entry of the protective order, access to his counsel, and production of a factual return to his habeas petition. Respondents' motion to dismiss should be denied, and Petitioner's cross-motion should be granted, for the following reasons.

### Introduction

Petitioner is a citizen of Yemen, who is currently detained virtually *incommunicado* in military custody at the U.S. Naval Station at Guantánamo Bay, Cuba ("Guantánamo"). Petitioner is being held without lawful basis, without charge, and without access to counsel or any meaningful opportunity to challenge his detention.

**ORAL ARGUMENT REQUESTED**

On October 16, 2006, Petitioner filed a habeas corpus petition challenging the legality of his detention ("Petition").[1] Petitioner alleges that he has been wrongfully classified as an "enemy combatant"; that he was not a member or associate of the Taliban or Al Qaeda; that he did not commit any hostile acts against the United States or its coalition allies; and that he had no involvement in the attacks on September 11th, the ensuing armed conflict, or any other acts of international terrorism. See Petition ¶¶ 20-23. Petitioner also contends that Respondents have seized and continue to detain him without affording him any fundamental due process. See Petition ¶¶ 24-26. In these respects, his arrest and continued detention violate the Suspension Clause of the U.S. Constitution, see U.S. Const., art. I, § 9, cl. 2, which guarantees him the right to be charged criminally or released. Moreover, Petitioner argues that the Detainee Treatment Act of 2005 ("DTA") is unconstitutional on its face and as applied to him because it purports to remove this Court's jurisdiction over the Petition in violation of the Suspension Clause. Accordingly, he argues, the DTA does not deprive this Court of jurisdiction to hear or consider the Petition and grant the relief that he seeks therein.[2]

On November 29, 2006, the Court ordered Respondents to show cause why the Petition should not be granted. Respondents filed a response to that order, and moved to dismiss this case for lack of jurisdiction under the DTA and the Military Commission Act of 2006 ("MCA") or, in the alternative, to transfer the case to the Court of Appeals ("Gvt. Br."). In support of their motion, Respondents argue that the DTA and MCA withdrew jurisdiction of the district courts to consider habeas petitions filed by non-citizens like Petitioner, who are held as "enemy combatants." See Gvt. Br. at 4-7. They also contend that the DTA

---

[1] The Petition was authorized in writing by Petitioner's father, who acts as his next friend.
[2] Petitioner also alleges other violations of U.S. and international law.

and MCA do not effect a suspension of habeas corpus inconsistent with the Constitution because (1) Petitioner has no constitutional rights, including under the Suspension Clause, *see id.* at 7-11, and (2) the DTA and MCA provide a constitutionally adequate substitute for habeas, *i.e.*, record review of Petitioner's Combatant Status Review Tribunal ("CSRT") determination in the Court of Appeals, *see id*. at 11-15. Respondents are wrong on all accounts.[3]

Respondents attempt to create an artificial distinction between the right to habeas corpus and the protections afforded against unilateral suspension of that right by the political branches of government.  But the Supreme Court has held that detainees are entitled to the protections of the writ as it existed at common law, at the time the Constitution was adopted, and that the common law right of habeas is protected by the Suspension Clause.  Thus, regardless of whether detainees have constitutional rights, they have the right to habeas and may seek to protect that right by asserting a challenge to the DTA and MCA under the Suspension Clause. This Court also plainly has the power under Article III of the Constitution to invalidate the DTA and MCA on the ground that those statutes violate the Suspension Clause.

The DTA and MCA are also constitutionally deficient because they fail to provide an adequate substitute for habeas in several respects.  First, they provide no review at all for certain detainees. Second, they provide no opportunity for the Court of Appeals to engage in a factual inquiry into the bases for detainees' detentions or to engage in any fact-finding at all. Third, the laws prevent detainees from introducing, and the Court of Appeals from considering, extrinsic evidence to controvert Respondents' evidence, including evidence of "actual innocence" or evidence that statements used against them were obtained

---

[3] Petitioner was granted an extension of time until January 19, 2006 to file this response to the motion to dismiss.

through torture.  Fourth, neither detainees nor their counsel are entitled under the DTA and MCA to all relevant classified information that may provide the factual bases for detainees' detentions.  Fifth, while the DTA and MCA authorize the Court of Appeals to consider whether the CSRT standards and procedures are "consistent with the Constitution and laws of the United States," Respondents argue that there is not a single constitutional protection, including fundamental due process, which detainees may invoke.  Sixth, Respondents have made clear their view that the DTA and MCA give the Court of Appeals no authority to order detainees released even if it determines that their CSRTs were unfair or unlawful.  The only remedy, according to Respondents, is for the Court of Appeals to order new CSRTs.[4]

The MCA is also unconstitutional in several other respects.  First, it violates core separation of powers principles by prescribing rules of decision that necessarily resolve all cases and controversies in Respondents' favor.  Second, to the extent the MCA may be interpreted to bar habeas review of otherwise valid non-constitutional claims, including Geneva Conventions-based claims that would otherwise support habeas relief, it violates the Suspension Clause. Third, the MCA constitutes an unlawful Bill of Attainder by imposing legislative punishment (limiting access to courts) on a specifically designated group (Guantánamo detainees and other non-citizens designated by Respondents as "unlawful enemy combatants").  Finally, the MCA violates equal protection by denying a class of individuals the fundamental right of equal access to the courts on the basis of an inherently suspect distinction (alienage).

---

[4] Respondents correctly point out that the Court of Appeals is considering similar issues in certain of the pending Guantánamo detainee appeals, *Boumediene v. Bush*, Nos. 05-5062 & 05-5063 (D.C. Cir.), and *Al Odah v. United States*, Nos. 05-5064, et al. (D.C. Cir.).  See Gvt. Br. at 4 n.4. However, unlike those cases which raise statutory construction arguments against the retroactive application of the DTA and MCA, the serious constitutional flaws addressed here cannot be avoided because this case was filed after enactment of the DTA and thus falls squarely within its purported withdrawal of jurisdiction. See DTA §§ 1005(e)(1), (h)(1); *see also infra* Part VI.C.

The Court should therefore deny Respondents' motion to dismiss. The Court should also enter the protective order, order counsel access to Petitioner and production of a factual return.

### Background

On December 30, 2005, President Bush signed the DTA into law. See Pub. L. No. 109-148, 119 Stat. 2680 (2005). Section 1005(e)(1) of the DTA amended the federal habeas statute, 28 U.S.C. § 2241, to eliminate the jurisdiction of the federal courts to hear or consider habeas petitions and other actions brought by or on behalf of detainees held by the Defense Department at Guantánamo. That provision took effect on the date of enactment. See DTA § 1005(h)(1).[5] Section 1005(e)(2)(A) of the DTA also granted the U.S. Court of Appeals for the District of Columbia Circuit "exclusive jurisdiction" to determine the validity of any final decision of a CSRT that an alien is properly detained as an "enemy combatant."[6] In addition, § 1005(e)(2)(C) provided that the applicable "scope of review" by the Court of Appeals is limited to determining whether a final CSRT decision "was consistent with the standards and procedures specified by the Secretary of Defense," and "to the extent the Constitution and laws of the United States are applicable, whether the use of such standards and procedures to make the determination is consistent with the Constitution and laws of the United States."[7]

---

[5] Again, because this case was filed after enactment of the DTA, it falls squarely within this purported withdrawal of jurisdiction. See *infra* Part IV.C.

[6] Respondents' argument that this provision for the exclusive review of CSRT decisions in the Court of Appeals operates independently to deprive this Court of jurisdiction over the Petition, see Gvt. Br. at 6, has already been squarely rejected by the Supreme Court and need not be considered further. See *INS v. St. Cyr*, 533 U.S. 289, 297-98, 308-11 (2001).

[7] Section 1005(e)(3)(A) of the DTA also granted the Court of Appeals "exclusive jurisdiction" to determine the validity of any final decision rendered by a military commission. Section 1005(e)(3)(D) specified a "scope of review" analogous to that provided for final CSRT determinations. However, like most detainees Petitioner has not been charged and likely never will be charged by military commission. See Craig Whitlock, *U.S. Faces Obstacles to Freeing Detainees from Guantanamo*, Wash. Post, Oct. 17, 2006, at A1 (reporting only 60 to 80 detainees are expected to be tried by military commission).

On June 29, 2006, the Supreme Court issued its decision in *Hamdan v. Rumsfeld*, 126 S. Ct. 2749 (2006), reaffirming its holding in *Rasul v. Bush*, 542 U.S. 466 (2004), that Guantánamo detainees are entitled to challenge their detention through habeas.  The Court also struck down the military commission procedures established to try detainees for violations of the laws of war, concluding that those procedures violated the Uniform Code of Military Justice and the Geneva Conventions. In addition, the Court determined that Common Article 3 of the Geneva Conventions applied in the conflict in Afghanistan and, among other things, entitled Guantánamo detainees to trial by "a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." *Id*. at 2796 (internal quotation marks omitted).

The MCA was enacted on October 17, 2006, ostensibly in response to *Hamdan*. *See* Pub. L. No. 109-366, 120 Stat. 2600 (2006). Among other things, the MCA established new military commission procedures and also amended 28 U.S.C. § 2241 to expand the withdrawal of habeas jurisdiction under the DTA. Thus, Section 7(a) of the MCA specifically provides, in relevant part, that:

> No court, justice, or judge shall have jurisdiction to hear or consider an application for a writ of habeas corpus filed by or on behalf of an alien detained by the United States who has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination.

Section 7(b) also provides that this amendment:

> [S]hall take effect on the date of the enactment of this Act, and shall apply to all cases, without exception, pending on or after the date of the enactment of this Act which relate to any aspect of the detention, transfer, treatment, trial, or conditions of detention of an alien detained by the United States since September 11, 2001.

Section 7 of the MCA thus not only attempts to withdraw habeas jurisdiction in pending cases, but also expands the territorial reach of that withdrawal to non-citizen detainees held anywhere in the world instead of simply to detainees at Guantánamo.  It also expands the withdrawal of jurisdiction to detainees held by the "United States" – which presumably includes detainees imprisoned by the Central Intelligence Agency in secret ghost prisons overseas – not just detainees in the custody of the Defense Department. And it extends the withdrawal of jurisdiction to include not only detainees designed as "enemy combatants" by CSRTs, but also those who are "awaiting such determination" by a CSRT or some other undisclosed "competent tribunal established under the authority of the President or the Secretary of Defense," MCA § 948a (defining "unlawful enemy combatant"), at some indeterminate point in the future.

Accordingly, for the reasons set forth below, because Congress has not invoked its stated powers under the Suspension Clause, and because it has otherwise breached the limitations on its constitutional powers by attempting to eliminate habeas entirely for a single class of individuals, the withdrawal of habeas jurisdiction under the DTA and MCA is invalid and this Court retains jurisdiction to consider the Petition.

<u>Argument</u>

"At its historical core, the writ of habeas corpus has served as a means of reviewing the legality of executive detention, and it is in that context that its protections have been strongest."  *INS v. St. Cyr*, 533 U.S. 289, 301 (2001). Petitioner's central argument – that he was seized and continues to be detained as an enemy combatant without "notice of the factual basis for his classification [or] a fair opportunity to rebut the Government's factual assertions before a neutral decision maker," *Hamdi v. Rumsfeld*, 542 U.S. 507, 533 (2004) – falls

squarely within this historical core of habeas review.  Indeed, the Supreme Court has held that alleged enemy combatants detained at Guantanamo have the right to challenge their detention through habeas corpus: "Consistent with the historic purpose of the writ, this Court has recognized the federal courts' power to review applications for habeas relief in a wide variety of cases involving Executive detention, in wartime as well as in times of peace."  *Rasul v. Bush*, 542 U.S. 466, 474 (2004).

The Court's jurisdiction to issue the writ in a case like this is a function not only of the federal habeas statute, but also of the common law, *see id*. at 481-82, as recognized and protected by the Suspension Clause of the Constitution.  See *St. Cyr*, 533 U.S. at 304 n.24 (Suspension Clause "was intended to preclude any possibility that 'the privilege itself would be lost' by either the inaction or the action of Congress").  The constitutional right to habeas relief therefore exists even in the absence of statutory authorization, and may be suspended only by explicit congressional action under strictly limited circumstances.  See *Johnson v. Eisentrager*, 339 U.S. 763, 767-68 (1950) (assuming that, in absence of a statutory right of habeas, petitioners could seek the writ directly under the Constitution to the extent their claims fell within the scope of habeas protected by the Suspension Clause).[8] The Suspension Clause thus protects the essential role of the courts in the preservation of liberty, and imposes clear limits on the powers of Congress to interfere with that role.  See *Hamdi*, 542 U.S. at 536 ("[U]nless Congress acts to suspend it, the Great Writ of habeas corpus allows the Judicial Branch to play a necessary role in maintaining [the] delicate balance of

---

[8] The Supreme Court has further signaled that detainees in Guantánamo are entitled to fundamental rights protected by the federal courts.  *See Rasul*, 542 U.S. at 484 n.15 ("Petitioners' allegations . . . unquestionably describe 'custody in violation of the Constitution or laws or treaties of the United States.'") (citing *United States v. Verdugo-Urquidez*, 494 U.S. 259, 277-78 (1990) (Kennedy, J., concurring); *see also In re Guantanamo Detainee Cases*, 355 F. Supp. 2d 443, 464 (D.D.C. 2005) (Green, J.), *appeal pending. But see Khalid v. Bush*, 355 F. Supp. 2d311, 320-21 (D.D.C. 2005) (Leon, J.), *appeal pending*.

governance, serving as an important judicial check on the Executive's discretion in the realm of detentions.").

In the Guantanamo detainee cases, Congress has plainly exceeded its constitutional power and improperly infringed on the Article III powers of the Judiciary. Far from invoking its constitutional powers to suspend habeas, Congress instead has attempted for the first time in our history to eliminate habeas altogether for a single class of individuals – non-citizens detained by the United States – by passage of the DTA and MCA. Indeed, Congress has attempted to do so indefinitely on a countrywide (and worldwide) basis. Congress has violated the Constitution, and these laws should therefore be struck down by the Court.

## I. THE DTA AND MCA VIOLATE THE SUSPENSION CLAUSE

In their motion to dismiss, Respondents argue that the DTA (and now the MCA) do not effect an unconstitutional suspension of the writ of habeas corpus because Petitioner has no constitutional rights under the Suspension Clause. In particular, they argue that "aliens" detained outside the sovereign territory of the United States have no constitutional rights, including under the Suspension Clause. See Gvt. Br. at 7-11. Respondents also contend that the DTA and MCA provide a constitutionally adequate substitute for habeas. These claims are meritless and should be rejected.

### A. Petitioner's Right to Habeas Is Protected by the Suspension Clause

As indicated above, the Supreme Court held in *Rasul* that the Guantánamo detainees have the right to habeas corpus. *See* 542 U.S. at 484. In addition to finding that they have that right under the federal habeas statute, *Rasul* confirmed that they are entitled to the writ under the common law and would have been entitled to the writ as it existed in 1789 when the Constitution was

adopted.  *See id*. at 479-82.[9]  Because "at the absolute minimum, the Suspension Clause protects the writ 'as it existed in 1789,'" *St. Cyr*, 533 U.S. at 301, Petitioner's right to the writ as it existed in 1789 includes the protection of the Suspension Clause. Accordingly, regardless of whether detainees have constitutional rights, they have the right to habeas and may seek to protect that right by asserting a challenge to the DTA and MCA under the Suspension Clause.

This Court also has the power under Article III of the Constitution to invalidate a statute that violates the Suspension Clause.  *Rasul* held that habeas corpus "does not act upon the prisoner who seeks relief, but upon the person who holds him in what is alleged to be unlawful custody." 542 U.S. at 478 (internal quotation marks omitted).  The Suspension Clause is likewise a plain, direct, and explicit limitation imposed on the power of Congress by Article I of the Constitution. Unlike the Due Process Clause of the Fifth Amendment, it does not confer individual rights.[10]  Rather, it acts as a restraint on the power of Congress.  It provides that Congress may not suspend habeas corpus except in certain limited circumstances of "invasion" or "rebellion" as the public safety may require, which plainly do not exist here.[11] Thus, because those circumstances do not exist, Congress cannot suspend habeas corpus and this Court cannot

---

[9] Respondents' contention that the holding in *Rasul* is limited to the reach of the federal habeas statute is simply wrong. *See* Gvt. Br. at 10 n.6.

[10] Nonetheless, we believe that Judge Green correctly held that the Guantánamo detainees have stated valid Fifth Amendment claims.  *See* 355 F. Supp. 2d at 464.

[11] The Suspension Clause provides: "The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." U.S. Const., art. I, § 9, cl. 2. Respondents do not argue that Congress has authorized a suspension of the writ, as it has done only four times in American history, *see* William F. Duker, A Constitutional History of Habeas Corpus 149, 178 n.190 (1980), or that a state of rebellion or invasion endangering the public safety otherwise exists to justify suspension of the writ.  *See also* Letter from Hon. Kenneth W. Starr to Hon. Arlen Specter (Sept. 24, 2006) [hereinafter "Starr Letter"] ("The United States is neither in a state of rebellion nor invasion. Consequently, it would [be] problematic for Congress to modify the constitutionally protected writ of *habeas corpus* under current events.") (attached hereto as Ex. A).

allow such a suspension to stand.  See *United States v. Klein*, 80 U.S. 128, 147 (1872) (invalidating a statute that unconstitutionally stripped the Supreme Court of jurisdiction in violation of the separation of powers); *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803) ("[A]n act of the legislature, repugnant to the constitution, is void.").

Respondents also mistakenly rely on *Johnson v. Eisentrager*, 399 U.S. 763 (1950), a case involving admitted "enemy aliens" tried by an American military commission in China in the immediate aftermath of Japan's surrender in World War II.  *See id*. at 765-66, 784. There, the Court held that the petitioners were not entitled to habeas corpus because they "at no relevant time and in no stage of [their] captivity, ha[d] been within [U.S.] territorial jurisdiction." *Id*. at 768, 781. Notably, however, the Court considered their application for a writ of habeas corpus on the merits but concluded that there was no basis for issuing the writ. *See id*. at 780-81 ("the doors of our courts have not been summarily closed upon these prisoners").  Indeed, the *Eisentrager* petitioners were afforded "the same preliminary hearing as to sufficiency of [their habeas] application that was extended in *Quirin* [and] *Yamashita*. . . ." *Id*. at 781; see infra Part I.B.4 (discussing *Quirin* and *Yamashita*).

Moreover, to the extent that the Court's decision was based on a lack of jurisdiction, that conclusion arose from factors not present in this case, as established in *Rasul* when it distinguished *Eisentrager*:

> Petitioners in these cases differ from the Eisentrager detainees in important respects: They are not nationals of countries at war with the United States, and they deny that they have engaged in or plotted acts of aggression against the United States; they have never been afforded access to any tribunal, much less charged with and convicted of wrongdoing; and for more than two years they have been imprisoned in territory over which the United States exercises exclusive jurisdiction and control.

*Rasul*, 542 U.S. at 476; *see also id*. at 487-88 (Kennedy, J., concurring). Accordingly, *Eisentrager* does not stand for the proposition that alleged enemy combatants held outside the United States have no habeas rights.[12] *See also* Starr Letter ("[T]he Eisentrager case may no longer be relied upon with confidence to rule out constitutional habeas protections for Guantanamo detainees.") (attached hereto as Ex. A).

### B.    The DTA and MCA Do Not Provide a Constitutionally Adequate Substitute for Habeas

Respondents contend that even if Petitioner could properly invoke the Suspension Clause, the review of his "enemy combatant" determination available in the Court of Appeals is "more than constitutionally sufficient" to withstand a suspension challenge to the validity of the DTA and MCA. In support of this argument, they note that the DTA permits the Court of Appeals to consider (1) whether the CSRT determination that Petitioner is properly held as an "enemy combatant" was consistent with the "standards and procedures" governing the CSRT process, including whether that determination was supported by a "preponderance of the evidence," and (2) whether the CSRT standards and procedures were "consistent with the Constitution and laws of the United States."  Gvt. Br. at 13 (quoting DTA § 1005(e)(2)(C)).  But such limited

---

[12] The other cases cited by Respondents also do not support their position.  *See* Gvt. Br. at 8-9. For example, 32 *County Sovereignty Comm. v. Dep't of State*, 292 F.3d 797 (D.C. Cir. 2002), and *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990), did not involve habeas or the Suspension Clause. However, in each case the court considered the merits of the petition. Notably, in 32 *County Sovereignty* that review included examination of classified information concerning an alleged terrorist organization.  See 292 F.3d at 799. In addition, although it rejected the extraterritorial application of U.S. law, *Verdugo-Urquidez* involved only non-fundamental rights (suppression of evidence obtained in violation of the Fourth Amendment). To the extent the Court addressed fundamental rights under the Fifth Amendment, it merely cited *Eisentrager, see* 494 U.S. at 269, which, as discussed above, is readily distinguishable from this case. *Verdugo-Urquidez* also largely relied on the "impractical and anomalous" application of the Fourth Amendment's warrant requirement in Mexico, *see id*. at 278 (Kennedy, J., concurring); but Respondents make no claim that the application of Fifth Amendment rights to Guantánamo – thousands of miles from any battlefield – would be similarly burdensome.

review is hardly adequate or effective to test the legality of Petitioner's detention as would be required in a habeas hearing.  See *Swain v. Pressley*, 430 U.S. 372, 381 (1977) (any statutory substitute for habeas must provide an "adequate and effective" means to test the legality of the detention, in a process "commensurate" with habeas, to avoid a violation of the Suspension Clause).[13]

## 1. The DTA and MCA Provide No Review for Certain Detainees

As an initial matter, to illustrate just how far Congress has gone in its unlawful attempt to eliminate judicial review for Guantánamo detainees, it must be noted that the DTA and MCA provide *no review at all* for certain detainees. The limited review available under the DTA and MCA only extends to the "final decision" of a CSRT that a detainee is "properly detained as an enemy combatant."  DTA § 1005(e)(2)(A).  Thus, a detainee's challenge to his detention as an "enemy combatant" is necessarily limited to a challenge to the adequacy of the CSRT. But, as indicated above, Section 7 of the MCA purports to withdraw habeas jurisdiction for detainees held as "enemy combatants" *and* those "awaiting such determination."  The DTA and MCA also impose no limits whatsoever on the time within which Respondents must make such determinations. Nor do those statutes even require that future determinations be made by a CSRT, as opposed to some other undisclosed tribunal established by the President or the Secretary of Defense.  See MCA § 948a. Accordingly, the DTA and MCA do not provide for any judicial inquiry or relief for those detainees awaiting an enemy combatant determination. For this reason alone, the DTA and MCA violate the Suspension Clause.

---

[13] The *Swain* Court upheld a statute providing a collateral remedy for prisoners in custody in the Superior Court of the District of Columbia against a Suspension Clause challenge for reasons that are not applicable here.  In particular, the Court cited the statute's "savings clause" allowing a federal district court to hear an application for habeas if the statute's remedy was "inadequate or ineffective" to test the legality of the prisoner's detention.  The DTA and MCA have no such "savings clause" allowing resort to habeas if limited review of the CSRTs under the DTA is determined to be inadequate or ineffective to test the legality of a detainee's detention.

2.     **The DTA and MCA Are Also Constitutionally Deficient**
**for the Reasons Set Forth in Respondents' Filings in the**
***Bismullah* Case**

In a recent filing in *Bismullah v. Rumsfeld*, No. 06-1197 (D.C. Cir.) – in
which a Guantánamo detainee seeks review in the Court of Appeals under the
DTA – Respondents have set forth their views concerning the scope of review
available under the DTA (and now the MCA), making it clear that such review is
not commensurate with the searching inquiry required by common law habeas.
*See* Response in Opp'n to Motion to Compel (Aug. 21, 2006) ("*Bismullah* Opp'n")
(attached hereto as Ex. B).

First, according to Respondents' position in *Bismullah*, the DTA provides
no opportunity for the Court of Appeals to engage in a factual inquiry into the
bases for detainees' detentions or to engage in any fact-finding at all. *Id*. at 15.
Rather, they argue, the Court of Appeals is limited to reviewing the CSRT
"record," *id*. at 14, which as a practical matter consists only of the evidence that
Respondents themselves chose to put before the CSRT panel. In Respondents'
view, the Court of Appeals also may only examine the CSRT record to determine
"whether the CSRT followed appropriate procedure." *Id*. at 12-13. And although
the DTA instructs the Court of Appeals to determine whether a detainee's enemy
combatant designation is consistent with "the requirement that the conclusion of
the Tribunal be supported by a preponderance of the evidence," Respondents
claim that this provision "limits review to the question of whether the CSRT
followed appropriate procedure and rendered a decision supported by sufficient
evidence." *Id*. at 12. Moreover, by "sufficient evidence" Respondents mean
"simply such relevant evidence as a reasonable person might accept as proof of a
conclusion." *Id*. at 13 (citation omitted).

Second, Respondents contend that the DTA prevents detainees like Petitioner from introducing, and the Court of Appeals from considering, extrinsic evidence to controvert Respondents' evidence, including evidence of "actual innocence" or evidence that statements used against detainees were obtained through torture. *Id*. at 16-17.[14] According to Respondents, the DTA simply "does not authorize the submission of new evidence." *Id*. at 16.

Third, Respondents contend that, although the factual bases for a detainee's detention may be classified, neither the detainees nor their counsel are entitled under the DTA to have access to all such relevant but classified information. Indeed, Respondents argue that detainees and their counsel are not entitled to any evidence relevant to the detainees' detentions that is outside the "record" compiled by them for the CSRTs. *Id*. at 10-12, 17-20. Moreover, in this case Respondents have refused to provide even the record evidence concerning Petitioner's CSRT proceedings, thus requiring counsel to file a motion for production of a factual return. *See infra* Part VI.B.

Fourth, while the DTA authorizes the Court of Appeals to consider whether the CSRT standards and procedures are "consistent with the Constitution and laws of the United States" – and Respondents point to that provision in their instant motion as a basis for why the DTA is not unconstitutional, see Gvt. Br. at 13 – Respondents argue in *Bismullah* that there is not a single constitutional protection, including fundamental due process, which detainees may invoke. *See Bismullah* Opp'n at 6 n.5 & 7. Thus, under Respondents' interpretation, DTA § 1005(e)(2)(C)(ii) is utterly meaningless.

---

[14] The CSRTs' acceptance of evidence obtained by torture – and the presumption that such evidence is genuine and accurate – constitutes a particularly troubling departure from habeas corpus, for all of the reasons set forth in the *amicus* brief filed by seven former federal judges in the *Al Odah/Boumediene* consolidated appeals (attached hereto as Ex. C), which we incorporate herein by reference.

Fifth, during oral argument in the *Al Odah/Boumediene* consolidated appeals, Respondents have made clear their view that the DTA gives the Court of Appeals no authority to order a detainee's release even if it determines that his CSRT was unfair or unlawful. The only remedy, according to Respondents, is for the Court of Appeals to order a new CSRT.

According to a recent analysis of unclassified CSRT proceedings, there have already been at least three cases where detainees who were found by CSRTs not to be "enemy combatants" were sent back for new hearings rather than being released. Respondents simply sent went back for a second or third "bite at the apple," ordering new CSRTs for each of those detainees until they eventually obtained "enemy combatant" determinations. *See* Mark Denbeaux & Joshua Denbeaux, *No-Hearing Hearings: An Analysis of the Proceedings of the Government's Combatant Status Review Tribunals at Guantánamo* at 3, 37-39 (Nov. 17, 2006) ("Denbeaux Report") (attached hereto as Ex. D).[15] Nor is there any indication that the detainees in those cases were ever informed of the initial favorable decisions, or informed of or allowed to participate in the later CSRT proceedings. *See id*. Perhaps nothing could offend fundamental due process more starkly than sending an innocent man back for additional pro forma hearings until Respondents are able to obtain a preferred outcome that results in potentially life-long detention without charge for the detainee.

In any event, the Court of Appeals' purported inability to order detainees released certainly belies any claim that CSRT review under the DTA is an

---

[15] It also appears from recently obtained unclassified factual returns in the case *Thabid v. Bush*, No. 05-CV-2398 (ESH), that all twenty-two of the Uighur detainees from China who have ever been detained at Guantánamo may at one time have been determined not to be "enemy combatants," and that all but five of those men (who have since been released to Albania) were sent back for subsequent CSRTs until it was determined that they were "enemy combatants." *See also, e.g., Lawyers Argue for Chinese at Guantanamo*, Assoc. Press (Dec. 5, 2006) (Navy spokesman confirming Uighurs had "multiple" enemy combatant reviews). Respondents have repeatedly refused to provide additional information concerning the status of the Uighurs. Nonetheless, if we are correct this would mean that many more detainees were sent back for additional CSRTs instead of being released than are reflected in the Denbeaux Report

adequate substitute for habeas corpus. *See, e.g., Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973) ("[T]he essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and [ ] the traditional function of the writ is to secure release from illegal custody."); *see also Hamdi v. Rumsfeld*, 542 U.S. 507, 576 (2004) (Scalia, J., dissenting) ("The role of habeas corpus is to determine the legality of the executive detention, not to supply the omitted process necessary to make it legal. . . . It is not the habeas court's function to make illegal detention legal by supplying a process that the Government could have provided, but chose not to.").

Nor are these constitutional deficiencies merely theoretical or academic in this particular case, as the limited information available concerning Petitioner's CSRT and Administrative Review Board ("ARB") proceedings illustrates so clearly. *See infra* Part I.B.5.

**3.    In Cases of Executive Detention, Common Law Habeas Demands a Far More Searching and Extensive Review Than the Limited DTA Review Espoused by Respondents**

Petitioner has been imprisoned in Guantánamo for several years without charge or trial. He is detained not under sentence of any court or tribunal, but by the sheer might of the Executive. In these circumstances of "pure executive detention," common law habeas would require a searching judicial inquiry into the factual and legal basis for the detention, including the opportunity to traverse Respondents' factual return – which, again, has not even been provided to Petitioner in this case – to present exculpatory evidence and to obtain a judicial determination of any disputed factual issues.

The common law distinguished between habeas petitions challenging a prior conviction pursuant to judicial process and those challenging pure executive detentions.  While courts prohibited petitioners from introducing

extrinsic evidence and limited their review of the underlying facts in cases where the petitioners were challenging a criminal conviction by a duly constituted court of "competent jurisdiction,"[16] that was never the case with respect to executivevdetentions. As indicated above, the Supreme Court has emphasized: "At its historical core, the writ of habeas corpus has served as a means of reviewing the legality of executive detention, and it is in that context that its protections have been strongest." *St. Cyr*, 533 U.S. at 301.

In cases of non-judicial detention, the common law required a searching judicial examination into the bases for detention. This examination included not only an examination of the Executive's return, but also allowed a petitioner to dispute the return and present evidence. And the court would review all of the evidence and order the petitioner's release if it concluded that the evidence as a whole was insufficient to justify the detention. *See, e.g., Goldswain's Case*, 96 Eng. Rep. 711, 712 (C.P. 1778) (petitioner "may plead to [court] any special matter necessary to regain his liberty" and court "could not willfully shut [its] eyes against such facts as appeared on the affidavits, but which were not noticed on the return"). Early American courts also required the same searching judicial examination into the bases for detention. *See, e.g., Ex parte Milligan*, 71 U.S. (4 Wall.) 2 (1866) (court examined "facts stated in Milligan's petition, and the exhibits [he] filed" to decide ultimate questions of lawful authority); *State v. Joseph Clark*, 2 Del. Cas. 578 (Del. Chancery 1920) (releasing habeas petitioner after reviewing his affidavit traversing the return and hearing testimony from his father). Likewise, non-citizens detained by the Executive in wartime were able to submit evidence in habeas proceedings to challenge whether they were properly detained by the Executive as "enemy aliens." *See, e.g., Lockington's Case*, Bright

---

[16] *See generally* R.J. Sharpe, The Law of Habeas Corpus 51 (1989).

(N.P.) 269, 298-99 (Pa. 1813); *Case of the Three Spanish Sailors*, 96 Eng. Rep. 775, 776 (C.P. 1779); *Rex v. Schiever*, 97 Eng. Rep. 551 (K.B. 1759).[17]

Nor does habeas otherwise entail a limited, highly deferential review that Respondents have suggested is the extent of judicial inquiry available under the DTA. Even if the Executive has undertaken some prior process of its own to justify the detention, a habeas court would not be bound by that process or restricted simply to reviewing whether the Executive had abided by its own rules in conducting that process. *See, e.g., Bushell's Case*, 124 Eng. Rep. 1006, 1007 (C.P. 1670) ("[O]ur judgment ought to be grounded upon our own inferences and understandings, and not upon [those of an inferior tribunal].")*; Ex parte Bollman*, 8 U.S. (4 Cranch) 75, 125 (1807) (Supreme Court examined written depositions to determine if there was sufficient evidence of petitioner levying war against United States to justify detention for treason); *see also Moore v. Dempsey*, 261 U.S. 86, 92 (1923) (habeas corpus does not "allow a Judge of the United States to escape the duty of examining the facts for himself").

4.     **Petitioner Has Not Been Afforded More "Procedural Process and Protections" Than Military Commission Defendants**

Respondents also suggest that the DTA and MCA do not violate the Suspension Clause because the CSRT process is modeled on Army Regulation § 190-8 (1997), which implements the Geneva Conventions' requirement for determining whether detainees are entitled to prisoner-of-war status. Indeed,

---

[17] Respondents misconstrue *INS v. St. Cyr*, 533 U.S. 289, 306 (2001), in support of the proposition that "[t]raditional habeas review in alien-specific contexts involved, in general, review of questions of law, but 'other than the question of whether there was some evidence to support the order, the courts generally did not review the factual determinations made by the Executive.'" Gvt. Br. at 13. To the contrary, in the cases cited in *St. Cyr* on which Respondents apparently rely the factual review of habeas was limited because the petitioners had already had the opportunity to participate in full immigration removal proceedings and appeals to the Board of Immigration Appeals. Indeed, the Court emphasized that at common law "an attack on an executive order could raise *all issues* relating to the legality of the detention." *Id*. at 301 n.14 (emphasis added; citation omitted).

Respondents contend that the CSRTs provide detainees like Petitioner with "significant additional procedural process and protections" beyond what is required by Army Regulation § 190-8. Gvt. Br. at 14 & n.9. Respondents also argue that these minimal procedures comport with the due process requirements of *Hamdi*. *See id*. Again, Respondents are wrong on all accounts.

As an initial matter, the CSRT process falls well short of the requirements of Army Regulation § 190-8. As Judge Green explained, Article 5 of the Third Geneva Convention entitles all individuals to be treated as prisoners of war "until such time as their status has been determined by a competent tribunal," even if there is doubt as to whether they are entitled to that status under Article 4 of the Convention. See *In re Guantanamo Detainee Cases*, 355 F. Supp. 2d 443, 479-80 (D.D.C. 2005), *appeal pending*. "Army Regulation 190-8 created the rules for the 'competent tribunal' referenced in Article 5 of the Third Geneva Convention." *Id*.

"Article 5 hearings, like the CSRT, involve a panel of three officers who hear information from the military and the prisoner. These hearings, the [*Hamdi*] Court said, had proven successful in resolving doubts about the status of prisoners captured during conflicts governed by the Geneva Conventions." Joseph Margulies, Guantánamo and the Abuse of Presidential Power 160 (2006). "The streamlined proceedings of an Article 5 hearing were developed in response to the unique circumstances presented in the field. . . . Admittedly, these hearings are extremely summary, which creates a significant risk of error. But the consequences of a mistake are mitigated by the fact that prisoners will be confined under conditions that comply with the Geneva Conventions." *Id*. That is far from true with the CSRTs, which are unrestrained by the applications of the Geneva Conventions. *See id*. at 170.

Indeed, while a CSRT "bears a glancing resemblance to an Article 5 hearing, [it] actually provides fewer procedural protections." *Id*. at 161. For

example, in the Guantánamo detainee cases the "inflexible and expansive definition of enemy combatant made it inevitable the CSRT would rule against a number of prisoners who should have been released. Yet this problem was exacerbated by the procedural rules governing the CSRTs. To begin with, the tribunals based their decision on secret evidence kept from the prisoner. This sometimes produced absurd spectacles, fit for Lewis Carroll . . ." *Id*. at 163.

> At the same time, the [CSRT] tribunal must presume that the evidence presented by the military, including secret evidence, is genuine and accurate. This distinguishes the CSRT from an Article 5 hearing, where the prisoner is presumed to be a POW until proven otherwise, and there is no presumption in favor of the military's evidence. In addition, the CSRT panel may rely on "any information it deems relevant and helpful," including any degree of hearsay. . . . and for the first time in U.S. military history, the tribunal may rely on evidence secured by torture, coercive interrogations, or cruel and degrading treatment. . . . Article 5 hearings, by contrast, rely on evidence secured in compliance with the Geneva Conventions, which prohibit torture and unlawful coercion and thereby minimize the risk of error caused by unreliable confessions.

*Id*. at 164.

The CSRTs are also decidedly not administered by impartial decisionmakers. *See id*. at 166. "Like an Article 5 hearing, each [CSRT] tribunal consists of three commissioned officers. But in an Article 5 hearing, the prisoner is presumed a POW. In these tribunals, by contrast, [Respondents] have all repeatedly announced that each detainee is an enemy combatant" without determining on an individualized basis whether a particular detainee complied with the laws of war or otherwise falls within an exception denying him POW status. *Id.; see also* 355 F. Supp. 2d at 480; *infra* note 24. In this respect, a CSRT is exactly the opposite of an Article 5 hearing.

Accordingly, while there are other examples of how CSRTs fall short of the standards for Article 5 hearings, "the conclusion is simply inescapable that

these tribunals were created for no other purpose than to validate a predetermined result." Margulies at 169. The CSRTs bear "superficial similarity to Article 5 hearings" but only serve to "create[ ] the impression that the Administration has fixed the problem identified in *Rasul*." *Id*.

Respondents are also incorrect that under *Hamdi* "proceedings by which the military determined enemy combatant status legitimately could be severely limited in scope, in ways that are not characteristic of traditional judicial proceedings." Gvt. Br. at 14. To the contrary, *Hamdi* held that an individual detained by Respondents as an "enemy combatant" must receive notice of the factual basis for that determination and a fair opportunity to rebut Respondents' factual assertions before a neutral decision maker. *See* 542 U.S. at 533. In reaching that conclusion, the Court "necessarily reject[ed]" Respondents' suggestions that "separation of powers principles mandate a heavily circumscribed role of the courts in such circumstances." *Id*. at 535. The Court cautioned that "a state of war is not a blank check for the President." *Id*. at 536.

The *Hamdi* plurality also suggested *in dicta* that "exigencies of the circumstances may demand that, aside from these core elements [of due process], enemy combatant proceedings may be tailored to alleviate their uncommon potential to burden the Executive at a time of ongoing military conflict." 542 U.S. at 533. "Hearsay, for example, may need to be accepted as the most reliable evidence available from the Government," and there may be a "presumption in favor of the Government's evidence, so long as that presumption remained a rebuttable one and fair opportunity for rebuttal were provided." *Id*. at 533-34. The Court further explained that "once the Government puts forth credible evidence that the habeas petitioner meets the enemy-combatant criteria, the onus could shift to the petitioner to rebut that evidence with more persuasive evidence that he falls outside that criteria." *Id*. at 534. But in the absence of a tribunal

22

following constitutionally mandated procedures, the district courts must provide those procedural rights to the detainee through habeas. *See id.* at 605.

Here, Respondents have not shown – and cannot show – that exigent circumstances require anything less than full habeas review.[18] And they have not demonstrated that admission of hearsay evidence is necessary, or that such evidence would be reliable. They have not put forth any evidence – let alone "credible" evidence – to show that Petitioner is properly held as an enemy combatant. Nor has Petitioner had a fair opportunity to contest that designation before a neutral decision maker. *See infra* Part I.B.5. Thus, under *Hamdi*, this Court must afford him full habeas review.

Respondents also overlook prior precedent establishing that detainees subject to military commissions have traditionally been afforded all of the rights that Petitioner has been denied here. For instance, unlike Petitioner, military commission defendants typically have the right to examine and rebut the factual evidence against them, to confront their accusers, to call witnesses and present evidence, and to be represented by counsel. *See Ex parte Quirin*, 317 U.S. 1 (1942); *In re Yamashita*, 327 U.S. 1 (1946); *Johnson v. Eisentrager*, 339 U.S. 763 (1950). The limited habeas review afforded in these cases is also consistent with

---

[18] While Respondents have often raised the specter of interference with military operations, the Supreme Court has rejected their argument that such circumstances justify the denial of due process in the detainee cases. The Court has done so in the context of tribunals to determine who is properly detained, and with respect to military commissions to try and punish violations of the laws of war. *See Hamdi*, 542 U.S. at 532, 534-35 ("It is during our most challenging and uncertain moments that our Nation's commitment to due process is most severely tested; and it is in those times that we must preserve our commitment at home to the principles for which we fight abroad. . . . We think that it is unlikely that this basic [due] process will have the dire impact on the central functions of warmaking that the Government forecasts. . . . [I]t does not infringe on the core role of the military for the courts to exercise their own time-honored and constitutionally mandated roles of reviewing and resolving claims like those presented here."); *Hamdan*, 126 S. Ct. at 2773 ("Exigency alone, of course, will not justify the establishment and use of penal tribunals not contemplated by . . . the Constitution unless some other part of that document authorizes a response to the felt need."). Here, too, any rote claims of exigency could not operate to deprive Petitioner of full habeas review because the Petition was not filed in a "zone of active military operations" and Petitioner is detained on an island thousands of miles away from any battlefield. *Cf. Johnson v. Eisentrager*, 339 U.S. 763, 780 (1950).

the limited habeas review that common law courts afforded petitioners who challenged convictions resulting from prior trial-like procedures deemed fair and adequate.  Moreover, in each of these cases the Supreme Court engaged in a searching and detailed analysis of whether the military commissions complied with the laws of war, including the Geneva Conventions.  *See* 317 U.S. at 24; 327 U.S. at 5-6, 9; 339 U.S. at 780-81, 785-91. Here, by contrast, Respondents contend that the Court of Appeals has no such power to inquire into such matters or independently assess the fairness and adequacy of the CSRT process.

Finally, it is important to remember that Petitioner has not been convicted of war crimes by military commission.  He has not even been charged with any offense. Nor can the post-hoc CSRT process to which he was unilaterally subjected by the military after *Rasul* in order to confirm his "enemy combatant" status be compared to duly authorized military commissions established to try war crimes.

## II.    THE MCA IS UNCONSTITUTIONAL BECAUSE IT INVADES THE CORE FUNCTION OF THE JUDICIARY  IN VIOLATION OF THE SEPARATION OF POWERS

The jurisdictional provisions of the MCA are also unconstitutional because they offend the separation of powers principles articulated in *United States v. Klein*, 80 U.S. 128 (1872), by unconstitutionally interfering with the core judicial functions of Article III courts.

In *Klein*, Congress passed a law providing that "no pardon [or amnesty granted by the President] shall be admissible in evidence in support of any claim against the United States in the Court of Claims," and "when judgment has been already rendered [in the Court of Claims in favor of a claimant based on a Presidential pardon], the Supreme Court, on appeal, shall have no further jurisdiction of the cause, and shall dismiss the same for want of jurisdiction."  *Id*.

at 143. The Court acknowledged that "[u]ndoubtedly the legislature has complete control over the organization and existence of that court and may confer or withhold the right of appeal from its decision." *Id.* at 145. But, the Court said, the language of the statute "shows plainly that it does not intend to withhold appellate jurisdiction except as a means to an end. . . . The proviso declares that pardons shall not be considered by this court on appeal.  We had already decided that it was our duty to consider them and give them effect, in cases like the present, as equivalent to proof of loyalty." *Id.*

The Court concluded that this manipulation of its jurisdiction was not a proper exercise of legislative authority because it invaded the judicial function. The Court asked:

> What is this but to prescribe a rule for the decision of a cause in a particular way? . . . . We are directed to dismiss the appeal, if we find that the judgment must be affirmed, because of a pardon granted . . . to claimants.  Can we do so without allowing one party to a controversy to decide it in its own favor? Can we do so without allowing that the legislature may prescribe rules of decision to the Judicial Department of the government in cases pending before it?  We think not.

*Id.* at 146.

Here, the MCA operates in a similar fashion. It prescribes "rules of decision to the Judicial Department" within the meaning of *Klein* by providing that "[n]o alien unlawful enemy combatant subject to trial by military commission under this chapter may invoke the Geneva Conventions as a source of rights." MCA § 948b(g).  This is directly analogous to the statute in *Klein*, which attempted to prevent courts from giving effect to a presidential pardon. As in *Klein*, the MCA's prohibition on giving effect to Geneva Convention rights is tantamount to "allowing one party to a controversy to decide it in its own favor." And the MCA does so here with respect to the decision of the Supreme

Court in Hamdan, which finally resolved the question of whether Common Article 3 of the Geneva Conventions applies in these cases.

In addition, by stripping the courts of jurisdiction over habeas claims filed by alleged members of the "Taliban, al Qaeda or associated forces" held at Guantánamo, MCA § 948a(1)(A)(i), the MCA "prescribe[s] a rule for the decision of a cause in a particular way" in precisely the same manner as the jurisdictional strip in *Klein*. It is an unconstitutional "means to an end" because the Taliban, Al Qaeda and associated forces are defined by the statute to be unlawful combatants, and the courts are directed that that determination is "dispositive." MCA §§ 948a(1)(A), 948d(c). Indeed, even if there were to be a subsequent judicial review of this determination under Section 7 of the MCA (and, again, there is no assurance of one given that Section 7 purports to strip habeas jurisdiction for anyone "awaiting" an enemy combatant status determination), Section 5 of the MCA would block any effort to seek redress because it provides that Geneva Convention rights – even those concerning combatant immunity as a prisoner of war ("POW"), for example – cannot be invoked. This is directly analogous to the situation in *Klein*, where "the court [was] forbidden to give the effect to evidence which, in its own judgment, such evidence should have." 80 U.S. at 147.

There are a number of other ways in which the MCA attempts to dictate a judicial decision. The MCA's definition of "unlawful enemy combatant," for example, is a jurisdictional prerequisite for a military commission and, concomitantly, a prejudgment of guilt for any detainee hauled before a commission (since unlawful combatants are not "privileged" to engage in combat and by doing so become criminals). Giving effect to this definition implicates the court in violating the Third Geneva Convention ("GCIII"). Under the MCA, an "unlawful enemy combatant" is defined as one who (1) "is not a

lawful enemy combatant," or (2) "has been determined to be an unlawful enemy combatant by a [CSRT]."  MCA § 948a(1)(A).  But the MCA's definition of "lawful enemy combatant" includes only three of six categories of persons identified under Article 4 of GCIII as persons entitled to POW status.  *Compare* MCA § 948a(2), *with* GCIII, Art. 4.[19]  And POWs are lawful combatants.  Thus, by refusing to recognize as lawful combatants all persons entitled to POW status under the GCIII, the MCA not only violates the GCIII (by failing to afford POWs the protections of the Convention, including the right to be tried by the "same courts, according to the same procedures" as would be used to try members of the Detaining Power's armed forces, see GCIII, Art. 102), it also completely decides the controversy in favor of the prosecution in any military commission trial because the only defendants before the commissions are those who have already been determined to be "unlawful combatants."  Without "combatant immunity" detainees are guilty by definition (just as in *Klein* people who had accepted a Presidential pardon were statutorily defined as guilty of disloyalty and were penalized rather than allowed the immunity conferred by the pardon).

The alternative definition of "unlawful enemy combatant" in the MCA is a person who "has been determined to be an unlawful enemy combatant by a Combatant Status Review Tribunal." MCA § 948a(1)(A)(ii).  This definition is

---

[19] As Judge Green explained:

> Article 4 of the Third Geneva Convention defines who is considered a "prisoner of war" under the treaty. Paragraph (1) provides that the term "prisoners of war" includes "members of the armed forces of a Party to the conflict, as well as members of militias or volunteer corps forming part of such armed forces."  As provided in Paragraph (2), the definition of "prisoners of war" also includes "members of other militias and members of other volunteer corps, including those of organized resistance movements," but only if they fulfill the following conditions: "(a) that of being commanded by a person responsible for his subordinates; (b) that of having a fixed distinctive sign recognizable at a distance; (c) that of carrying arms openly; (d) that of conducting their operations in accordance with the laws and customs of war."

*In re Guantanamo Detainee Cases*, 355 F. Supp. 2d 443, 479-80 (D.D.C. 2005), *appeal pending*. "Nothing in the Convention itself or in Army Regulation 190-8 authorizes the President of the United States to rule by fiat that an entire group of fighters covered by the Third Geneva Convention falls outside of the Article 4 definitions of 'prisoners of war.'" *Id*.

completely circular.  It is devoid of any standards or criteria by which a reviewing court could determine that the detainee is not an unlawful enemy combatant.  While the DTA may allow for judicial review of whether the standards used by the CSRT to make the status determination are "consistent with the Constitution and laws of the United States," this formulation pointedly excludes "treaties." When combined with Section 5 of MCA (prohibiting any person from invoking the Geneva Conventions as a source of law in any American court), the effect of the habeas strip in Section 7 of the MCA and the inadequate substitute provided by the statute is to "decide the controversy" against any detainee who might have a defense based on Geneva Convention rights.  This is a particularly egregious invasion of the judicial function.  *See Hamdan*, 126 S. Ct. at 2796; *see also Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 227 (1995) ("Congress may not declare by retroactive legislation that the law applicable *to that very case* was something other than what the courts said it was.").

In sum, both the substantive and jurisdictional provisions of the MCA operate as a "means to an end" in the manner of the unconstitutional statute at issue in *Klein*. Because this "passe[s] the limit which separates the legislative from the judicial power," the MCA's jurisdictional strip should be deemed constitutionally invalid.  *Klein*, 80 U.S. at 147.

III.    **THE MCA DOES NOT PRECLUDE HABEAS RELIEF  FOR CLAIMS UNDER THE GENEVA CONVENTIONS OR  FOR VIOLATIONS OF CUSTOMARY INTERNATIONAL LAW**

Because Section 5 of the MCA attempts to block detainees' efforts to invoke their Geneva Convention rights in any federal or state court, it risks placing this country in default of its obligations under these treaties and customary international law, and makes the judicial inquiry authorized by the

MCA an inferior process to that which has historically been available through habeas. For this reason, the MCA must be read not to preclude habeas relief for claims under the Geneva Conventions or for violations of customary international humanitarian law.

Section 5(a) of the MCA provides, in relevant part, that "[n]o person may invoke the Geneva Conventions or any protocols thereto in any habeas corpus or other civil action or proceeding to which the United States . . . is a party as a source of rights in any court of the United States or its States or territories.  *See also* MCA § 948b(g) ("No alien unlawful enemy combatant subject to trial by military commission under this chapter may invoke the Geneva Conventions as a source of rights.").  This section prohibiting invocation of the Geneva Conventions contains no indicia of retroactivity and thus plainly does not apply to pending  actions, including this case.

In addition, the qualifying phrase "as a source of rights" would appear to have meaning only if construed to refer to rights afforded exclusively by the Geneva Conventions, and not to rights afforded by other sources of law, regardless of whether the rights are also afforded by the Geneva Conventions. Section 5(a) of the MCA thus should be read not to bar enforcement of rights afforded by the laws of war or customary international law, even though such law may incorporate rights afforded by the Geneva Conventions, and even though the Geneva Conventions may incorporate rights afforded by such law. *See Hamdan*, 126 S. Ct. at 2793-98.[20]

---

[20] See *Ali v. Rumsfeld*, No. 06-CV-145 (TFH) (D.D.C. Nov. 28, 2006) (dkt. no. 33); *see also* Theodor Meron, *The Geneva Conventions as Customary International Law*, 81 Am. J. Int'l L. 348 (1987).  The minimal rules governing all armed conflicts are set forth in Common Article 3 of the four Geneva Conventions, which bars violence to life and person, including murder, mutilation, cruel treatment, torture and "outrages on personal dignity." *See, e.g*., Michael J. Matheson, *Session One: The U.S. Position on the Relation of Customary International Law to the 1977 Protocols Additional to the 1949 Geneva Conventions* 2 Am. U. J. Int'l L. & Pol'y 419, 430-31 (1987) (Common Article 3 is a part of generally accepted customary international law); International Committee of the Red Cross, Customary International

Thus construed, Section 5(a) of the MCA would not violate the Suspension Clause to the extent that other law also affords the rights at issue. Such a construction comports with "the longstanding rule requiring a clear statement of congressional intent to repeal habeas jurisdiction," INS v. St. Cyr, 533 U.S. 289, 298 (2001), and also with the canon that statutes "ought never to be construed to violate the law of nations if any other possible construction remains." Murray v. The Schooner Charming Betsy, 6 U.S. (2 Cranch) 64, 118 (1804); see also Weinberger v. Rossi, 456 U.S. 25, 32 (1982).

However, to the extent that Section 5(a) of the MCA may be interpreted to bar habeas review of otherwise valid non-constitutional claims in pending cases like the instant case, including habeas review of Geneva Conventions-based claims, it would violate the Suspension Clause because those treaties have the status of supreme federal law within the meaning of Article VI of the Constitution and 28 U.S.C. § 2241(c)(3), and thus provide a substantive source of rights that may be vindicated through habeas. See Breard v. Greene, 523 U.S. 371, 376 (1998); United States v. Alvarado-Torres, 45 F. Supp. 2d 986, 988 n.3 (S.D. Cal. 1999) ("as law of the land, courts must give a treaty the same consideration as a federal statute"), aff'd, 230 F.3d 1368 (9th Cir. 2000).

## IV.    THE MCA IS AN UNLAWFUL BILL OF ATTAINDER

Laws violate the Attainder Clause, U.S. Const. art. I, § 2, cl. 3, when they inflict "legislative punishment, of any form or severity, on specifically designated persons or groups." United States v. Brown, 381 U.S. 437, 447 (1965); Foretich v. United States, 351 F.3d 1198, 1217 (D.C. Cir. 2003) ("[A] law is prohibited under the bill of attainder clause 'if it (1) applies with specificity, and (2) imposes

---

Humanitarian Law (2005)(Rules) (discussing sources of customary international law in addition to the Geneva Conventions). In addition, U.S. courts have held that violations of Common Article 3 are violations of the law of nations and justifiable under the Alien Tort Statute. See, e.g., Kadic v. Karadzic, 70 F.3d 232, 242-43 (2d Cir. 1995).

punishment.'").  The jurisdiction-stripping provision of Section 7 of the MCA targets only "aliens" who by virtue of Respondents' own designation are deemed "unlawful enemy combatants."  *See also* MCA § 948a(1). There can be no real question that this language in the MCA, like the DTA before it, is specifically targeted at Guantánamo detainees, though it may be applied to non-citizens elsewhere as well.  *See Foretich*, 351 F.3d at 1217 (specificity element satisfied by describing affected persons without naming them).

Furthermore, the definition of "unlawful enemy combatant" includes "a person who is part of the Taliban, al Qaeda, or associated forces."  MCA § 948a(1)(A)(i). But any Taliban fighters detained at Guantánamo were part of the armed forces of a sovereign state when American military personnel invaded Afghanistan in the fall of 2001.  The MCA is therefore a legislative decree that strips members of that military force of the protections and immunities that must be afforded to them under the laws of war.  As such, it is an unlawful Bill of Attainder. See *Pierce v. Carskado*n, 83 U.S. 234, 239 (1872) (declaring lack of access to the courts an unlawful attainder); see also *United States v. Lovett*, 328 U.S. 303, 317-18 (1946) (noted that the Attainder Clause, at its core, is intended to prevent trial by unlawful means and citing a case involving trial by military commission).

## V.    THE MCA'S WITHDRAWAL OF HABEAS  JURISDICTION VIOLATES EQUAL PROTECTION

The right of equal access to the courts is a fundamental right under equal protection, and that right is taken away by the MCA.  See *Griffin v. Illinois*, 351 U.S. 12, 17 (1956); *Douglas v. California*, 372 U.S. 353, 358 (1963); *see also Tennessee v. Lane*, 541 U.S. 509, 522-23 (2004) ("the right of access to the courts" is subject to

"more searching judicial review" under equal protection). Moreover, the line that divides who does and does not receive habeas review under Section 7 of the MCA is based on a patently unconstitutional distinction – alienage. See *Graham v. Richardson*, 403 U.S. 365, 372 (1971) ("classifications based on alienage . . . inherently suspect and subject to close judicial scrutiny"). As the text of the MCA makes clear, it is not only those detainees like Petitioner, whom Respondents have imprisoned without charge for several years, who have their habeas rights removed. The MCA deprives those rights to all non-citizens – even lawful permanent residents of the United States – and thus violates equal protection. The MCA's withdrawal of habeas jurisdiction is therefore unconstitutional on this basis as well and must be stricken.

For all of these reasons, Respondents' motion to dismiss for lack of jurisdiction should be denied. Respondents' alternate request to transfer this case to the Court of Appeals, pursuant to 28 U.S.C. § 1631, based on its exclusive jurisdiction under the DTA, see Gvt. Br. at 15-17, should likewise be denied.

## VI.    THE COURT SHOULD GRANT ADDITIONAL RELATED RELIEF

Because the withdrawal of habeas jurisdiction under the DTA and MCA is unconstitutional, there is no reason to delay consideration of the merits of the Petition. Petitioner thus moves for an order scheduling a habeas hearing. He also requests additional related relief, including expedited entry of the protective order, access to his counsel, and production of a factual return to his habeas petition.[21]

---

[21] Respondents object to these requests. *See* Gvt. Br. at 16 n.11.

### A.    Expedited Entry of the Protective Order and Access to Counsel

As indicated above, it is clear from the unclassified summaries of Petitioner's CSRT and ARB proceedings that he wants – and desperately needs – access to his counsel in order to challenge the legality of his continuing, indefinite detention.  Indeed, based on the unclassified summaries it appears that Petitioner may currently be detained as an enemy combatant solely as a result of mistaken identity.  He may very well be "actually innocent" of any offense, as he maintained throughout the CSRT and ARB proceedings.  *See supra* Part I.B.5. As this Court is also aware, Petitioner may not meet or otherwise communicate with his counsel until the protective order first entered by Judge Green in the *In re Guantanamo Detainee Cases*, 344 F. Supp. 174 (D.D.C.), is also entered in this case.[22]  Petitioner therefore respectfully requests that the Court order expedited entry of the protective order and direct Respondents to provide him access to his counsel as soon as possible.[23]

The Court plainly has the power to order entry of the protective order and grant counsel access to Petitioner because the withdrawal of habeas jurisdiction under the DTA and MCA is unconstitutional.  Even if the Court were to conclude otherwise, that would not prevent the Court from granting this limited form of relief.  Courts have entered the protective order more than forty times since enactment of the DTA.  *See* Ex. E (attached hereto).  In addition, Courts have entered the protective order several times since enactment of the MCA, including in cases like this that were filed between enactment of the DTA and MCA.  *See, e.g., Al-Zarnouqi v. Bush*, No. 06-CV-1767 (D.D.C. Dec. 4, 2006) (Urbina, J.); <u>Hentif</u>

---

[22] See Amended Protective Order and Procedures for Counsel Access to Detainees at the United States Naval Base in Guantanamo Bay, Cuba (Nov. 8, 2004); Order Addressing Designation Procedures for "Protected Information" (Nov, 10, 2004); Order Supplementing and Amending Filing Procedures Contained in November 8, 2004 Amended Protective Order (Dec. 13, 2004).

[23] Counsel has obtained the necessary security clearances to meet with Petitioner under the terms of the protective order; and intends to meet with him as soon as possible.

v. Bush, No. 06-CV-1766 (D.D.C. Nov. 21, 2006) (Kennedy, J.); *Saleh v. Bush*, No. 06-CV-1765 (D.D.C. Nov. 17, 2006) (Kennedy, J.); *Lal v. Bush*, No. 06-CV-1763 (D.D.C. Oct. 29, 2006 (Kollar-Kotelly, J.); *see also Feghoul v. Bush*, No. 06-CV-618 (D.D.C. Oct. 31, 2006) (Roberts, J.) (petition filed before, but docketed after, enactment of the DTA).

As Judge Urbina recently explained in *Al-Zarnouqi*, "[d]espite the lack of finality regarding the issues on appeal [ ] it is hardly sensible to withhold or frustrate something that no one doubts is petitioner's right – a meaningful communication with counsel regarding the factual basis of petitioner's detention. Allowing petitioners to meet with their lawyers is not the type of interim relief that even remotely risks infringing on the Court of Appeals' possible jurisdiction." *Feghou*l at 2. Moreover, even if this case ultimately must be litigated in the Court of Appeals under the DTA and MCA, Petitioner will certainly require and – as Respondents have conceded – be granted access to counsel. Accordingly, there is no reason to delay entry of the protective order or counsel access.

### B.    Production of a Factual Return to the Petition

Petitioner likewise seeks production of a factual return to the Petition, which at least two Courts have ordered since enactment of the MCA. *See Feghoul*, No. 06-CV-618 (D.D.C. Oct. 31, 2006); *Lal v. Bush*, No. 06-CV-1763 (D.D.C. Oct. 29, 2006) (Kollar-Kotelly, J.) (requiring production within thirty days of ruling by Court of Appeals). He specifically requests copies of all classified and unclassified records from his CSRT and ARB proceedings, including without limitation any audio recordings or verbatim transcripts of those proceedings and any interim or final decisions of those proceedings. Like entry of the protective order and counsel access, there can be no dispute that Petitioner is entitled to receive such information in order to fully and adequately challenge the factual

and legal basis for his enemy combatant designation before a neutral decision maker.  *See Hamdi*, 542 U.S. at 533. As it stands now, Petitioner has not even received the most basic notice concerning the basis for his continuing, indefinite detention except for the limited information contained in the two unclassified summaries of his CSRT and ARB proceedings, which is plainly insufficient to satisfy the due process requirements of *Hamdi*.

Moreover, we note that Respondents have already provided the type of information that Petitioner seeks here to members of the media – *some of whom previously attended CSRT and/or ARB proceedings* – who recently broadcast audio excerpts of such hearings on National Public Radio. *See* Jackie Northam, *Tapes Provide First Glimpse of Secret Gitmo Panels, NPR Morning Ed. (Nov 21, 2006) available at* http://www.npr.org/templates/story/story.php?storyId=6514923. Accordingly, there can be no good reason why this information should not also be provided to counsel for Petitioner.  Respondents' refusal to provide Petitioner with even the most limited information about the basis for his detention can only be seen as part of a campaign to frustrate and delay judicial scrutiny.

The Center for Constitutional Rights filed the first habeas petition on behalf of Guantánamo detainees in February 2002.  That case proceeded to the Supreme Court, which held in *Rasul* (and again in *Hamdan*) that the detainees have the right to challenge their detention through habeas. The Court also instructed the district courts to consider the "merits" of those petitions in the first instance. That has not happened.

Nearly five years after the first habeas case was filed, and after two Supreme Court decisions in favor of the detainees, Respondents continue to imprison more than 400 men virtually *incommunicado*, without charge, and without any meaningful opportunity to challenge the legality of their continuing detention.  The results have been predictable: three detainees have died; more

than eighty detainees suffer from serious mental illnesses precipitated or exacerbated by their indefinite detention; and many others have suffered and continue to suffer untold physical and psychological harm as a result of their hopeless circumstances.[24]  This is not justice.  For justice finally to be done at Guantánamo, this Court must consider the merits of the Petition.

## Conclusion

Petitioner respectfully requests that the Court deny Respondents' motion to dismiss and grant his cross-motion in its entirety.

DATED at St. Johnsbury, Vermont on January 18, 2007.

Respectfully submitted,

Counsel for Petitioner:

By: /s/ David C. Sleigh
Sleigh & Williams
364 Railroad Street, Ste. E
St. Johnsbury, VT 05819
802-748-5176
linda@sleighandwilliams.com

---

[24] In some cases the harm may be so great as to impair a detainee's ability ever to proceed with a hearing on the merits of his petition.  *See, e.g.*, Emergency Motion to Supplement Record on Appeal, *Kiyemba v. Bush*, Nos. 05-5487, *et al*. (D.C. Cir. Sept. 1, 2006) (with redacted supporting affidavit) (attached hereto as Ex. F).

# EXHIBIT A

*Kenneth W. Starr*
*24569 Via de Casa*
*Malibu, CA 90263*

September 24, 2006

The Honorable Arlen Specter
Chairman, Senate Committee on the Judiciary
Dirksen Senate Office Building, Room 224
Washington, D.C. 20510

Dear Chairman Specter:

I write to express my concerns about the limitations on the writ of *habeas corpus* contained in the compromise military commissions bill, The Military Commissions Act of 2006 (S. 3930). Although S. 3930 contains many laudable improvements to military commission procedure, section 6 of the bill effectively bars detainees at the U.S. Naval Base at Guantanamo Bay, Cuba from applying for *habeas corpus* review of their executive detention. I am concerned that limitation may go too far in limiting *habeas corpus* relief, especially in light of the apparent conflict between the holdings of Rasul v. Bush, 124 S.Ct. 2684 (2004), and Johnson v. Eisentrager, 339 U.S. 763 (1950).

Although the Rasul Court limited its holding to statutory *habeas* rights, which may be limited by the Congress, the Supreme Court nevertheless viewed Guantanamo Bay, Cuba as a territory within the control and jurisdiction of the United States. Accordingly, the Eisentrager case may no longer be relied upon with confidence to rule out constitutional *habeas* protections for Guantanamo detainees. One of the Eisentrager factors that limited constitutional *habeas* rights for aliens in military custody was whether the detainee was held outside of the United States. Based on the finding of the Rasul case that Guantanamo Bay falls within U.S. territorial jurisdiction, Guantanamo detainees likely have a different constitutional status than the alien detainees in Eisentrager, who were held in Landsberg, Germany.

Article 1, section 9, clause 2 of the United States Constitution provides that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." The United States is neither in a state of rebellion nor invasion. Consequently, it would problematic for Congress to modify the constitutionally protected writ of *habeas corpus* under current events.

I encourage the Senate Judiciary Committee to study the constitutional implications of S. 3930 on the *habeas corpus* rights of detainees in United States territory. Although no one wants the War on Terror to be litigated in the courts, Congress should act cautiously to strike a balance between the need to detain enemy combatants during the present conflict and the need to honor the historic privilege of the writ of *habeas corpus*. I thank you for holding a hearing on this topic and hope that it helps to strike that balance.

Sincerely,

Kenneth W. Starr

# EXHIBIT B

[NO ORAL ARGUMENT SCHEDULED]

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

|  |  |  |
|---|---|---|
| HAJI BISMULLAH, et al., | ) | |
| Petitioners, | ) | |
| v. | ) | No. 06-1197 |
| | ) | |
| DONALD H. RUMSFELD, | ) | |
| Secretary of Defense, | ) | |
| Respondent. | ) | |

## RESPONSE IN OPPOSITION TO MOTION TO COMPEL

The Government opposes petitioners' motion to compel.  Bismullah has been determined to be an enemy combatant in connection with the ongoing hostilities in Afghanistan against the Taliban and Al Qaeda and communications with him carry with them an inherent risk to the nation's wartime security.  Accordingly, counsel access to Bismullah should be controlled by the entry of a protective order by this Court, in the form proposed by the government, and counsel's execution of a memorandum of understanding acknowledging the requirements of that order and agreeing to comply with it.  The United States will move for entry of an appropriate protective order on or before August 25, 2006.  Until the entry of that order, counsel can submit the petition or any other materials to Bismullah through normal mail channels, where the material would be subject to routine security screening. [1] Any specialized "legal mail" system in these circumstances, however, is appropriately controlled by a protective order, which is not yet in effect for Guantanamo Bay detention

---

[1]  Contrary to petitioners' assertions, the Government has not refused to provide the petition or other legal material to Bismullah.  Rather, it has refused to provide them absent the clearance of the filings through the Defense Department screening process for material within those filings that would raise security concerns.

cases in this Court pursuant to the Detainee Treatment Act. Bismullah's counsel also has no right to access classified information in the record of the Combatant Status Review Tribunal (CSRT), and access to such information must also await entry of a protective order.[2]

The development of a protective order for entry by this Court is not a simple task, contrary to what Bismullah suggests. Mot. at 9-10. It is a complex document consisting of numerous provisions designed to balance carefully the interest of allowing counsel to participate in this proceeding with the compelling national security interests that are at stake in detaining enemy combatants during ongoing hostilities. Further, the district court protective order is not an adequate substitute. Rather, that order has led to intractable disputes over vague or ambiguous provisions, unanticipated consequences that threaten safety and security at Guantanamo, and gaps that have allowed unwarranted potential security risks and inappropriate impositions upon the military during a time of war.[3]

Bismullah's overheated rhetoric (p. 2) that these issues "must be resolved immediately" lacks merit. Bismullah has been detained as an enemy combatant since February 2003. He was expressly notified in 2004 of his right to submit a petition for habeas

---

[2] The unclassified CSRT material has now been provided to counsel. In future cases, the provision of such material will also be governed by the proposed protective order.

[3] These problems will be explained in detail in the government's motion for a protective order to be filed later this week. In brief, those problems have stemmed from counsel and detainees utilizing the legal mail system to transmit materials that are not related to the litigation challenging the detentions or in a manner that creates a security risk; the pursuit of litigation on behalf of detainees by alleged "next friends" in circumstances where the detainee refuses to participate in the suit; and communications from counsel that have encouraged risky behavior by detainees.

corpus. *See Adem v. Bush*, 425 F.Supp.2d 7, 11-13 (D.D.C. 2006). In spite of this notice, Bismullah never sought habeas corpus relief, nor has he himself sought relief under the Detainee Treatment Act. Likewise, the petitioner here, who claims to be Bismullah's "next friend," has been aware of Bismullah's detention at Guantanamo since March 2003 (Pet. 13), yet did not file any action in until over <u>three years</u> had passed. The government is working diligently to prepare a proposed protective order to govern these proceedings and will move for entry of one by August 25; in these circumstances, no immediate court-ordered access as sought by Bismullah is necessary in advance of the entry of such an order. Indeed, the government has permitted two visits by counsel with Bismullah in the past two months pursuant to a restrictive regime agreed to by counsel.

The government genuinely seeks to allow counsel to participate meaningfully in this litigation, and its proposed protective order will provide counsel with much of what they are seeking. First, it will allow counsel to communicate with the detainee through a special legal mail system designed to preserve attorney-client privilege while still ensuring that national security is protected in these unique circumstances. Second, if the detainee elects to participate in this action, counsel will be given the opportunity to visit the detainee in person. Third, counsel with the necessary clearances will be given access to the full CSRT record to the extent counsel has a need to know this information. This record formed the basis of the CSRT determination and has been certified in this Court as the "complete record upon which the final decision of the [CSRT] was entered in this case." Certified Index to Record at 1.

Counsel seeks, in addition to the record before the CSRT, to be given immediate

access to "all relevant and reasonably available information in the government's possession concerning Bismullah." Mot. at 14. Essentially, counsel seeks to engage in wide ranging discovery in search of any information that ought to have been considered by the CSRT. Such a request wholly incompatible with the scheme of limited judicial review provided by the Detainee Treatment Act. It is also inconsistent with the scope of review familiar in administrative review cases, where a strong presumption of regularity is accorded to the record, and, finally, it is unprecedented with respect to wartime detention of enemy combatants. For all these reasons, to the extent counsel seeks information other than that contained in the certified CSRT record, that request should be denied.

## STATEMENT

**A.** CSRT procedures were established by written orders of the Deputy Secretary of Defense and the Secretary of the Navy "to determine, in a fact-based proceeding, whether the individuals detained * * * [at] Guantanamo * * * are properly classified as enemy combatants and to permit each detainee the opportunity to contest such designation." Deputy Sec. England Memo. at 1 (Pet. Exh. 3). A CSRT is composed of "three neutral commissioned officers" who were not involved in the apprehension or interrogation of the detainee, CSRT Process, Encl. 1, §C(1) (Pet. Exh. 3). A recorder is charged with "obtain[ing] and present[ing] all relevant evidence to the [CSRT] and to cause a record to be made of the proceedings." *Id.* § C(2). During the CSRT hearing, the recorder "shall present to the Tribunal such evidence in the Government Information as may be sufficient to support the detainee's classification as an enemy combatant, including the circumstances of how the

-4-

detainee was taken into the custody of U.S. or allied forces." *Id.* § H(4).[4]  The recorder

provides to the CSRT any evidence which might "suggest that the detainee should not be

designated as an enemy combatant." *Ibid.*  The recorder also presents an "unclassified report

summarizing the Government Evidence and any evidence to suggest that the detainee should

not be designated as an enemy combatant."   *Id.* § H(5).  This report is provided to the

detainee and his personal representative in advance of the CSRT proceeding. *Ibid;* Enc. 3,

§ D. The recorder also "shall call witnesses, if any." Enc. 1, § H(6). The detainee's personal

representative also reviews the government information presented, and may independently

present evidence "to the CSRT on the detainee's behalf." *Id.*, Enc. 3, § C(2) & (3).

During the CSRT proceeding, the detainee may "present evidence" and testimony.

*Id.* Enc. 1, § H(7).  In addition to his own testimony, the detainee may present the relevant

"testimony of witnesses who are reasonably available," as well as relevant documents and

written statements.  *Id.* § F(6), H(7).  A personal representative shall "assist the detainee in

reviewing all relevant unclassified information, in preparing and presenting information, and

in questioning witnesses."  *Id.* § C(3).

**B.**  The Detainee Treatment Act ("DTA"), enacted in December 2005, establishes a

---

[4]  Information presented to the CSRT that supports the detainee's classification as an
enemy combatant is delineated as the "Government Evidence."   *Ibid.*  "Government
information" is defined as that information which is "reasonably available information in the
possession of the U.S. Government bearing on the issue of whether the detainee meets the
criteria to be designated as an enemy combatant, including information generated in
connection with the initial determination to hold the detainee as an enemy combatant and in
any subsequent reviews of that determination, as well as any records, determinations, or
reports generated in connection with such proceedings." *Id.* § E(3).

judicial review mechanism for determinations made by a CSRT. Pub. L. No. 109-148, tit. X, § 1105(e)(2), 119 Stat. 2741-42. The statute confers on this Court "exclusive jurisdiction to determine the validity of any final decision of a [CSRT] that an alien is properly detained as an enemy combatant." *Id.* § 1105(e)(2)(A). This Court's review "shall be limited to the consideration of * * * whether the status determination of the [CSRT] with regard to such alien was consistent with the standards and procedures specified by the Secretary of Defense for [CSRTs] (including the requirement that the conclusion of the Tribunal be supported by a preponderance of the evidence and allowing a rebuttable presumption in favor of the Government's evidence)." *Id.* § 1105(e)(2)(C). This Court may also consider, "to the extent the Constitution and laws of the United States are applicable, whether the use of such standards and procedures to make the determination is consistent with the Constitution and laws of the United States." *Id.* § 1105(e)(2)(C).[5]

C. Bismullah, was captured in Afghanistan in February 2003 and has been detained as an enemy combatant since that time. In a hearing held on November 30, 2004, a CSRT reviewed his status and determined that he is an enemy combatant. In June 2006, Haji Mohammad Wali filed a petition for review in this Court under the DTA. Wali states that he is Bismullah's brother, and is acting as his "next friend." Pet. at 6-7. Counsel has been allowed to visit Bismullah in person twice at Guantanamo (in June and August 2006) but has

---

[5] This petition was filed after the enactment of the DTA. Accordingly, this case will remain in this Court regardless of the decision in *Al Odah v. United States*, Nos. 05-5064, 05-5095 through 05-5116, and *Boumediene v. Bush*, 05-5062 & 05-5063, relating to the applicability of the Act to pending cases and other issues that will impact this case, such as whether Guantanamo detainees have rights under the Constitution.

not submitted anything to this Court signed by Bismullah to suggest that Bismullah supports this lawsuit or would like counsel to represent him.

### ARGUMENT

On or before August 25, 2006, the government will seek the entry of a protective order that will allow counsel access to much of what he seeks. Until such an order is entered, however, he is not entitled to the information requested in his motion. Further, even after the entry of a protective order, Bismullah is not entitled to the sort of wide-ranging discovery of any "relevant" information contained in government files. Instead, review under the DTA is on the record of the CSRT, and no additional material need be provided in order for this Court to carry out that review.

A.    **Entry of a Protective Order on Terms Appropriately Protective of the Government's Interests is Required to Govern Counsel Access to Classified Material and to Represented Detainees.**

Contrary to Bismullah's claim, counsel has no right stemming from the Constitution or the DTA to access the detainee or classified information in the record. Rather, that access requires protective measures appropriate to the circumstances of these detentions, and which will be set forth soon in a proposed protective order. As an initial matter, Bismullah, as an enemy combatant detained overseas during an ongoing armed conflict, has no right to counsel; nor does his counsel have any right to access classified information. These points were fully addressed in *Al-Odah* and *Boumediene*, and a decision on the process appropriate in this case is closely bound up in this Court's resolution of those appeals.

1. Historically, a captured enemy combatant was entitled to *no* process to challenge

his status. More recently, the process granted to aliens captured on a foreign battlefield was no more than the procedures reflected in Article 5 of the Geneva Convention and Army Regulation 190-8, where there is *no* provision of counsel and detainees are given *no* access to classified information. *See* Army Reg. 190-8, § 1-6.e(3) & (5).[6] The same could occur in this review proceeding.

Further, this Court can carry out its review without a requirement for counsel access to classified information. When this Court performs its familiar role of reviewing the decision of an administrative body, it has the "inherent authority to review classified material *ex parte, in camera* as part of its judicial review function." *Jifry v. FAA*, 370 F.3d 1174, 1182 (D.C. Cir. 2004). Because this Court can perform that function *ex parte*, there is no reason to allow counsel access to the classified material that is in the CSRT record. Instead, this Court has explained in regard to classified information: "[w]e anticipate that in camera review of affidavits, followed if necessary by further judicial inquiry, *will be the norm*." *Stillman v. C.I.A.*, 319 F.3d 546, 548 (D.C. Cir. 2003) (emphasis added).

**2.** The Due Process Clause does not require that counsel be provided materials that are classified. The rulings of the Supreme Court and this Court have recognized the government's compelling interest in protecting its national security and in the classified information that is vital to the nation's security. *See Haig v. Agee*, 453 U.S. 280, 307

---

[6] Common Article 3 of the Convention does not address the procedures for determining an individual's status as an enemy combatant during the relevant hostilities. Instead, it only limits the "passing of sentences and the carrying out of executions," neither of which are involved here. 6 U.S.T. 3316, 3318 (1956).

(1981). Because of this compelling interest, this Court has upheld agency action and rejected due process claims even when private parties and their counsel have been denied all access to classified information in the record. *See Jifry*, 370 F.3d at 1184; *People's Mojahedin Org. v. Dep't of State*, 327 F.3d 1238, 1242 (D.C. Cir. 2003) (citing *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 207-09 (D.C. Cir. 2001)); *Holy Land Foundation v. Ashcroft*, 333 F.3d 156, 164 (D.C. Cir. 2003).

Moreover, this Court should work towards a solution that will allow resolution of this matter while avoiding the difficult constitutional and separation-of-powers questions that would arise if a court attempted to *compel* disclosure of national security information or *require* access to a detained enemy combatant. *See Stillman*, 319 F.3d at 548. Indeed, ordering the release of information or unqualified access to enemy combatants would violate core separation-of-powers principles. *See Hamdi* v. *Rumsfeld*, 542 U.S. 507, 531 (2004) (recognizing detention of enemy combatant as "core strategic matters of warmaking belong in the hands of those who are best positioned and most politically accountable for making them") (plurality op.); *Egan*, 484 U.S. at 527 ("authority to classify and *control access to information* bearing on national security * * * flows primarily from [Article II's] constitutional investment of power in the President and exists quite apart from any explicit congressional grant") (emphasis added); *Holy Land*, 333 F.3d at 164 (recognizing "the primacy of the Executive in controlling and exercising responsibility over access to classified information"). These considerations strongly militate in favor of awaiting the government's proposed protective order, to be filed later this week, prior to ordering access to the detainee

or to the classified materials in the CSRT record.

### B. Counsel Is Not Entitled To The Production Of Materials Outside of the CSRT Record.

**1.** Bismullah next argues (p. 18) that the "plain language" of the DTA authorizes him to "rely on evidence that was not part of the prior CSRT evidentiary record." This contention is without merit because the DTA's plain language clearly sets forth a familiar scheme whereby this Court reviews the decision of the CSRT based on the record before it. The Act specifies that "review" is of "the validity of any final decision of a Combatant Status Review Tribunal." *Id.* § 1105(e)(2)(A). That "review" also "shall be limited to the consideration of * * * whether the status determination * * * was consistent with the standards and procedures specified by the Secretary of Defense for Combatant Status Review Tribunals (including the requirement that the conclusion of the Tribunal be supported by a preponderance of the evidence and allowing a rebuttable presumption in favor of the Government's evidence)." *Id.* § 1105(e)(2)(C). The review may also consider, "to the extent the Constitution and laws of the United States are applicable, whether the use of such standards and procedures to make the determination is consistent with the Constitution and laws of the United States." *Id.* § 1105(e)(2)(C).

Such review is limited by the statute's terms and established precedent to the administrative record before the tribunal. Even outside the wartime context, it is established that statutes providing for review of final agency decisions authorize a "reviewing function [that] is * * * ordinarily limited to consideration of the decision of the agency or court below and of the evidence on which it was based." *United States v. Carlo Bianchi & Co.*, 373 U.S.

709, 714-15 (1963); *see Florida Power & Light Co. v. Lorion* 470 U.S. 729, 743 (1985) (recognizing the "fundamental principle[] of judicial review of agency action" that "'[t]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.'") (quoting *Camp v. Pitts*, 411 U.S. 138, 142 (1973)); *Jifry*, 370 F.3d at 1181.

Even in cases where "Congress has simply provided for review, without setting forth the standards to be used or the procedures to be followed, [the Supreme] Court has held that consideration is to be confined to the administrative record and that no de novo proceeding may be held." *Carlo Bianchi*, 373 U.S. at 715. Here, Congress specified narrow review of the administrative decision – to determine if the decision was "consistent with" CSRT procedures; whether the decision was "supported by a preponderance of the evidence"; and whether the "use of such standards and procedures * * * is consistent with the Constitution and laws of the United States," to the extent applicable. *Id.* § 1105(e)(2). Each of these limitations calls for a review of the record before the agency upon which it based its decision. Accordingly, this type of record review is limited to assessing the validity of the decision of the CSRT based upon the record before it and applying the appropriate standard of review. *See Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears v. Peterson*, 685 F.2d 678, 685 (D.C. Cir. 1982) ("applicability of de novo review to administrative actions is limited and is generally not presumed in the absence of statutory language or legislative

intent to the contrary"). [7]

Bismullah urges that review need not be on the record of the proceeding because the detainee may challenge the CSRT determination "on the ground that the determination is not supported by 'a preponderance of the evidence'" and the statute does "not limit" this review to "a preponderance of the evidence 'in the record.'" Mot. at 18. This argument simply fails to accord meaning to the language of the statute. The Act specifies that this Court may assess whether the "requirement *that the conclusion of the Tribunal* be supported by a preponderance of the evidence" has been met, DTA, § 1105(e)(2)(C) (emphasis added), as part of an inquiry into whether a CSRT decision is "consistent with the standards and procedures specified by the Secretary of Defense." *Ibid.* By its terms, this provision limits review to the question of whether the CSRT followed appropriate procedure and rendered a decision supported by sufficient evidence. In determining on review whether the "the tribunal (*i.e.* the CSRT) rendered a decision "consistent with" DOD CSRT procedures requiring support of a CSRT decision by a "preponderance of the evidence," it makes no sense to consider evidence not before the CSRT.

Rather, this type of review provision is consistent with this Court reviewing the CSRT

---

[7] Review on the record is, of course, particularly appropriate where Congress has lodged review of an agency determination in the court or appeals, which is not suited for factfinding. *See Bianchi*, 373 U.S. at 715; *Midwest Independent Transmission System Operator, Inc. v. FERC*, 388 F.3d 903, 910 (D.C. Cir. 2004) (court of appeals review appropriate when "'[t]he factfinding capacity of the district court is . . . unnecessary to judicial review of agency decisionmaking,' because the administrative proceedings have already generated the record necessary for appellate review"); *General Elec. Uranium Management Corp. v. U.S. Dept. of Energy*, 764 F.2d 896, 903 (D.C. Cir. 1985).

factual determination to ensure, at most, that it is supported by substantial evidence. *See Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938) ("Substantial evidence * * * * means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"); *Jifry*, 370 F.3d at 1181 ("'[s]ubstantial evidence' is simply such relevant evidence as a reasonable person might accept as proof of a conclusion"); *Charlton v. FTC*, 543 F.2d 903, 907 (D.C. Cir. 1976) (explaining that in circumstance where "agency itself is to initially ascertain the facts" under a "preponderance of the evidence" standard, "on judicial review of agency action, [those] administrative findings of fact must be sustained when supported by substantial evidence on the record considered as a whole" as the standard to be utilized by the "reviewing court").

Indeed, every administrative review proceeding must necessarily develop a standard of review for administrative resolution of factual issues, and nothing about defining that standard of review suggests that this Court should conduct its review by going outside of the record. *See Carlo Bianchi*, 373 U.S. at 715 ("the standards of review adopted * * * 'not supported by substantial evidence'-have frequently been used by Congress and have consistently been associated with a review limited to the administrative record * * * * [t]his standard goes to the reasonableness of what the agency did on the basis of the evidence before it, for a decision may be supported by substantial evidence even though it could be refuted by other evidence that was not presented to the decision-making body"). Rather, when Congress intends to allow factfinding when a court is conducting review of an agency decision, it provides expressly for such factfinding. *Cabinet Mountains*, 685 F.2d at 685;

-13-

*see, e.g.*, 28 U.S.C. § 2347(c) (Hobbs Act provision addressing "leave to adduce additional

evidence"); 5 U.S.C. § 706(2)(F); *Reid ex rel. Reid v. District of Columbia*, 401 F.3d 516,

521 (D.C. Cir. 2005) (IDEA expressly authorizes district court to "'hear additional evidence

at the request of a party'" and "'bas[e] its decision on the preponderance of the evidence'")

(quoting 20 U.S.C. § 1415(i)(2)(B)). In sum, the DTA does not provide for evaluating

evidence outside of the record reviewing a CSRT's factual conclusion of evidentiary

sufficiency.

In accord with ordinary administrative review principles, the DTA is thus properly

read as limiting this Court's review to the record before the CSRT. It is important to

remember, however, that this is not a garden-variety administrative law case. Rather, it is

the extraordinary grant of review of an enemy combatant determination during an ongoing

armed conflict. To read the DTA to afford wide ranging discovery and    *de novo*    fact

review, as petitioner suggests, is not only contrary to established administrative review

principles, it is also to argue that the DTA grants greater judicial review than that has

historically been granted to even a person convicted by a military commission.  *See*

*Yamashita v. Styer*, 327 U.S. 1, 8, 23 (1946). Such review is not remotely contemplated by

Article 5 of the Geneva Convention or Army Regulation 190-8, and it is not even

contemplated in *Hamdi* even for citizens held in this country as enemy combatants. At

bottom, the DTA, which provides record review of final CSRT decisions, cannot fairly be

construed as providing discovery and *de novo* review, especially where doing so both has no

historical precedent and would impose of the Executive an unprecedented wartime burden.

**2.** Bismullah next argues (p. 8) that factfinding is allowed because the DTA "confers original – not appellate – jurisdiction on this Court." The fact that the DTA provides direct review of a CSRT determination in this Court lends no support to Bismullah's argument that review should extend beyond the record in this case. Rather, as we have shown, record review is the norm when original jurisdiction is conferred upon this Court. Similarly, whether or not this case involves "administrative decisions entitled to deference" (p. 19 n.11) or "claims" rather than "appeals" (*ibid.*) says nothing about whether this case involves review based on the record before the CSRT. Instead, as we have explained, the statute itself calls for record review by conferring on this Court "exclusive jurisdiction to determine the validity of any final decision of a Combatant Status Review." DTA § 1005(e)(2)(A).

Bismullah urges (p. 19 n.11) that he has "made a strong showing of inadequate fact-finding procedures" such that this Court needs to consider extra-record evidence. In a similar vein, Bismullah's counsel urges that "significant exculpatory information has been provided" to various United States officials, thereby justifying a discovery-like process to determine if the government is in possession of this evidence. But the DTA does not authorize fact-finding by this Court in these or any other circumstances. *Cf. Camp*, 411 U.S. at 142 ( *de novo* hearing allowed in APA claims in limited circumstances because 5 U.S.C. § 706(2)(F) expressly so provides). Instead, Congress directed the Department to ensure that its already existing administrative review board process for periodic review of detainee status that takes into consideration any relevant new information. *See* DTA § 1005(a)(1) & (3) (directing Secretary to promulgate "procedures of the * * * Administrative Review Boards" that, among

other things, "provide an annual review to determine the need to continue to detain an alien

who is a detainee" and "provide for periodic review of any new evidence that may become

available relating to the enemy combatant status of a detainee"). The Department has

updated its preexisting regulation to include those procedures.     *See* ARB Memo. and

Procedures, Enc. 13 (July 14, 2006).[8] The ARB procedures, in existence since 2004, provide

for annual "consideration of all relevant and reasonably available information to determine

whether the enemy combatant represents a continuing threat." ARB Mem., § 1.c. In those

proceedings, the detainee is allowed to "present information relevant to his continued

detention, transfer, or release." *Ibid.*; *Id.* encl. 3, § 3.a (detainee "shall be provided a

meaningful opportunity to be heard and to present information to the ARB"). Under the

present regulations, any new information relating to the enemy combatant status of a detainee

that is presented to an ARB shall be brought to the attention of the Deputy Secretary of

Defense as soon as practicable. The Deputy Secretary of Defense shall review the new

evidence and decide whether to convene a new CSRT to reconsider the basis of the

detainee's enemy combatant status. *See* ARB Memo. and Procedures, Enc. 13.

In sum, the DTA does not authorize the submission of new evidence to this Court

relating to the detainee's status as an enemy combatant; such evidence must instead be

submitted to DoD, consistent with the congressionally-authorized procedures for

consideration of such evidence.

Finally, Bismullah argues that he must be able to submit evidence to this Court "akin

---

[8] Http://www.defenselink.mil/news/Aug2006/d20060809ARBProceduresMemo.pdf.

to an 'actual innocence' claim in *habeas corpus* proceedings;" if not, Bismullah argues (p. 19-20), the DTA would constitute a suspension of the writ of habeas corpus. This claim is meritless, for reasons that have been addressed in detail in the *Al Odah* briefing. First, alien combatants held overseas have no constitutional rights under the Suspension Clause. *See Johnson v. Eisentrager*, 339 U.S. 763, 777-79 (1950). Second, even if Suspension Clause rights existed, they do not require or necessitate any factual review of the CSRT determination. *See INS v. St. Cyr*, 533 U.S. 289, 305-06 (2001) (under traditional habeas review, "other than the question whether there was some evidence to support the order, the courts generally did not review the factual determinations made by the Executive"); *Yamashita*, 327 U.S. at 8 (military tribunals are "not subject to judicial review merely because they have made a wrong decision on disputed facts."). And third, what Bismullah calls an "actual innocence" claim is in fact a claim that Bismullah is not properly designated as an enemy combatant. A challenge to the evidentiary sufficiency of the CSRT decision, designating him as an enemy combatant,  is properly rendered on the CSRT record. *Superintendent, Mass. Correctional Institution v. Hill*, 472 U.S. 445, 455-457 (1985) (the some evidence standard "does not require" a "weighing of the evidence," but rather calls for assessing "whether there is any evidence in the record that could support the conclusion")).

**3.** Bismullah also argues that he is entitled to obtain  "all information in the possession of the government that is relevant" (Mot. at 15) in order to "show that the Recorder failed to discharge his obligations consistent with the CSRT Procedures" to provide relevant information to the CSRT. Mot. at 16. Bismullah argues that such review is entailed

in determining whether the "CSRT Procedures" were followed. Mot at 16. Such a request is essentially an effort to disguise free-ranging discovery of any relevant material possessed by the government in the guise of a procedural challenge. But Bismullah misperceives the scope of this Court's review as well as the nature of the recorder's task, which is routine and entitled to a presumption of regularity.

First, Bismullah misperceives the scope of this Court's review, which is of the "validity of any final decision of a CSRT." DTA, § 1005(e)(2)(A). That review, as we have explained, is on the record and does not call for opening up to review the recorder's process of identifying and gathering relevant evidence. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 417, 420 (1971) (in evaluating "whether the Secretary's action followed the necessary procedural requirements" under the APA, explaining that "where there are administrative findings that were made at the same time as the decision * * * there must be a strong showing of bad faith or improper behavior before [an] inquiry may be made" into the "mental processes of administrative decisionmakers"); *Community for Creative Non-Violence v. Lujan*, 908 F.2d 992, 998 (D.C. Cir. 1990) (no review of "agency decisionmaking process" when there is an "adequate record in this case for effective judicial review"). Instead, this Court's review of the process is based on the record before the administrative decisiomaker, *i.e.*, the CSRT. *See James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1095 (D.C. Cir.1996).

Thus, this Court has rejected the notion that in conducting review of an agency decision, it should look behind the actions of officials who are not the ultimate

decisionmaker. In *James Madison*, this Court rejected the assertion that because "the examiners were the 'real decision-makers,' * * * the district court should have reviewed whatever materials the examiners may have seen during their on-site investigation." *See James Madison*, 82 F.3d at 1095. Instead, there was no reason to look behind the actions of the examiners, just as here there is no reason to look beyond the evidence compiled by the recorder; rather, review is of the information submitted by the examiner or the recorder for use in making the ultimate administrative decision. *Id.* at 1095-96. Ultimately, a contrary view would turn the Court into the first line factfinder searching for "all information in the possession of the government that is relevant" (Mot. at 15), but in administrative review courts "do not duplicate agency fact-finding efforts." *James Madison*, 82 F.3d at 1096.

Indeed, the recorder's task is routine and subject to a strong presumption of regularity. The recorder's job, essentially, is to compile material that is both relevant and reasonably available and to present that material to the CSRT. CSRT Procedures, Enc. 1, § C(2).[9] Such a routine task is entitled to the strongest sort of presumption of regularity in reviewing the

---

[9] Bismullah vastly overstates the recorder's role. With one small exception, the recorder simply compiles relevant material that is reasonably available in government files (*see* CSRT Procedures, Enc. 1, § E(3) (defining "Government Information")), and places that information into the CSRT record. *Id.* § H(4). The only government information that would not enter the CSRT record is material that goes *beyond* what would be sufficient to conclude that the detainee is an enemy combatant, *e.g.*, duplicative material supporting the fact that a detainee is an enemy combatant. As an additional check, the Personal Representative also reviews all of the government information, and may independently present evidence "to the CSRT on the detainee's behalf." *Id.*, Enc. 3, § C(2) & (3). And, of course, Bismullah himself could testify and submit evidence that is reasonably available. *Id.*, Enc. 1, § F(6). Thus, Bismullah's claim (p. 15) that the "Recorder *alone* is responsible for reviewing all information * * * that is relevant" is not true.

decision of the CSRT. *See Martino v. U.S. Dept. of Agriculture*, 801 F.2d 1410, 1413 (D.C.

Cir. 1986. Indeed, the original purpose of the presumption of regularity is to allow reliance

upon the record upon which a decision is based. *See Dorsey v. Gill*, 148 F.2d 857, 874 (D.C.

Cir. 1945).

In sum, the functions of the recorder cannot be utilized as an avenue for freewheeling

discovery into "all information in the possession of the government that is relevant." Mot.

at 15. Instead, the review in this Court is to be based upon the record before the CSRT, and

that record will be provided to this Court and, upon entry of a protective order, to counsel.

## CONCLUSION

For the foregoing reasons, this Court should deny Bismullah's motion to compel.

Respectfully submitted,

> PETER D. KEISLER
> *Assistant Attorney General*
>
> GREGORY G. KATSAS
> *Deputy Associate Attorney General*
>
> DOUGLAS N. LETTER
> *Terrorism Litigation Counsel*
>
> ROBERT M. LOEB
> (202) 514-4332
> AUGUST E. FLENTJE
> (202) 514-1278
> Attorneys, Appellate Staff
> Civil Division, Room 7268
> U.S. Department of Justice
> 950 Pennsylvania Avenue, N.W.
> Washington, D.C. 20530

AUGUST 2006

-20-

## CERTIFICATE OF SERVICE

I hereby certify that on August 21, 2006, I caused copies of the foregoing "RESPONSE IN OPPOSITION TO MOTION TO COMPEL" to be served upon counsel of record by causing copies to be sent by Fed Ex overnight delivery and by e-mail transmission to:

Jeffery I. Lang
Jennifer R. Cowan
Debevoise & Plimpton
919 Third Avenue
New York, New York 10022

Robert M. Loeb

# EXHIBIT C

ORAL ARGUMENT HELD SEPTEMBER 8, 2005 AND MARCH 22, 2006

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Nos. 05-5064, 05-5095 through 05-5116
KHALED A.F. AL ODAH, *et al.*,
*Petitioners-Appellees/Cross-Appellants,*

v.

UNITED STATES OF AMERICA, *et al.*,
*Respondents-Appellants/Cross-Appellees.*

Nos. 05-5062 and consolidated case 05-5116
LAKHDAR BOUMEDIENE, *et al.*,
*Petitioners-Appellants,*

v.

GEORGE W. BUSH, *et al.*,
*Respondents-Appellees.*

ON CONSOLIDATED APPEALS FROM THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

## BRIEF OF *AMICI CURIAE* RETIRED FEDERAL JURISTS
## IN SUPPORT OF PETITIONERS' SUPPLEMENTAL BRIEF
## REGARDING THE MILITARY COMMISSIONS ACT OF 2006

Patricia A. Bronte
Douglas A. Sondgeroth
JENNER & BLOCK LLP
330 N. Wabash Avenue
Chicago, IL 60611
312 222-9350

Dated: November 1, 2006

Agnieszka M. Fryszman
COHEN, MILSTEIN, HAUSFELD
 & TOLL, PLLC
1100 New York Avenue, N.W.
Washington, DC 20005
202 408-4600

*Counsel for Amici Curiae*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), the undersigned counsel of record certifies as follows:

### A.    Parties and *Amici*

Except for the following, all parties, intervenors, and *amici* appearing before the District Court and/or in this Court on these appeals are listed in the Opening Brief of the Government in *Al-Odah v. United States*, Nos. 05-5064, 05-5095 through 05-5116, in the Opening Brief of the Petitioners in *Boumediene v. Bush*, Nos. 05-5062 and 05-5063, in the Brief of the Government in *Boumediene v. Bush* filed on May 25, 2005, in the Guantanamo Detainees' Corrected Second Supplemental Brief Addressing the Effect of the Detainee Treatment Act of 2005 in *Al Odah v. United States* filed on March 10, 2006, and in the briefs filed on November 1, 2006 by the Petitioners in *Al-Odah v. United States* and *Boumediene v. Bush*.

*Amici curiae,* former federal judges, are:

- The Honorable Shirley M. Hufstedler, who served as a judge on the United States Court of Appeals for the Ninth Circuit from 1968 to 1979.

- The Honorable Nathaniel R. Jones, who served as a judge on the United States Court of Appeals for the Sixth Circuit from 1979 to 2002.

- The Honorable George N. Leighton, who served as a judge on the United States District Court for the Northern District of Illinois from 1976 to 1987.

- The Honorable Timothy K. Lewis, who served as a judge on the United States District Court for the Western District of Pennsylvania from 1991 to 1992, and as a judge on the United States Court of Appeals for the Third Circuit from 1992 to 1999.

- The Honorable Frank J. McGarr, who served as a judge on the United States District Court for the Northern District of Illinois from 1970 to 1988, and as chief judge of the court from 1981 to 1986.

- The Honorable Abner J. Mikva, who served as a judge on the United States Court of Appeals for the District of Columbia Circuit from 1979 to 1994, and as chief judge of this Court from 1991 to 1994.

- The Honorable Patricia M. Wald, who served as a judge on the United States Court of Appeals for the District of Columbia Circuit from 1979 to 1999, and as chief judge of this Court from 1986 to 1991.

The law firms of Jenner & Block LLP and Cohen, Millstein, Hausfeld & Toll, PLLC have appeared for *amici*. Jenner & Block LLP currently represents fourteen Guantánamo detainees, only one of whom is a petitioner in these consolidated appeals. The firm previously submitted an *amicus* brief to this Court on behalf of petitioners in *Qassim, et al. v. Bush*, No. 05-5477. In addition, Jenner & Block LLP represented *amici* before the Supreme Court in *Hamdi v. Rumsfeld*, No. 03-6696, and *Rasul, et al. v. Bush*, No. 03-334. Cohen, Milstein, Hausfeld & Toll PLLC currently represents four Guantánamo detainees, but none of the detainees is a petitioner in these consolidated appeals.

**B.     Rulings Under Review**

References to the rulings at issue appear in the Opening Briefs of the Government in *Al-Odah v. United States* and of the Petitioners in *Boumediene v. Bush*.

**C.     Related Cases**

The Opening Briefs of the Government in *Al-Odah v. United States* and of the Petitioners in *Boumediene v. Bush* indicate which of the cases on review were previously before this Court and identify the names and numbers of related cases pending in this Court or in the District Court.

# TABLE OF CONTENTS

Certificate as to Parties, Rulings, and Related Cases .................................................. i

A.    Parties and *Amici* ................................................................................... i

B.    Rulings Under Review .......................................................................... iii

C.    Related Cases ..................................................................................... iii

Table of Authorities ................................................................................. vi

Glossary ................................................................................................ viii

Interest of *Amici Curiae* ............................................................................ 1

Summary of Argument ............................................................................... 1

Argument ............................................................................................... 4

Adopting The Government's Interpretation Of The MCA/DTA Would Unconstitutionally Force This Court To Condone The Use Of Evidence Secured By Torture. ....................................................................... 4

A.    The CSRTs Failed to Consider Whether Evidence Relied Upon Was Obtained By Torture. ........................................................... 4

      1.    CSRTs referred torture allegations for investigation but did not wait for the investigation results. ............................ 6

      2.    Many CSRTs did not address evidence of torture. ................ 9

      3.    A few CSRTs cross-examined detainees to distance U.S. forces from the alleged torture. ..................................... 11

B.    The Fifth Amendment and the Common Law Prohibit Detention Based on Evidence Procured by Torture. .................... 15

      1.    The Due Process Clause ..................................................... 15

      2.    The Common Law ............................................................. 16

C.   The Government's Reading of the MCA/DTA Would Allow
      Indefinite Imprisonment Based On Evidence Secured By Torture,
      in Violation of the Constitution and the Common Law. ...............................18

Conclusion .............................................................................................................20

## TABLE OF AUTHORITIES

**Cases**

*A(FC) v. Secretary of State for the Home Department*,
   [2005] UKHL 71 (H.K. Dec. 8, 2005) ............................................................17

*Brown v. Mississippi*, 297 U.S. 278 (1936) ...........................................................16

*Chambers v. Florida*, 309 U.S. 227 (1940) ...........................................................18

*Chavez v. Martinez*, 538 U.S. 760 (2003)...............................................................15

*County of Sacramento v. Lewis*, 523 U.S. 833 (1998)............................................15

*Felker v. Turpin*, 518 U.S. 651 (1996)....................................................................16

*Hamdan v. Rumsfeld*, 126 S. Ct. 2749 (U.S. 2006) .................................................2

*In re Guantánamo Detainee Cases*, 355 F. Supp. 2d 443 (D.D.C. 2005) ................6

*INS v. St. Cyr*, 533 U.S. 289 (2001) .......................................................................16

*Jackson v. Denno*, 378 U.S. 368 (1964) .................................................................15

*Miller v. Fenton*, 474 U.S. 104 (1985)...............................................................15, 16

*Palko v. Connecticut*, 302 U.S. 319 (1937), *overruled on other grounds
   by Benton v. Maryland*, 395 U.S. 784 (1979) .............................................15

*Rasul v. Bush*, 542 U.S. 466 (2004).........................................................................1

*Rochin v. California*, 342 U.S. 165 (1951)..........................................................15, 16

*Swain v. Pressley*, 430 U.S. 372 (1977)..................................................................18

\* Authorities upon which we chiefly rely are marked with asterisks

**Statutes**

Pub. L. No. 109-148, 119 Stat. 2739 (2005).................................................2

Pub. L. No. 109-366, 120 Stat. 2600 (2006)...............................................2

U.S. Const. Art. I, § 9, cl. 2.........................................................................18

**Other Authorities**

4 William Blackstone, *Commentaries on the Laws of England*
(1st ed. 1803) ........................................................................................17

Edward Coke, *The Third Part of the Institutes of the Laws of England*
(W. Clarke & Sons 1817) .....................................................................17

3 Jonathan Elliot, The Debates in the Several State Conventions on the
Adoption of the Federal Constitution (1836) .........................................15, 18

Lawrence Herman, *The Unexpected Relationship Between the Privilege
Against Compulsory Self-Incrimination and the Involuntary
Confession Rule (Part I)*, 53 Ohio St. L.J. 101 (1992)...................................18

David Hope, *Torture*, 53 Int'l & Comp. L. Q. 807 (2004)................................17, 18

Seth F. Kreimer, *Too Close to the Rack and the Screw: Constitutional
Constraints on Torture in the War on Terror*, 6 U. Pa. J. Const.
L. 278 (2003) ........................................................................................18

John H. Langbein, *Torture and the Law of Proof: Europe and England
in the Ancient Regime* (1977) ...............................................................17

Joseph Margulies, *Guantánamo and the Abuse of Presidential Power* 182 (New
York 2006) ...........................................................................................7

Leonard A. Parry, *The History of Torture in England* 1 (1933) ...........................16

Proceedings Against John Felton, 3 Howell's St. Tr. 367 (1628)....................17, 18

# GLOSSARY

| Term | Definition |
|------|------------|
| CSRT | Combatant Status Review Tribunal |
| DTA | Detainee Treatment Act, Pub. L. No. 109-148, 119 Stat. 2739 (2005) |
| MCA | Military Commissions Act, Pub. L. No. 109-366, 120 Stat. 2600 (2006) |

## INTEREST OF *AMICI CURIAE*

The issue presented by these consolidated cases challenges the integrity of our judicial system: may this Court sanction life-long detention in the face of credible allegations that the evidence upon which the detention is based was secured by torture? As former federal judges, we believe that compelling this Court to sanction Executive detentions based on evidence that has been condemned in the American legal system since our Nation's founding erodes the vital role of the judiciary in safeguarding the Rule of Law. Therefore, pursuant to Federal Rule of Appellate Procedure 29 and this Circuit's Rule 29, *amici* respectfully submit this brief in support of Petitioners Al Odah, *et al.* and Boumediene, *et al.*

*Amici curiae* include the following former federal judges, as further identified in the Parties and *Amici* section of this brief: The Honorable Shirley M. Hufstedler, the Honorable Nathaniel R. Jones, the Honorable George N. Leighton, the Honorable Timothy K. Lewis, the Honorable Frank J. McGarr, the Honorable Abner J. Mikva, and the Honorable Patricia M. Wald.

## SUMMARY OF ARGUMENT

After the Supreme Court found in *Rasul v. Bush*, 542 U.S. 466 (2004), that detainees at the Guantánamo Bay Naval Base in Cuba were entitled to challenge their detentions in federal court, the United States Defense Department announced

that each prisoner would appear before a "Combatant Status Review Tribunal." At the same time, the Defense Department also stated that every prisoner at the base had been determined "through multiple levels of review" to be an "enemy combatant."[1]   The stated purpose of the CSRT was to decide whether this determination would be upheld.[2]   Between August 2004 and January 2005, the military conducted 558 CSRT hearings, finding all but 38 prisoners to be enemy combatants.[3]

On December 30, 2005, the President signed the Detainee Treatment Act. Pub. L. No. 109-148, 119 Stat. 2739 (2005).   The DTA purported to replace plenary district court review over the prisoners' habeas petitions with the CSRT and limited review in this Court.   On June 29, 2006, the Supreme Court held that the DTA did not apply to pending habeas cases which, like these consolidated cases, "challeng[ed] the very legitimacy" of the CSRTs.  *Hamdan v. Rumsfeld*, 126 S. Ct. 2749, 2769 (2006).   On October 17, 2006, the President signed the Military Commissions Act.  Pub. L. No. 109-366, 120 Stat. 2600 (2006).

---

[1]  Memo. of Deputy Sec'y of Def. to Sec. of Navy, *Order Establishing Combatant Status Review Tribunal* 1 (July 7, 2004) (A442).  *Amici* respectfully submit with this brief an Addendum of cited materials marked A1 to A445.

[2]  *Id.*; Memo. of Deputy Sec'y of Def., *Implementation of Combatant Status Review Tribunal Procedures* (July 29, 2004) (A382) (hereinafter "CSRT Procedures").

[3]  Dep't of Def., *Combatant Status Review Tribunal Summary*, *available at* http://www.defenselink.mil/news/Mar2005/d20050329csrt.pdf.

In their briefs, the Petitioners discuss the various statutory and constitutional infirmities of the MCA. *Amici* direct this brief at one specific and fundamental flaw.[4] With the CSRT, the Government created a tribunal that was permitted to accept evidence secured by torture and presume that evidence was genuine and accurate. Furthermore, the limited review in this Court provided by the MCA/DTA cannot remove the stain of torture because the Court – at least according to the Government – cannot alter or expand the record created by the military.

One of the most hallowed judicial roles in our constitutional democracy is to ensure that no person is imprisoned unlawfully. The statutory scheme created by the MCA/DTA inhibits the Judiciary's ability to ensure that Executive detentions are not grounded on torture or cruel, inhuman, or degrading treatment. Because no habeas court would permit detentions based on evidence obtained in this manner, the MCA/DTA scheme is not an adequate substitute for habeas review and is therefore unconstitutional.

---

[4] *Amici* take no position on other constitutional deficiencies in the MCA.

3

## ARGUMENT

## ADOPTING THE GOVERNMENT'S INTERPRETATION OF THE MCA/DTA WOULD UNCONSTITUTIONALLY FORCE THIS COURT TO CONDONE THE USE OF EVIDENCE SECURED BY TORTURE.

### A.    The CSRTs Failed to Consider Whether Evidence Relied Upon Was Obtained By Torture.

Two of the rules governing the CSRT procedures are particularly relevant to our purpose:  First, the CSRT could rely on any information it deemed "relevant and helpful to a resolution of the issues before it," and second, the CSRT was obligated to accept the Government's evidence against the prisoner as presumptively "genuine and accurate."[5]  Applying these rules, the CSRTs were allowed to and apparently did conclude that prisoners' incriminating statements were both "relevant and helpful" to the decision, and presumptively correct.

Yet, case after case for which transcripts of the CSRT hearings are publicly available,[6] prisoners told the CSRT panels that their so-called confessions were false and had been wrung from them through torture.[7]  Often they assured the

---

[5]  CSRT Procedures, Encl. 1 ¶¶ G(7) and G(11) (A390) ("There is a rebuttable presumption that the Government Evidence . . . to support a determination that the detainee is an enemy combatant, is genuine and accurate.").

[6]  *See* Dep't of Def., *Combatant Status Review Tribunal (CSRT) and Administrative Review Board (ARB) Documents*, *available at* http://www.dod.mil /pubs/foi/detainees/csrt/index.html (last visited Oct. 29, 2006).

[7]  Because the prisoners did not have access to counsel and many did not attend their CSRT hearing, the CSRT record likely underreports the extent to which evidence obtained by torture formed the basis of enemy combatant determinations.

CSRT their account could be confirmed by review of medical records or other reports. But the Executive has maintained that investigating allegations of torture was not "the CSRT's role," and that it was permissible for the Tribunal to rely on evidence "obtained through a non-traditional means, even torture" to determine that a prisoner was an enemy combatant.[8] *Amici* take no position on the veracity of the prisoners' accounts,[9] nor do we attempt here to distinguish between torture and other illegal forms of coercion. But we do firmly contend that Article III courts have a duty to inquire whether, in fact, evidence has been gained by torture or

---

[8] Transcript of Oral Argument at 83-87, *Boumediene v. Bush, et al.*, Civ. No. 04-1166 (RJL) (D.D.C. Dec. 2, 2004) (A377-81). The DTA required the Department of Defense to revise its procedures so that future CSRTs would, "to the extent practicable, assess whether any statement derived from or relating to such detainee was obtained as a result of coercion; and the probative value (if any) of any such statement." DTA § 1005(b). The prisoners with cases currently pending in federal court, however, were found to be "enemy combatants" under the prior rules. Moreover, the MCA/DTA does not require the prior CSRT determinations to meet the new standard, and the MCA explicitly states that the determination of enemy combatant status under the prior rules is final, at least for the purpose of eligibility for trial by a Military Commission. MCA § 948a(1).

[9] We note, however, that investigations by the military, international bodies, and human rights organizations revealed that abusive interrogations did occur. *See, e.g.,* Dep't of Def., *Army Regulation 15-6: Investigation of the Abu Ghraib Detention Facility and 205th Military Intelligence Brigade* 63 (Aug. 2004) ("Abu Ghraib Report"), *available at* http://www.defenselink.mil/news/ Aug2004/ d20040825fay.pdf; United Nations, *Conclusions and Recommendations of the Committee against Torture: United States of America* ¶¶ 24, 26, 30 (July 25, 2006); Human Rights First, *Command's Responsibility: Detainee Deaths in U.S. Custody in Iraq and Afghanistan* (Feb. 2006).

other cruel, inhuman, or degrading treatment, and to reject that evidence if so obtained. In the CSRT process, however, that inquiry did not take place.

* * * *

The publicly available record indicates the CSRT panels did little to evaluate the probity of allegedly coerced evidence, even when evidence such as medical records was readily available. Some CSRTs found the torture allegations credible enough to warrant investigation by other military authorities, but the panels nevertheless found the detainees to be enemy combatants without awaiting the outcome of the investigation. Although the Government might have adduced other, non-coerced evidence in individual cases, the CSRT neither examined allegations of torture *before* the individual was adjudicated an enemy combatant nor did it exclude such evidence from its consideration.

1. **CSRTs referred torture allegations for investigation but did not wait for the investigation results.**

Many cases involved reports of false confessions coerced by interrogators in countries where the State Department has long condemned the use of torture by state security agents.[10]   For instance, the District Court recounted the torture endured by Mamdouh Habib, who was rendered by the United States to Egypt,

---

[10] *See, e.g.*, Dep't of State, *Country Reports on Human Rights Practices – 2005 – Egypt* (Mar. 8, 2006), *available at* http://www.state.gov/g/drl/rls/hrrpt/2005/61687.htm.

6

where he alleges he was subjected to horrific abuse. *See In re Guantanamo Detainee Cases*, 355 F. Supp. 2d 443, 473 (D.D.C. 2005). The United States has never denied the truth of Habib's allegations. All the Government's claims against Habib were based on "confessions" he gave to interrogators in Egypt.[11]  (*See* September 9, 2004 Memo at 1-2, A20-21.) Habib's Personal Representative reported to the CSRT that his "confessions" were made "under duress" in an attempt to "tell interrogators what they wanted to hear because he was in fear." (Unclassified Summary at 1, 3, A12, A14.) Yet, the CSRT simultaneously (a) determined that the torture allegations were credible enough to warrant an investigation, and (b) found Habib to be an enemy combatant. (*Id.* at 3, A14.)

Habib's case is not unusual. Several prisoners told the CSRT they had been tortured by Pakistani security forces.[12]  For example, Abd Al Nasir Khantumani and his son, Muhammad Khantumani, were arrested in Pakistan. The Pakistanis

---

[11] Joseph Margulies, *Guantánamo and the Abuse of Presidential Power* 182 (New York 2006).

[12] These allegations are consistent with the State Department's findings that Pakistan tortures prisoners. *See* Dep't of State, *Country Reports on Human Rights Practices - 2005 – Pakistan* (Mar. 8, 2006), *available at* http://www.state.gov/g/ drl/rls/hrrpt/2005/61710.htm. Ironically, the 2005 report also criticizes an anti-terrorism law under which "coerced confessions are admissible in special courts." *Id.* The State Department made similar allegations in its 2004, 2003, 2002, and 2001 reports. *See, e.g.,* Dep't of State, *Country Reports on Human Rights Practices - 2004 – Pakistan* (Feb. 28, 2005), *available at* http://www.state.gov/g/ drl/rls/hrrpt/2004/41743.htm.

wanted them to admit they had been on a particular bus: "the Pakistanis tortured us to a point that we admitted we were on the bus." (Transcript at 4, A85.) "We tried to say no, no, no," his son, Muhammad, testified at his father's Tribunal, "but they just keep torturing us. Then they broke my nose and I said I was on the bus." (*Id.* at 7, A88.) "If you look at my nose," he said, "you can see it is broken." (*Id.*) The CSRTs passed the Khantumanis' allegations of torture up the chain of command, but found them both to be enemy combatants before any investigation was conducted. (Unclassified Summary at 3, A81, 118; Report at 1, A78, 115.)

The CSRT took the same action in the case of Abdul Aziz Al Khaldi, who told the CSRT he had been captured by the Afghani police. "They were threatening me and torturing me," he said. (Transcript at 9, A161.) "If I didn't say that I was from al Qaeda or Taliban I was tortured." (*Id.*) The Afghanis transferred him to Kandahar, where the beatings continued. (*Id.*) "The guy was speaking English saying, al Qaeda? Taliban? . . . Evidence of the torture is that they broke my tooth, which was fixed here [in Cuba]." (*Id.*) Al Khaldi's allegations of torture were referred for investigation (Unclassified Summary at 2, A168), but the CSRT found Al Khaldi to be an enemy combatant on the day of his CSRT hearing (Report at 1, A167).

### 2.   Many CSRTs did not address evidence of torture.

A number of CSRTs simply ignored testimony that the detainee's prior statements to interrogators were the result of torture.  Bisher al Rawi, for example, reported to the CSRT that he confessed "only after I was subjected to sleep deprivation and various threats were made against me" at Bagram, Afghanistan.[13] (Transcript at 24, A216.)   Al Rawi, a British resident, was arrested during a business trip to Gambia and taken to Afghanistan. (*Id.*)    The CSRT discussed other aspects of al Rawi's testimony, but did not address al Rawi's testimony that his confession to interrogators had been coerced.  (Unclassified Summary at 3-4, A190-91.)

Similarly, Fahd Al Sharif was arrested while visiting Pakistani villages with a group of missionaries.  (Transcript at 5, A314.)   He told the CSRT that he confessed to interrogators at Kandahar because they beat him so severely that his wrist was broken and his eardrum punctured.  (*Id.* at 2, A311.)  According to the publicly available record, the CSRT did not retrieve Sharif's medical records.

---

[13] Prisoners held in Afghanistan reported being subjected to prolonged isolation, sleep deprivation, environmental manipulation, hooding, and so-called "stress and duress positions" – all techniques the U.S. has admitted using. *See, e.g.,* Don Van Natta, Jr. and Ray Bonner, *Questioning Terror Suspects in a Dark and Surreal World*, N.Y. Times at A1 (Mar. 9, 2003); Tim Golden, *In U.S. Report, Brutal Details of 2 Afghan Inmates' Deaths*, N.Y. Times at A1 (May 20, 2005); Abu Ghraib Report 63; Human Rights Watch, *Enduring Freedom: Abuses by U.S. Forces in Afghanistan* at 37-40 (Mar. 2004), *available at* http://hrw.org/reports/2004/afghanistan0304.

Similarly, the public record indicates no investigation of Mohammed Souleimani Laalami's testimony that he confessed to training at the al-Farouq training camp only to end the beatings by his captors. "I did say these things," he told the panel, "but I said them when I was captured and being beaten and threatened with death. . . . I told the Red Cross in Kandahar, I and others were being beaten and admitted to things that were not true. . . . I was beaten until I said they were true." (Transcript at 1, A322.)

These accounts are not unique. When the CSRT accused Mohammed Haidel of receiving artillery training in Afghanistan, for instance, Haidel explained that an interrogator in Kandahar "hit my arm and told me I received training in mortars." (Transcript at 1, A325.) When Haidel denied the allegation, the beating intensified. "As he was hitting me, I kept telling him, no I didn't receive training." (*Id.*) Throughout this interrogation, Haidel was kneeling on the ground with his hands lashed behind his back. (*Id.*) He began to bleed from his head. "I was crying and finally I told him I did receive the training. . . . I was in a lot of pain, so I said I had the training." (*Id.*) "At that point," Haidel said, "if he had asked me if I was Usama Bin Ladin, I would have said yes." (*Id.*)

Samuer Abdenour explained to the CSRT that in Kandahar he had admitted to advance knowledge of the 9/11 attacks because interrogators refused to tend his wounded leg: "They just wanted anything. Any information. I just told them

10

anything; whatever they wanted to hear because I wanted them to treat my leg. I saw other people whose legs had to be cut off [as a result of injuries]. I did not want my leg to be cut off." (Transcript at 4, A331.) The CSRT found Abdenour to be an enemy combatant.[14] The publicly available record does not indicate that the CSRT sought to review any potentially relevant medical or other records.

### 3. A few CSRTs cross-examined detainees to distance U.S. forces from the alleged torture.

On occasion, CSRTs probed the torture allegations, but to demonstrate that U.S. forces did not participate in the torture, not to determine whether the "confession" was reliable or the product of coercion. For example, Abdul Rahim Ginco told the CSRT that he had been tortured by both the Taliban and forces allied with Americans. (Transcript at 11, 13, A352, A354.) The Taliban had accused Ginco of being an American spy, and imprisoned him from May 2000 until January 2002. (*Id.* at 3, 6-7, A344, A347-48.) Upon release from the Taliban prison, Ginco and a friend told an Australian reporter that they "wanted to be witnesses against al Qaida and Taliban . . . to the Americans." (*Id.* at 6, 8, A347, A349.) Two days later, U.S. forces arrested Ginco and held him in Kandahar. (*Id.*) Ginco told the CSRT the interrogators at Kandahar "kept pushing me, they

---

[14] *See* Annual Review Board Transcript for Detainee ISN #659 at 1, *available at* http://www.dod.mil/pubs/foi/detainees/csrt/ARB_Transcript_Set_8_20751-21016. pdf. (indicating enemy combatant status).

beat and tortured me. . . . Military intelligence, they told me to say I'm al Qaida, so, I told them, ok, I'm al Qaida." (*Id.* at 13, A354.) In finding Ginco to be an enemy combatant, the CSRT apparently relied not only on Ginco's coerced confessions to U.S. interrogators, but also a false videotaped confession that Ginco made after weeks of torture by the Taliban and high-level Al Qaeda members. (*Id.* at 3, 10-11, A344, A351-52.) The CSRT had asked Ginco only about torture by the Taliban: "So it was the Taliban prison people who forced you to do this [videotape]?" (*Id.* at 11, A352.) [15]

\* \* \* \*

In each of these cases, the prisoner reported to the CSRT that he had "confessed" only to stop the torture. But because the CSRTs relied on secret evidence, it is impossible to know how many times a CSRT found a prisoner to be an enemy combatant based on a false accusation by one prisoner who was tortured to incriminate another. For instance, the Department of Defense has reported that interrogation of Guantánamo detainee Mohammed al Qahtani produced "detailed information about 30 of Osama Bin Laden's bodyguards who are also held at

---

[15] *See also* Transcript of Obaidullah at 5, A360 (CSRT asked detainee whether he had "told a consistent story since" arriving in Cuba, but did not inquire into alleged torture in Afghanistan leading to false confession).

Guantanamo."[16]  According to the publicly released portion of his Department of

Defense interrogation log,[17] al Qahtani was interrogated at Guantánamo for about

20 hours per day for seven weeks, during which period he was kept in isolation,

intimidated with military dogs, sexually humiliated, and subjected to sleep and

sensory deprivation.[18]

Under standard CSRT procedures, the 30 men whom al Qahtani implicated

would never be told who had accused them of being Osama Bin Laden's

bodyguards or under what circumstances, and al Qahtani's coerced accusations

would be presumed accurate.  This Court cannot know how many other prisoners

remain at Guantánamo based on accusations produced by similar interrogation

techniques.[19]

---

[16]  Dep't of Def., News Release (June 12, 2005), *available at* http://www.
defenselink.mil/releases/2005/nr20050612-3661.html.

[17]  Dep't of Def., *Interrogation Log, Detainee 063* (Nov. 23, 2002 to Jan. 11, 2003),
*available at* www.time.com/time/2006/log/log.pdf.

[18]  *Id.* at 27 (At one point al Qahtani's heart rate slowed to 35 beats per minute).

[19]  *See, e.g.*, FBI email from (name redacted) to (name redacted) (Aug. 2, 2004),
*available      at*      http://www.aclu.org/torturefoia/released/FBI.121504.5053.pdf
(describing detainees chained to floor for 18-24 hours, subjected to extreme
temperatures, sleep deprivation, and threatened with dogs); FBI email from (name
redacted) to Gary Bald, Frankie Battle, and Arthur Cummings (Dec. 5, 2003),
*available at* http://www.aclu.org/torturefoia/released/FBI. 121504.3977.pdf; Dep't
of Def., *Army Regulation 15-6:  Investigation Into FBI Allegations of Detainee
Abuse at Guantánamo Bay, Cuba, Detention Facility, Executive Summary* (June 9
2005),     *available     at*     http://www.defenselink.mil/news/Jul2005/d20050714
report.pdf; Neil A. Lewis, *Red Cross Finds Detainee Abuse in Guantánamo*, N.Y.

Furthermore, even when prisoners suspected that the allegations against them came from another detainee's torture, it was impossible for them to prove it. For example, Ibrahim Zeidan told his CSRT that he believed another person – Anwar Abu Faris – had made false statements about Zeidan receiving training in Afghanistan because Faris had been rendered to Jordan and tortured.[20] (Transcript at 3, 6, A369, A372.)

*Amici* are not aware of a single CSRT that permitted the prisoner to develop an evidentiary record regarding statements allegedly obtained by torture. Yet, according to the Government, the MCA/DTA does not allow this Court to consider facts outside the CSRT record bearing on the grounds for detention, even if those facts would show that the prisoner is detained based on a false confession obtained through torture. *Amici* cannot know if the torture allegations are true, but the reviewing court will likewise not be able to make that determination.

---

TIMES (Nov. 30, 2004), *available at* http://www.nytimes.com/ 2004/11/30/politics/ 30gitmo.html?ex=1259470800&en=825f1aa04c65241f&ei =5088&partner=rssnyt.

[20] The State Department has reported on confessions obtained by torture in Jordanian prisons. Dep't of State, *Country Reports on Human Rights Practices – 2005 – Jordan* (Mar. 8, 2006), *available at* http://www.state.gov/g/drl/rls/hrrpt/ 2005/61691.htm.

**B.**   **The Fifth Amendment and the Common Law Prohibit Detention Based on Evidence Procured by Torture.**

**1.**   **The Due Process Clause**

"What has distinguished our ancestors? – That they would not admit of tortures, or cruel and barbarous punishment."[21]   Patrick Henry's words expressed the Founding Fathers' deep abhorrence of torture, which they viewed as a tool of royal despotism.  This abhorrence is embedded in our Constitution.  The Supreme Court has consistently held that the Due Process Clause of the Fifth Amendment prohibits the government from depriving a person of his liberty based on statements obtained by torture.  *See, e.g., Miller v. Fenton*, 474 U.S. 104, 109 (1985); *Rochin v. California*, 342 U.S. 165, 173-74 (1951).  Indeed, the most fundamental purpose of the Due Process Clause is to "give protection against torture, physical or mental" to all persons subject to government power.  *Palko v. Connecticut*, 302 U.S. 319, 326 (1937), *overruled on other grounds by, Benton v. Maryland*, 395 U.S. 784 (1979); *see also Chavez v. Martinez*, 538 U.S. 760, 774 (2003) (plurality); *County of Sacramento v. Lewis*, 523 U.S. 833, 846-47 (1998).

Not only is evidence derived from torture inherently unreliable,[22] but allowing detentions based on such evidence corrupts the judicial process.  An

---

[21]  3 Jonathan Elliot, *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 447 (1836).

[22]  *See, e.g., Jackson v. Denno*, 378 U.S. 368, 385-86 (1964).

unwavering stand against the use of this evidence is therefore essential. For that reason, federal courts have long held that "certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned . . . ." *Miller*, 474 U.S. at 109. Beatings and other forms of physical and psychological torture are interrogation methods that are "revolting to the sense of justice." *Brown v. Mississippi*, 297 U.S. 278, 286 (1936). Coerced confessions "offend the community's sense of fair play and decency. . . . [T]o sanction [such] brutal conduct . . . would be to afford brutality the cloak of law. Nothing would be more calculated to discredit law and thereby to brutalize the temper of a society." *Rochin*, 342 U.S. at 173-74.

## 2. The Common Law

The common law similarly condemns torture and the use of its fruits. At a minimum, the Suspension Clause protects habeas as it existed at common law. *See, e.g., INS v. St. Cyr*, 533 U.S. 289, 301 (2001) (citing *Felker v. Turpin*, 518 U.S. 651, 663-64 (1996) and stating "at the absolute minimum, the Suspension Clause protects the writ 'as it existed in 1789'"). "It has always been the boast of Englishmen that torture was forbidden by the Common Law of the land."[23]

---

[23] Leonard A. Parry, *The History of Torture in England* 1 (1933).

Blackstone, for instance, derided the rack as "an engine of state, not of law."[24]

Coke was likewise unequivocal in condemning torture, declaring without

reservation that "there is no law to warrant tortures" in England.[25]

By the time the common law was developed in the colonies, and long before

the Constitution was adopted, torture was a discarded relic of a repudiated past.

*See A(FC) v. Secretary of State for the Home Department*, [2005] UKHL 71 (H.K.

Dec. 8, 2005) ¶¶10-17 (holding common law forbids reliance on evidence gained

via torture even where detaining power didn't conduct the torture). In 1628, King

Charles asked the common law judges whether John Felton, assassin of the Duke

of Buckingham, "might not be racked" to make him identify his accomplices and

"whether there were any law against it."[26] The judges answered unanimously that

the common law would not tolerate a prisoner's detention or prosecution based on

---

[24] 4 William Blackstone, *Commentaries on the Laws of England* at 320-21 (1st ed. 1803).

[25] Edward Coke, *The Third Part of the Institutes of the Laws of England* 35 (W. Clarke & Sons 1817) (1644); *see also* David Hope, *Torture*, 53 Int'l & Comp. L.Q. 807, 811 (2004) ("the use of torture was not permitted in any of the common law courts in England as part of the ordinary course of the administration of justice.").

[26] Proceedings Against John Felton, 3 Howell's St. Tr. 367, 371 (1628); John H. Langbein, *Torture and the Law of Proof: Europe and England in the Ancient Regime* 134 (1977).

evidence secured by torture.[27]   As noted above, the framers of the Constitution

shared the English common law's abhorrence for evidence obtained by torture.[28]

## C.   The Government's Reading of the MCA/DTA Would Allow Indefinite Imprisonment Based On Evidence Secured By Torture, in Violation of the Constitution and the Common Law.

No habeas court would ever rely on evidence obtained by torture, whether its

review were grounded in the common law or the Fifth Amendment.   Instead, when

presented with allegations that evidence had been so obtained, a habeas court

would ensure a searching inquiry.   We do not understand Congress to have

suspended the writ.   *See* U.S. Const. art. I, § 9, cl. 2 (limiting Congress's power to

suspend the writ to cases of invasion or rebellion).   Absent a suspension, therefore,

the constitutional question is simply whether allegations of torture under the MCA

and DTA are handled in a fashion equivalent to that under the common law or the

Constitution.   *See, e.g.*, *Swain v. Pressley*, 430 U.S. 372, 384 (1977) (absent

suspension, Congress cannot divest federal courts of habeas jurisdiction without

providing an adequate and effective substitute "commensurate" with the scope of

---

[27] Lawrence Herman, *The Unexpected Relationship between the Privilege Against Compulsory Self-Incrimination and the Involuntary Confession Rule (Part I)*, 53 Ohio St. L.J. 101, 134 (1992) (citing Proceedings Against John Felton, 3 Howell's St. Tr. 367, 371 (1628)); *see also* Hope, *supra*, at 812; Seth F. Kreimer, *Too Close to the Rack and the Screw:  Constitutional Constraints on Torture in the War on Terror*, 6 U. Pa. J. Const. L. 278, 311 n.17 (2003).

[28] *See, e.g.*, *Chambers v. Florida*, 309 U.S. 227, 236-37 (1940); 3 Jonathan Elliot, *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 447 (1836).

habeas).  Regrettably, the CSRTs did not subject allegations of torture and other abuse to the same searching inquiry as would a habeas court.  The MCA, therefore, is unconstitutional, at least in its treatment of such allegations.

Section 7 of the MCA purports to strip the federal courts of jurisdiction to hear habeas corpus claims by aliens whom the Executive has designated enemy combatants and to relegate such persons to the limited judicial review the DTA specifies.  Under the DTA, the Court is limited to considering whether the CSRT followed its own "standards and procedures" in determining enemy combatant status and, "to the extent the Constitution and laws of the United States are applicable, whether the use of such standards and procedures . . . is consistent with the Constitution and the laws of the United States."  DTA § 1005(e)(2)(C).

The Executive Branch interprets the first clause to prevent this Court from considering any evidence not presented to and considered by the CSRT. According to the Government, "the DTA does not authorize the submission of new evidence to this Court relating to the detainee's status as an enemy combatant."[29] Moreover, the Government claims the Tribunal's evidentiary record "is entitled to

---

[29] Resp'ts' Resp. in Opp'n to Mot. to Compel at 19, *Bismullah v. Rumsfeld*, No. 06-1197 (D.C. Cir., Aug. 21, 2006).

the strongest sort of presumption of regularity."[30]   The Government would apparently relegate this Court to undertaking the most cursory review into whether the CSRT followed its own rules, beginning with a presumption that it did.  If the Court adopted this interpretation, it – like the CSRT – would be forced to accept evidence obtained under torture, a result abhorrent to this Nation's judicial and legal principles.

The Government maintains that the second clause has no effect because the Constitution and laws of the United States do not apply to this Court's review of CSRT determinations.  If this were correct, then MCA/DTA effectively would bar this Court from examining whether evidence presented to the CSRT had been obtained by torture or other illegal coercion, and if so, whether there remained a sufficient basis in law or fact to justify detention.  Accordingly, the Government's interpretation would mean that the MCA/DTA fails to provide an adequate or effective substitute for habeas in violation of the Suspension Clause.

## CONCLUSION

The Executive's interpretation of the MCA/DTA threatens to force the federal judiciary to sanction indefinite detention based on evidence secured by torture.  This prospect raises grave constitutional concerns and jeopardizes the

---

[30] *Id.*; *see also id.* at 14 ("In sum, the DTA does not provide for evaluating evidence outside of the record reviewing [sic] a CSRT's factual conclusion of evidentiary sufficiency.").

integrity of the Judiciary. This Court should not be made to accept evidence wrung

from the prisoner by the simple expedient of brute force.


Dated: November 1, 2006                    Respectfully submitted,


                                    By:  _____

Patricia A. Bronte                       Agnieszka M. Fryszman
Douglas A. Sondgeroth                    COHEN, MILSTEIN, HAUSFELD
JENNER & BLOCK LLP                        & TOLL, PLLC
330 N. Wabash Avenue                     1100 New York Avenue, N.W.
Chicago, IL 60611                        Washington, DC 20005
312 222-9350                             202 408-4600

                        *Counsel for Amici Curiae*


21

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies, pursuant to Federal Rules of Appellate Procedure 29(c)(5) and 32(a)(7)(C), and Circuit Rule 32(a)(7)C), that the foregoing Brief of *Amici Curiae* Retired Federal Jurists complies with the type-volume limitations set forth in Circuit Rule 32(a)(7)(B) and the Court's Order of October, 18, 2006.

This brief is in 14-point, proportionally spaced Times-New Roman Type, and the number of words in this brief, according to the word-processing system utilized in preparing it, is 4,881.

Dated: November 1, 2006                    Certified by:

                                           Agnieszka M. Fryszman

                                           Counsel for *Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on November 1, 2006, two copies of the foregoing Brief

of *Amici Curiae* Retired Federal Jurists were hand-delivered and were also sent by

e-mail transmission, to the following counsel:

| | |
|---|---|
| Robert M. Loeb | Thomas B. Wilner |
| Douglas N. Letter | Neil H. Koslowe |
| S. Department of Justice | Shearman & Sterling |
| Civil Division, Appellate | 801 Pennsylvania Avenue, NW |
| 950 Pennsylvania Ave., N.W. | Suite 900 |
| Washington, DC  20530-0001 | Washington, DC  20004-2634 |
| Robert.Loeb@usdoj.gov | twilner@shearman.com |
| | neil.koslowe@shearman.com |

In addition, two copies of the foregoing were sent by overnight mail and e-mail
transmission to the counsel listed below:

Stephen H. Oleskey
Robert C. Kirsch
Melissa A. Hoffer
Mark Fleming
Wilmer Cutler Pickering Hale & Dorr
60 State Street
Boston, MA  02109
Melissa.Hoffer@wilmerhale.com
Mark.Fleming@wilmerhale.com

Douglas F. Curtis
Wilmer Cutler Pickering Hale & Dorr LLP
339 Park Avenue
New York, NY  10022
Douglas.Curtis@wilmerhale.com

Linda Aono

# EXHIBIT D

# NO-HEARING HEARINGS

## CSRT: THE MODERN HABEAS CORPUS?

### AN ANALYSIS OF THE PROCEEDINGS OF THE GOVERNMENT'S COMBATANT STATUS REVIEW TRIBUNALS AT GUANTÁNAMO

By
Mark  Denbeaux
Professor, Seton Hall University School of Law and
Counsel to two Guantanamo detainees
Joshua Denbeaux, Esq.
Denbeaux & Denbeaux

David Gratz, John Gregorek, Matthew Darby, Shana Edwards,
Shane Hartman, Daniel Mann, Megan Sassaman and Helen Skinner
Students, Seton Hall University School of Law

1

# NO-HEARING HEARINGS

### AN ANALYSIS OF THE PROCEEDINGS OF THE GOVERNMENT'S COMBATANT STATUS REVIEW TRIBUNALS AT GUANTÁNAMO

# EXECUTIVE SUMMARY

In the wake of the Supreme Court's decision that the United States Government must provide adequate procedures to assess the appropriateness of continued detention of individuals held by the Government at Guantánamo Bay, Cuba, the Department of Defense established the Combatant Status Review Tribunals ("CSRT") to perform this mission. This Report is the first comprehensive analysis of the CRST proceedings. Like prior reports, it is based exclusively upon Defense Department documents. Most of these documents were released as a result of legal compulsion, either because of an Associated Press Freedom of Information request or in compliance with orders issued by the United States District Court in habeas corpus proceedings brought on behalf of detainees. Like prior reports, "No Hearing Hearings" is limited by the information available.

The Report documents the following:

1.  The Government did not produce any witnesses in any hearing and did not present any documentary evidence to the detainee prior to the hearing in 96% of the cases.
2.  The only document that the detainee is always presented with is the summary of classified evidence, but the Tribunal characterized this summary before it as "conclusory" and not persuasive.
3.  The detainee's only knowledge of the reasons the Government considered him to be an enemy combatant was the summary of the evidence.
4.  The Government's classified evidence was always presumed to be reliable and valid.
5.  In 48% of the cases, the Government also relied on unclassified evidence, but, like the classified evidence, this unclassified evidence was almost always withheld from the detainee.
6.  At least 55% of the detainees sought either to inspect the classified evidence or to present exculpatory evidence in the form of witnesses and/or documents.
    a.  All requests by detainees to inspect the classified evidence were denied.
    b.  All requests by detainees for witnesses not already detained in Guantánamo were denied.

2

     c. Requests by detainees for witnesses detained in Guantánamo were denied in 74% of the cases.  In the remaining 26% of the cases, 22% of the detainees were permitted to call some detainee-witnesses and 4% were permitted to call all of the detainee-witnesses that they requested.

     d. Among detainees that participated, requests by detainees to produce documentary evidence were denied in 60% of the cases. In 25% of the hearings, the detainees were permitted to produce all of their requested documentary evidence; and in 15% of the hearings, the detainees were permitted to produce some of their documentary evidence.

7.    The only documentary evidence that the detainees were allowed to produce was from family and friends.

8.    Detainees did not always participate in their hearings.  When considering all the hearings,  89% of the time no evidence was presented on behalf of the detainee.

9.    The Tribunal's decision was made on the same day as the hearing in 81% of the cases.

10.   The CSRT procedures recommended that the Government have an attorney present at the hearing; the same procedures deny the detainees any right to a lawyer.

11.   Instead of a lawyer, the detainee was assigned a "personal representative," whose role, both in theory and practice, was minimal.

12.   With respect to preparation for the hearing, in most cases, the personal representative met with the detainee only once (78%) for no more than 90 minutes (80%) only a week before  the hearing (79%).

13.   At the end of the hearing, the personal representative failed to exercise his right to comment on the decision in 98% of the cases,

     a. During the hearing; the personal representative said nothing 12% of the time.

     b. During the hearing; the personal representative did not make any substantive statements in 36% of the cases; and

     c. In the 52% of the cases where the personal representative did make substantive comments, those comments sometimes advocated for the Government.

14.   In three of the 102 CSRT returns reviewed, the Tribunal found the detainee to be  not/no-longer an enemy combatant. In each case, the Defense Department ordered a new Tribunal convened, and the detainee was then found to be an enemy combatant. In one instance, a detainee was found to no longer be an enemy combatant by two Tribunals, before a third Tribunal was convened which then found the detainee to be an enemy combatant.

15.   When a detainee was initially found not/no-longer to be an enemy combatant:

     a. The detainee was not told of his favorable decision;

     b. There is no indication that the detainee was informed of or participated in the second (or third) hearings;

     c. The record of the decision finding the detainee not/no-longer to be an enemy combatant is incomplete.

**INTRODUCTION:**

After the Supreme Court ruled on June 28, 2004 in *Rasul v. Bush*, 542 U.S. 466 (2004), and *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004), that the Guantánamo detainees were entitled to access to federal court through the writ of habeas corpus, the Defense Department established processes to review the status of all detainees, many of whom had been held without any proceeding for two and a half years. Within one month of *Rasul,* the Defense Department created the "Combat Status Review Tribunal" ("CSRT") and established a process for hearings before the CSRT. Each CSRT was composed of three unidentified members of the military who presided over the hearings.

As soon as most of the CSRT hearings were completed, the Government informed the District Court in which the habeas proceedings were pending that, despite the Supreme Court's ruling, no further judicial action was necessary because the detainees had been given CSRT review.

This Report analyzes the CSRT proceedings, comparing the hearing process that the detainees were promised with the process actually provided. The Report is based on the records that the United States Government has produced for 393 of the 558 detainees who had CSRT hearings.

The most important documents in this record were produced by the Government in response to orders by United States District Judges that the Department of Defense provide the entire record of the Combat Status Review Tribunal for review by counsel for at least 102 detainees. These are described as habeas-compelled "full CSRT returns." Without these documents, it would only be possible to review the process promised. With the 102 "full CSRT returns," this Report can also compare the process promised with the process provided.

The results of this review are startling. The process that was promised was modest at best. The process that was actually provided was far less than the written procedures appear to require.

The detainees were denied any right to counsel. Instead, they were assigned a "personal representative" who advised each detainee that the personal representative was neither his lawyer nor his advocate, and that anything that the detainee said could be used against him. In contrast to the absence of any legal representative for the detainee, the Tribunal was required to have at least one lawyer and the Recorder (Prosecutor) was recommended to be a lawyer.

The assigned role of the personal representative was to assist the detainee to present his case. In practice, any assistance was extraordinarily limited. The records of meetings between detainees and their personal representatives indicate that in 78% of the cases, the personal representative met with the detainee only once. The meetings were as short as 10 minutes, and this includes time for translation. Some 13% of the meetings were 20 minutes or less, and more than half of the meetings lasted no more than an hour.

During this meeting, the detainee was told the following:

- The CSRT proceeding was his opportunity to contest the Government's finding that he was an enemy combatant;

- The Government had already found the detainee to be an enemy combatant at multiple levels of review;

- The Government's finding rested upon classified evidence that the detainee would not see; and

- The Tribunal must presume that the secret classified evidence was reliable and valid.

In the majority of the CSRT hearings, the Government rested on the presumption that the classified evidence was sufficient to establish that the detainee was an enemy combatant. The Government never called any witnesses and rarely adduced unclassified evidence. In the majority of cases, the Government provided the detainee with no evidence, declassified or classified, which established that the detainee was an enemy combatant. Instead, the Government provided the detainee merely with what purported to be a summary of the classified evidence. This summary was so conclusory that it precluded a meaningful response. The Government then relied on the presumption that the secret evidence was reliable and accurate.

In the minority of cases, the Government produced declassified evidence to the Tribunal. Such declassified evidence did not bear directly on the question at issue. It consisted of letters from the detainee's family and friends asking for his release, portions of habeas corpus petitions submitted by the detainee's own lawyers on his behalf in United States District Court, and publicly available records that did not mention the detainee by name. None of the declassified evidence introduced against any detainee contained any specific information about the Government's basis for the detainee's detention as an enemy combatant.

Detainees who participated in CSRT proceedings rarely were able to confront the Government evidence. The Government never called witnesses and did not typically produce any unclassified evidence. When such evidence was presented to the Tribunal, it was not shown to the detainee 93% of the time. As for the ability of the detainees to produce evidence, only 11% of the detainees were allowed to introduce any evidence. The promised CSRT process provided that detainees could call witnesses, but no witness from outside Guantánamo ever appeared. The only witnesses the Government allowed detainees to call were other detainees. Therefore, the only witnesses that were allowed under the CSRT process were presumed enemy combatants testifying in favor of other presumed enemy combatants.

5

The promised CSRT process stated that detainees would be allowed to produce documentary evidence. In operation, the only documentary evidence that detainees were actually allowed to introduce were letters from family and friends. This was true even when the documentary evidence sought to be introduced was available and, in fact, even when the documents were in the Government's possession -- such as passports, hospital records, and even judicial proceedings. In these cases, the detainee insisted that the documents would prove that the charges against him could not be true, but none of the documents was permitted to be introduced.

The detainee's personal representative was totally silent in 12% of the hearings, and in only 52% of the hearings did the personal representative make substantive comments. However, sometimes the substantive comments of the personal representative advocated for the Government and against the detainee. At the end of the hearing, the personal representative had a last opportunity to make comments, but 98% of the time the personal representative explicitly chose not to do so.

In sum, while the promised procedures stated that detainees were allowed to present evidence (witnesses and documents), the only evidence that the detainees were permitted to offer in the vast majority of the cases was their own testimony. As a result, the only option available to the detainee was to make a statement attempting to rebut what he could glean from the summary of classified evidence that he could not see. In 81% of the cases reviewed, the Tribunals made their decision the same day as the hearing. Among the 102 records reviewed for this report, the ultimate decision was always unanimous, and all detainees reviewed were ultimately found to be enemy combatants. It is true that Government statements indicate that 38 of 558 detainees were ultimately found not/no longer to be enemy combatants, but no such determinations are found in the full CSRT records reviewed.

While all detainees reviewed were ultimately found to be enemy combatants, not all Tribunals found the detainee to be an enemy combatant. On a few occasions, a Tribunal initially found that the detainee was not/no longer an enemy combatant. In such cases, the detainee was never told of this decision. Instead, the Tribunal's decision was reviewed at multiple levels in the Defense Department chain of command and eventually a new Tribunal was convened. However, some detainees were still found not/no longer to be enemy combatants. At least one detainee's record indicates that after a second Tribunal found him no longer an enemy combatant, the process was repeated and sent back for a third Tribunal which found him to be an enemy combatant.

6

## THE DATA

In response to *United States v. Rasul* and *Hamdi v. Rumsfeld,* on June 28, 2004 the Department of Defense created the Combatant Status Review Tribunal system and processed each detainee. This report analyzes the data released by the Department Defense about the CSRT proceedings in response to Freedom of Information Act requests and through discovery during *habeas* lawsuits. Substantive data regarding individual detainees has never been voluntarily released by the Department of Defense.

According to the available Department of Defense data, there have been 759 total detainees ever incarcerated at Guantanamo; 558 detainees at Guantánamo Bay have been reviewed by the CSRT process.[1] The Department presumably created a file for each of the 558 CSRT proceedings, which we will refer to as the full CSRT Record. Since the Government has not released these files, except under court orders entered in the various habeas proceedings, the 102 full CSRT returns are the only full CSRT records that can be analyzed in this Report.

Each detainee was provided the right to appear before the CSRT Tribunal. At least 361 detainees chose to participate, and a Summarized Detainee Statement was prepared from their testimony in each case. This report refers to these Summarized Detainee Statements as "transcripts," although they are not verbatim records. A transcript is provided for those Tribunals in which the detainee is physically present and for those Tribunals in which the detainee has the personal representative read a statement into the record. The Department of Defense initially refused to release any of these transcripts, but a Freedom of Information Act lawsuit brought by the Associated Press succeeded and the Department of Defense was ordered to release these documents.[2] This Report examines these 102 full CSRT returns and 356 transcripts, as those are the only documents that the Government has released.[3] See Diagram I.

---

[1] This report does not consider the recent "high value detainees" transferred to Guantanamo in September 2006. See "High Value Deatinees Moved to Gitmo; Bush Proposes Detainee Legislation," (Sept. 6, 2006), http://www.defenselink.mil/news/NewsArticle.aspx?ID=721.

[2] The Department of Defense released 356 transcripts through the FOIA request, but there are 4 additional detainee transcripts available among the 102 full CSRT returns reviewed in this report.

[3] 5 of the 102 CSRT returns include transcripts that were not produced in conjunction with the AP FOIA request. Therefore, a total of 361 transcripts exist.

**DIAGRAM I**



Since only 356 transcripts were released, 202 of the 558 detainees apparently did not participate in the CSRT process; however, because 5 of the 102 full CSRT returns contain transcripts that are not present in the FOIA released 356 transcripts, these 356 transcripts do not contain the records of all detainees who participated in the CSRT.

Although the 102 full CSRT returns contain 69 returns with transcripts, in 11 of these cases the transcripts only record conversations between the personal representative and the Tribunal. Therefore 102 Full CSRT records reviewed include records of 58 detainees who appeared in the CSRT proceeding and 43 detainees who did not physically appear. See **Diagram II.**

**DIAGRAM II**



This results in full CSRT returns (including transcripts) for 69 detainees. The 38 full CSRT returns of detainees who do not have transcripts released in the Associated Press FOIA are for detainees about whom no other information has been released by the Department of Defense. Eleven detainees who were not physically present at their hearing are among the 69 for whom a transcript is available. The 356 FOIA transcripts combined with the 38 full CSRT returns total 394 detainee records which make up our full sample set. These 394 records reveal that 324 detainees physically appear before the Tribunal.

The data collected on these 38 detainees without a FOIA released transcript constitutes the only information available about the 202 detainees whose transcripts were not produced by the FOAI request.

In short, of the entire 558 detainees at Guantánamo who have been provided the CSRT process, there is some documentation for 394 detainees: the 356 FOIA released transcripts (64 of which also have full CSRT returns) and the 38 full CSRT returns whose transcript was not released by the FOIA.[4]

---

[4] The two different data sets upon which this report is based have been compared with the profile of all of the detainees that was published February 8, 2006. Mark Denbeaux, *et. al.*, REPORT ON GUANTANAMO DETAINEES: A Profile of 517 Detainee through Analysis of Department of Defense Data (2006), available at *http://law.shu.edu/news/guantanamo_report_final_2_08_06.pdf* . The correlation between the data

9

## CREATION OF THE COMBATANT STATUS REVIEW TRIBUNALS

*United States v. Rasul* and *Hamdi v. Rumsfeld* were decided on June 28, 2004. The Department of Defense issued Establishing and Implementing Orders on July 7 and 29, 2004, respectively.[5] Guantanamo personnel hand-delivered a letter to every detainee, advising him both of the upcoming Combatant Status Review Tribunal and of his right, independent of the CSRT, to file a habeas corpus suit in United States District Court.[6] Therefore the entire CSRT procedures were promulgated in only 32 days.

As the CSRT's were being convened in Guantánamo, the Department of Defense was responding to habeas proceeding in Washington, D.C. The response, beginning in August 2004, justified the CSRT as providing the appropriate hearing detainees were entitled to under *Rasul*. On October 4, 2004 the Defense Department advised the Court that the CSRT's were being processed and described the process that each detainee was being provided. The goal was to demonstrate that, since a sufficient hearing had been held for each detainee, no habeas hearing by a federal court was required.

According to the CSRT procedures established in the July 29, 2001 memo, prior to the commencement of any CSRT proceeding, the classified evidence relevant to that detainee had to be reviewed, a "summary of evidence" prepared, a personal representative appointed for the detainee, the personal representative had to meet with the detainee, and a Tribunal impaneled. The first hearing, according to the records reviewed was of ISN #220[7] and held on August 2, 2004. For that first hearing, the personal representative met with the detainee on July 31, 2004, two days after the CSRT procedures were promulgated. This was the only meeting between this detainee and his personal representative and it lasted only 10 minutes, including translation time. On Monday, August 2, 2004, two days after the meeting between the personal representative and the detainee, the CSRT Tribunal was empanelled, the hearing held, the classified evidence evaluated and the decision issued. This detainee did not participate in his CSRT hearing.

The remainder of the habeas detainees whose CSRT returns were in the 102 considered in this report were processed rapidly: 49% of the hearings were held and

---

previously analyzed and the data considered in this report is very strong. That correlation is presented in Appendix 1.

[5] Paul Wolfowitz, *Order Establishing Combatant Status Review Tribunal* (Jul. 7, 2004), http://www.defenselink.mil/news/Jul2004/d20040707review.pdf; Gordon England, *Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at U.S. Naval Base Guantanamo Bay, Cuba* (Jul. 29, 2004), http://www.defenselink.mil/news/Jul2004/d20040730comb.pdf.

[6] While the right, to proceed in federal court may have been extinguished by the Military Commissions Act of 2006, Pub. L No. 109-366, the meaning and constitutionality of that statute is not addressed by the present Report.

[7] Mr. Abdullah Saleh Ati Ai Ajmi, ISN #220, is represented by counsel in habeas litigation. He represents one of the 35 detainees who refused to participate in the CSRT process but whose Full CSRT Return was obtained by his attorney under court order in the *habeas* litigation.

decisions reached by September 30, 70% by October 31, and fully 96% were completed by the end of November 2004. This haste can be seen not only in the scheduling of the hearing but in the speed with which the Tribunals declared a verdict. Among the 102, in 81% of the cases, the decision was reached the same day as the hearing.

The progress of the CRST hearings is reflected in Chart I, "Timeline of CSRT for 102 full CSRT returns" which displays the history of the 102 full CSRT returns by tracking four separate events for each detainee. "R-1" (dark blue line) is the declassified "Summary of Evidence" for each detainee; "1st D-A" (pink line) is the document prepared by the personal representative either during or after the first meeting between he and the detainee. "Hearing" (yellow line) is the date the CRST convenes to consider evidence and hear from the detainee. "Decision" (light blue line) is the date of the CRST decision (in most cases closely tracking the hearing date). It is apparent that the proceedings were commenced and completed in a very short period. [8]

## CHART I



Chart I can be profitably compared with Chart II, the "Dates of Decision for the CSRT," which presents the pattern of decision making of the CSRT's for all of the detainees as published by the Department of Defense in March 29, 2005. Chart II chart

---

[8] The Defense Department reported in 2005 that, to the best of their knowledge, there were only 5 personal representatives participating in the CSRT process. Affidavit on file at Seton Hall University School of Law.

11

shows the timing of the decisions for all of the detainees' CSRT proceedings. According to Chart II, the detainees' final administrative decisions tended to cluster at the end of the time frame, long after the decisions of the Tribunals. Almost 40% of the final decisions were made after the last Tribunal decision. During this six weeks after the Tribunals ended and the bulk of the decisions were made, 35 of the 38 detainees who were found to no longer be enemy combatants were determined.

**CHART II**



**THE DECISION TO PARTICIPATE**

Each of the 558 detainees who received a CSRT proceeding was advised on at least three occasions that he would also have a right to a habeas corpus proceeding in United States District Court in Washington D.C.

The Department of Defense Order of July 7, 2004 directed that each detainee be told within 10 days that he would have a CSRT proceeding and that each detainee was also entitled, should he so choose, to proceed with habeas litigation in United States District Court challenging their detention at Guantánamo Bay. Pursuant to this Order, each detainee was hand-delivered a formal written notice so specifying.

12



The English version of this Notice, prepared for and delivered to every detainee in translation in accordance with the DOD July 7, 2004 Order provided as follows:

> The U.S. Government will give you an opportunity to contest your status as an enemy combatant. Your case will go before a Combatant Status Review Tribunal, composed of military officers. This is not a criminal trial and the Tribunal will not punish you, but will determine whether you are properly held...
>
> As a matter separate from these Tribunals, *United States courts have jurisdiction to consider petitions brought by enemy combatants held at this facility that challenge the legality of their detention.* You will be notified in the near future what procedures are available should you seek to challenge your detention in the U.S. courts. Whether or not you decide to do so, the Combatant

---

[9] 07/13/2004 Guantánamo Bay, Cuba - The Combatant Status Review Tribunal Notice is read to a detainee. Photo by Airman Randall Damm, USN http://www.defenselink.mil/news/Jul2004/2004071604b.jpg. This picture was obtained from the Department of Defense and depicts the service of the formal written notice, duly translated, advising the detainee of the CSRT and his right to challenge his detention in United States District Court.

Status Review Tribunal will still review your status as an enemy combatant.[10]

This document, then, informs each detainee he will be accorded a CSRT, whether or not he chooses to participate. It also informs the detainee that the CSRT is only one of his legal rights, the other being petitions to "United States courts."

### THE PERSONAL REPRESENTATIVE

The CSRT procedures provide that there must be a "personal representative" for each detainee, and also require the personal representative to meet with the detainee before the CSRT hearing. The personal representative must advise the detainee of the CSRT process, and also advise the detainee, for a second time, that he has an independent right to habeas corpus.[11]

The records of meetings between detainees and their personal representatives indicate that in 78% of the 102 full CSRT returns, the detainee and the personal representative met only once. Such meetings were typically brief: 91% percent of these meetings were two hours or less, 51% were an hour or less, 6% were 30 minutes or less, 13% were 20 minutes or less, and 2% were ten minutes or less.

The time spent in the meetings includes the time spent translating and the time spent conveying specific information about the process, the personal representative's role, and the option of going to federal court. The length of these meetings did not leave much time for detailed communication, much less meaningful consultation between the personal representative and detainee.

---

[10] Gordon England, *Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at U.S. Naval Base Guantanamo Bay, Cuba* (Jul. 29, 2004), http://www.defenselink.mil/news/Jul2004/d20040730comb.pdf, (emphasis added).
[11] *Id.*

**DIAGRAM III**



**Length of D-A Meeting**

- ▣ 20 Mins. or less (13%)
- ▣ 21-30 Mins. (6%)
- □ 31-60 Mins. (32%)
- □ 61-90 Mins. (29%)
- ▣ 91-120 Mins. (11%)
- ▣ 121-180 Mins. (9%)

At that initial meeting with each detainee, the personal representative had several tasks, including warning the detainee that the personal representative was not the detainee's lawyer and that nothing discussed would be held in confidence:

> I am neither a lawyer nor your advocate, but have been given the responsibility of assisting your preparation for the hearing. *None of the information you provide me shall be held in confidence and I may be obligated to divulge it at the hearing.* I am available to assist you in preparing an oral or written presentation to the Tribunal should you desire to do so.[12]

This statement makes clear both that the detainee has no advocate in the process and that the detainee has the right to not participate in his process. After receiving this information, 32% of the detainees opted not to participate in the CSRT proceeding.

The meetings with the personal representative occurred very shortly before the Tribunal hearing. The records of meetings between detainees and their personal representatives indicate that for 24% of the detainees, the meeting with the personal representative was held the day of or the day before the CSRT proceeding. For 55% of the detainees, the meeting was between two days and a week before the hearing. Only 7% of the detainees met with their personal representative more than two weeks prior to the CSRT proceeding. See Diagram IV.

---

[12] Gordon England, *Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at U.S. Naval Base Guantanamo Bay, Cuba* (Jul. 29, 2004), http://www.defenselink.mil/news/Jul2004/d20040730comb.pdf, (emphasis added).

15

**DIAGRAM IV**



**Number of days between 1st D-A and Hearing**

- ☑ 1 Day or Less (24%)
- ☑ 2-7 Days (55%)
- ☐ 8-14 Days (14%)
- ☐ More Than 2 Weeks (7%)

24%
7%
14%
55%

In 52% of the cases, the personal representative made substantive statements to the Tribunals. However, many times they did not say a word (12 %) and other times they made only formal non-substantive comments (36%). Furthermore, in a number of cases, the personal representative advocated for the Government.

Detainees frequently expressed the view that the CSRT process was not an opportunity to "contest" their status as enemy combatants, but rather another form of interrogation. Seven percent of the detainees who *did* physically appear in their CSRT proceeding made voluntary statements on the record indicating that they understood this to be a continuation of their interrogation and not a true hearing.

The documents show that some detainees objected to the personal representative's role as an aid to the Tribunal rather than as an assistant to the detainee. In 8% all records reviewed, the detainees suggested, without being asked, that the personal representative or the Tribunal were a form of interrogation rather than a hearing. In every occasion when the detainee objected to his personal representative serving as the Government's agent against him, the detainee's objections were ignored.

Contained in the records for detainee ISN #1463 is the following exchange:

> Detainee: My personal representative is supposed to be with me. Not against me. Now he is talking like he is an interrogator. How can he be an attorney? I said all of these allegations were fabricated and I told you I had nothing to do with them. It's up to

16

the Recorder or Reporter to respond or provide the proof. I'm afraid to say anything that you might use against me. As you know, there is no attorney here today and I don't know anything about the law. I don't know which of these statements are going to be used for me or against me. Whoever is representing the Government needs to provide evidence.

I cannot say anything that can be used against me. I am even afraid to say what my name is

Anything else I say, I am afraid is going to be used against me.

I hope that you can forgive me.[13]

Although the CSRT procedure requires the personal representative to advise the detainee of the Tribunal process and the detainee's rights under the process, the personal representative on a number of occasions neglected to do this.

ISN #45, Ali Ahmed Mohammed Al Rezehi, did not appear at his CSRT hearing. His personal representative received the "Summary of Evidence" against Mr. Al Rezehi on September 23, 2004 and met with him for 20 minutes on September 28, 2004. According to the "Conclusions of the Tribunal" section the Summary of the Basis for Tribunal Decision, Mr. Al Rezehi declined to participate in his CSRT proceeding:

> The detainee understood the Tribunal Proceedings, but chose not to participate . . . The Tribunal questioned the personal representative closely on this matter and was satisfied that the personal representative had made every effort to ensure that the detainee had made an informed decision.

The Tribunal's close questioning of the personal representative is problematic because the form the personal representative presented to the Tribunal stated that the he had neither read nor left a written copy of the procedures with the detainee.

According to the CSRT record, the detainee's brother submitted a sworn affidavit on behalf of Mr. Al Rezehi. The Tribunal declined to consider the sworn affidavit, determined that the detainee had chosen not to participate in the CSRT, and found Mr. Al Rezehi to be an enemy combatant. The personal representative made no comment during the proceeding.

At least once, the personal representative did not advise the detainee of his right to appear before the Tribunal until after that hearing had already taken place and the Tribunal made its decision. The Detainee Election Form is the document that each personal representative was required to complete as soon as he finished his first meeting with each of his detainees. In the case of Musa Abed Al Wahab, ISN #58, the Combatant

---

[13] Quotes taken from detainee transcripts are available on file at Seton Hall University School of Law.

Status Review Tribunal Decision Report Cover Sheet concludes that the detainee was
determined to be an enemy combatant by a Tribunal, following a hearing with which he
chose not to participate in, on October 20, 2004.  There is nothing remarkable about this,
except for the fact that the Detainee Election Form (Exhibit D-a) is dated *October 25,
2004*. It is not clear how the personal representative could have advised the Tribunal that
the detainee had affirmatively declined to participate when he had yet to meet with the
detainee.

<h2 style="text-align:center">BURDEN OF PROOF AND
PRESUMPTION OF VALIDITY OF GOVERNMENT EVIDENCE</h2>

*A.    Burden of Proof*

The published rules for CSRT proceedings formally place the burden of proof that
the detainee is an enemy combatant upon the Government, not the detainee:

> Tribunals shall determine whether the preponderance of the
> evidence supports the conclusion that each detainee meets the
> criteria to be designated as an enemy combatant.[14]

That language might seem inconsistent with the notice read to each detainee in
notifying them of the CSRT procedures:

> The U.S. Government will give you an opportunity to
> contest your status as an enemy combatant.  Your case will
> go before a Combatant Status Review Tribunal, composed
> of military officers.  This is not a criminal trial and the
> Tribunal will not punish you, but will determine whether
> you are properly held....[15]

The language "...an opportunity to *contest* your status as an enemy combatant"
(emphasis added) might suggest that it is the detainee, and not the Government, that bears
the burden of proof to demonstrate that the detainee is *not* an enemy combatant.  Indeed,
the July 7th Order also referred to determinations of combatant status that the military had
made before the CSRT process. "Each detainee subject to this Order has been determined
to be an enemy combatant *through multiple levels of review* by officers of the Department
of Defense." (emphasis added)

Further, the summary of evidence provided to each detainee at the start of the first
meeting with the personal representative repeats this refrain. Each summary of evidence
includes the following statement:

[14] Gordon England, *Implementation of Combatant Status Review Tribunal Procedures for Enemy
Combatants Detained at U.S. Naval Base Guantanamo Bay, Cuba* (Jul. 29, 2004),
http://www.defenselink.mil/news/Jul2004/d20040730comb.pdf.
[15] *Id.*

18

> The United States Government has *previously determined*
> that the detainee is an enemy combatant. This determination
> is based on information possessed by the United States that
> indicates that the detainee is....
> (Emphasis added)

In sum, while the burden of proof was placed formally on the Government, the controlling documents clearly suggest the presumptive correctness of the detentions. A Tribunal would have to find that "multiple levels" of military review were all in error in order to find a detainee to not be an enemy combatant. In any event, the debate about who bore the burden of proof may not be worth pursuing in light of the presumption of the validity of the evidence that the procedures mandated, which is detailed below.

### B.    *Presumption of Validity of Government Evidence*

While the CSRT procedures formally place the burden of persuasion on the Government, they simultaneously mandate that the Tribunal consider the classified evidence as presumptively valid:

> There is a rebuttable presumption that the Government Evidence,
> as defined in paragraph H (4) herein, submitted by the Recorder to
> support a determination that the detainee is an enemy combatant, is
> genuine and accurate[16]

The effect of this presumption of validity of classified evidence is to meet, if not lift, the Government's burden of proving by a preponderance of the evidence that the detainee was properly classified as an enemy combatant. The detainee is presumed to be an enemy combatant based upon the classified evidence. Although the detainee may in theory rebut the presumption, the requirement that he do so effectively shifts the burden of persuasion to him.

However objectionable it may be to place the burden of proof on the Government with one hand and simultaneously presume it satisfied with the other, the CSRT procedures are even more problematic in light of their concomitant command that the detainee be denied access to the evidence itself. The evidentiary presumption might in theory be rebuttable, but, since the evidence is classified and kept secret from the detainee, he is unable to challenge, explain, or simply rebut it.    The rebuttable presumption of validity becomes, in practice, an irrebuttable one.

This explains why, although the burden of proof was supposedly on the Government, the Government never felt the need to present a single witness at any of the 393 CSRT hearings.    Instead, it relied almost exclusively on the secret, and

---

[16] Gordon England, *Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at U.S. Naval Base Guantanamo Bay, Cuba* (Jul. 29, 2004), http://www.defenselink.mil/news/Jul2004/d20040730comb.pdf.

presumptively valid, classified evidence. In reality, the burden was on the detainee to prove that the classified evidence was wrong. And the detainee was denied access to the evidence that might have enabled him to do so.


## THE HEARING


Each CRST took place in a small room. Armed guards brought the detainee, shackled hand and foot, to the room, seated him in a chair against the wall and chained his shackled legs to the floor. The detainee faced the Recorder (prosecutor for this proceeding), the personal representative (seated beside the Recorder), a paralegal and the interpreter. The three (3) Tribunal members, all military officers, sat to the right of the detainee behind the covered table. The scene is captured in the photograph below.[17]



---

[17] 07/29/2004 Guantánamo Bay, Cuba - The facility where the Combatant Status Review Tribunals (CSRT) will take place for detained enemy combatants. U.S. Navy photo by Photographer's Mate 1st Class Christopher Mobley (RELEASED) http://www.defenselink.mil/news/d20040805pic4.jpg

## THE EVIDENCE

Typically the Government provided the detainee only the document known as the "Unclassified Summary of the Evidence" and marked R-1 by the Recorder.[19] The boilerplate Discussion of Unclassified Evidence in most record reads:

> Exhibit R-1 is the Unclassified Summary of Evidence. While this summary is helpful in that it provides a broad outline of what the Tribunal can expect to see, *it is not persuasive in that it provides conclusory statements without supporting unclassified evidence.*

(Emphasis added)

The Unclassified Summary of Evidence often made it impossible for detainees to address its thrust. For example, the transcript of the proceeding for detainee ISN# 1463 recounts:

> Detainee: That is not true. I did not help anybody and whoever is saying that I did, let them present their evidence. If I know that somebody presented any evidence, then somebody can tell me what that evidence is so that I can respond to it. If there is any evidence at all....

> Detainee: That's not true. Again, whoever has any evidence to prove, let them present it. If somebody submitted any evidence, I'd like to take a look at it to find out if that evidence is true....

> Detainee: It's not fair for me if you mask some of the secret information.... How can I defend myself?

The CSRT Procedures as promulgated by the July 29, 2004 memo accord a broad range of powers to the Tribunals for the production of evidence. The Tribunal has the power to order witnesses who are members of the United States military to appear, the power to request civilian witnesses to testify, and the power to order production of any document in the possession of the United States Government. For none of the 393 detainees for whom records have been released did the Government *ever* produce a single witness, military or civilian, during the unclassified portion of the record. The CSRT Procedures accord the detainee a right to question witnesses against him, but that right is academic because the Government never presented any witness.

*A.*    *Government Unclassified Documentary Evidence*

The CSRT Procedures anticipate that the Government will produce unclassified evidence at the hearing. The Procedures explicitly require that the personal representative advise the detainee of his right to see such unclassified evidence.[20]   According to the 102 full CSRT returns the Government did not present any witnesses and rarely presented non-testimonial evidence to the detainee prior to the hearing.  A review of the 361 transcripts reveals that the Government may have shown the detainee some evidence before he began his statement in 4% of the cases.  When the hearing began, 89% of the detainees had no facts to rebut, whether from witnesses or from documentary evidence. The same documents also reveal that the Tribunal showed the detainee unclassified information in 7% of the hearings.  It is unclear why the Tribunal showed unclassified evidence in some cases but not in others.

As explained below, 49% of the 102 full CSRT returns contain some form of unclassified evidence presented by the Government.  This number is in stark contrast to the 4% of detainees who had access to unclassified information prior to their hearings, and to the 7% of detainees who were shown unclassified information during their hearings.

Each CSRT Return includes an Unclassified Summary of the Basis for Tribunal Decision, including the unclassified evidence against the detainee.  Twenty nine of the 102 full CSRT returns also contain a Recorder's Exhibit List, which cites every piece of classified and unclassified evidence that the Tribunal considers.  In addition, sometimes unclassified evidence is appended to the full CSRT returns.  These appended exhibits may or may not be listed in either the Recorder's Exhibit List or the Unclassified Summary of Basis.  Based on these three sources, unclassified evidence against detainees appears in 48% of the 102 full CSRT returns.

Thus, for 52% of the CSRT hearings, the Government had no unclassified evidence and relied solely upon the presumptively valid classified evidence to meet its burden of proof.

## 1. Types of Government Unclassified Evidence Presented to the Tribunal

The Government introduced five types of unclassified evidence in the CSRT hearing:

1.    Documents from friends and family
2.    Submissions from habeas corpus litigation
3.    Publicly available documents either released by the Government or published by the press that name the detainee at issue

---

[20] Enclosure (3) page 3, Gordon England, *Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at U.S. Naval Base Guantanamo Bay, Cuba* (Jul. 29, 2004), http://www.defenselink.mil/news/Jul2004/d20040730comb.pdf.

4.   Publicly available documents either released by the Government or published by the press that do not name the detainee
5.   Non-publicly available documents that particularly concern the detainee.

These are reflected in Chart III

## CHART III



**Types of Unclassified Documents Present in the Full CSRT Returns**

**Percentage of 49 Returns with Unclassified Evidence**

For 47% of the detainees whose Tribunal consider unclassified documents, this evidence consisted of documents and letters written by friends and family of the detainees. Correspondence written by family and friends generally lacks inculpatory value.

Eighteen percent of the records contain habeas corpus pleadings. Motions taken from habeas corpus proceedings also lack inculpatory value.

Of the full CSRT returns that consider unclassified documents, 29% contain public records that do not refer to the detainee. The inculpatory value of these documents is tenuous because the documents are used to establish that certain groups are terrorist organizations while not directly accusing the detainee of any wrongdoing.

23

Of the full CSRT returns that reflect unclassified documents, 10% contain public records that identify the detainee by name. The inculpatory value of these documents is more apparent.

An additional 14% contain non-publicly available documents directly pertinent to the detainee. Included in this group are documents that are labeled FOUO, as discussed below, as well as a Bosnian court investigation documents and a mental health record. The inculpatory value of these documents seems more apparent -- however, there is no indication the detainees ever saw these documents.

Most unclassified documents in a detainee's full CSRT return do not allow the detainee to effectively contest his status as an enemy combatant particularly when the detainee is usually not allowed to view this unclassified evidence.

## 2.    Unclassified FOUO Evidence Withheld from Detainee

Unclassified evidence includes, but is not limited to, documents labeled "For Official Use Only" ("FOUO"). However, the CSRT process consistently treated FOUO documents as if they are classified. For example, the record does not discuss these documents in the unclassified summary of the basis for decision. The FOUO documents primarily consist of interrogations of the detainee. Without access to these FOUO documents, the detainee is not able to clarify statements made or claim the statements were made as a result of torture.

The existence and reliance upon FOUO evidence is not revealed in any of the 356 FOIA-produced transcripts. Its existence was revealed, in most instances, in the Recorder's Exhibit List, which was produced only as part of the habeas compelled full CSRT returns. But for the habeas petitions, therefore, the Government's reliance on this variety of secret evidence would never have been revealed.

This Report was able to review the Recorder's Exhibit list for only 28% of the detainees' full CSRT returns. However, Exhibit Lists, when present, show that the Government relied upon unclassified FOUO evidence *for 83% of the detainees*. The record also shows that, when the Government relied upon unclassified FOUO evidence, it was always withheld from the detainee. See Chart IV.

## CHART IV



% of FOUO Doc's Used by Government

Contains Exhibit List 28%

Do Not Reference FOUO Doc 17%

No Exhibit List 73%

Reference FOUO Doc 83%

In essence detainees were not shown any evidence against them, classified or unclassified. Not only was the FOUO evidence withheld from the detainee in violation of the CSRT procedures, but other declassified evidence was also withheld.

*B.    The Detainee's Opportunity to Present His Evidence*

Records indicate that as many as 96% of the detainees began their presentation of their case without hearing or seeing any facts upon which the Government based its determination that the detainee was an enemy combatant other than the unclassified summary of evidence. The detainee began to present his case without knowing the facts he had to rebut. All data within this section is based upon the 102 full CSRT returns reviewed.

The CSRT procedures provided that each detainee would have the right to present his evidence to the Tribunal. The CSRT procedures provide that:

> (6) **The detainee may present evidence to the Tribunal,** including the testimony of witnesses who are reasonably available and whose testimony is considered by the Tribunal to be relevant. Evidence on the detainee's behalf (other than his own testimony, if

25

offered) may be presented in documentary form and through written statements, preferably sworn.[21]

Of the detainees who chose to participate in their Tribunal, more than half[22] (55%) attempted either to inspect the classified (or perhaps unclassified) evidence or to produce their own witnesses or documentary evidence. Most requests for the production of evidence at the Tribunal, however, were denied. Chart V reflects the requests made by type of evidence.

**CHART V**



1. **Witness Requests**

One third of detainees who participated requested that witnesses testify on their behalf. In some cases, requests were denied as being made too late to be considered, as during the hearing. Still other detainees refused to participate because their requests were denied.

---

[21] Gordon England, *Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at U.S. Naval Base Guantanamo Bay, Cuba* (Jul. 29, 2004), http://www.defenselink.mil/news/Jul2004/d20040730comb.pdf.

[22] Some detainees sought more than one kind of evidence. Some detainees sought witnesses and/or non-testimonial evidence and/or the opportunity to review classified evidence. The analysis that follows reviews the evidence requested and permitted without associating it with the total requests of any particular detainee.

Chart VI below shows that, among those records, only 26% of the detainees that requested witnesses were able to get *any* of those witnesses produced by the Tribunal. Even detainees who requested the testimony of other detainees at Guantánamo were often denied the right to call such witnesses.

**CHART VI**



% of Participating Detainees that Requested Witnesses and had Witnesses Produced

- ▣ Did Not Request Witnesses
- ▤ Requested Witnesses
- ☐ None Produced
- ☐ Some Produced
- ▦ All Produced

Chart VII further breaks down the data by showing that only 4% of these detainees were able to obtain *all* of their witnesses, and 22% of these detainees were able to have only *some* of their witnesses produced. Fully 74% of the detainees who requested witnesses were denied the production of all witnesses by the Tribunal. The Tribunal denied witness requests if it deemed the witnesses either "not reasonably available," "irrelevant," or at least one egregious example, because "the Tribunal would have been burdened with repetitive, cumulative testimony."[23]

**CHART VII**



Some detainees requested witnesses located outside Guantánamo and some requested witnesses from within the Base -- always another detainee. More than half of the detainees who requested witnesses, requested the testimony of witnesses who were not at Guantánamo. *All requests* for the testimony of detainees not detained at Guantánamo were denied.

The detainees who asked for witnesses from inside Guantánamo were successful in producing some witnesses only 50% of the time.

---

[23] For example, ISN 277 requested 17 witnesses, and the Tribunal President decided that he could only have two of them, because he determined that "all of the witnesses would probably testify similarly, if not identically." No basis is given for the belief that the witnesses would testify similarly or identically, and, as ISN 277's personal representative pointed out to the Tribunal, there is no basis in the CSRT procedures for denying a witness based on redundancy.

Nineteen percent of the participating detainees requested witnesses from outside Guantánamo. However, these requests were *never successful*. Thus, as the data shows, the only witnesses that any of the detainees were able to produce to testify on their behalf were other detainees.

The Unclassified Summary of the Basis for Decision lists the evidence that it considered and the evidence that the Tribunal did not consider. The data shows that only 26% of the detainees who requested witnesses had witnesses whose testimony was considered by the Tribunal. Broken down further, only 4% of the detainees who requested witnesses had all of their witnesses considered by the Tribunal. All of the witnesses considered were detainees testifying for each other.

In sum, the detainees were denied the right to produce any testimonial evidence other than the testimony of some of the fellow detainees.

## 2.    Unclassified Evidence Requests

Twenty-nine percent of the detainees requested unclassified documentary evidence prior to their hearings. Chart VIII analyzes participating detainees' unclassified evidence requests and the disposition of the requests. For the detainees who requested unclassified evidence, it was only produced 40% of the time. Twenty-five percent of the detainees who requested this evidence had all of their evidence produced, while 15% of these detainees had only some of the requested evidence produced. The documentary evidence that the Tribunal allowed the detainee to bring mostly letters from parents and friends that was accorded little weight by the Tribunal.

**CHART VIII**



% of Detainees That Requested
Unclassified Evidence and Had It Produced

D Had Some Produced 15%

D Had None Produced 60%

D Had All Produced 25%

**3.    Requests to See Classified Evidence**

During their hearing, more than 14% of the detainees requested the opportunity to view the classified evidence against them.[24]  These requests were always denied.

**4.    Evidence Detainees were Permitted to Present**

The Tribunals denied more evidence than they permitted, and denied almost all evidence that would be persuasive.  Detainees' requests for witnesses not detained in Guantanamo were always rejected.  Detainees requests to see any of the Government's classified evidence was always denied.  Detainees' requests for testimony from other detainees was usually denied.   The detainees, however, were allowed to present their documentary evidence, at least in part, 40% of the time.

**CHART IX**



---

[24] An examination of the 361 available transcripts reveals 18% made a request for classified evidence, but for purposes of this section analyizing all evidentiary requests, 14% corresponds to the 102 full CSRT returns.

The picture of what kind of evidence was permitted and rejected is bleak. However, when the number of detainees who have any evidence to present upon their behalf is considered, the picture is bleaker still. Based upon the 361 available transcripts, for as many as 89% of detainees, no evidence was presented on their behalf. The evidence the remaining 11% had was limited to testimony from other detainees and letters from friends and families. Taken as a whole, 96% of the detainees were shown no facts by the Government to support their detention as enemy combatants and 89% of the detainees had no evidence to present, and the 11% who did were allowed only unpersuasive evidence: family letters and other testimony from other detainees.

## 5. Reasons for Denying the Detainees' Evidence

The Procedures empower the CSRT Tribunal to:

> Order U.S. military witnesses to appear and to request the appearance of civilian witnesses if, in the judgment of the Tribunal President those witnesses are *reasonably available*.[25]

The Procedures also permit the CSRT Tribunal to:

> [R]equest the production of such *reasonably available* information in the possession of the US. Government bearing on the issue of whether the detainee meets the criteria to be designated as an enemy combatant, including information generated in connection with the initial determination to hold the detainee as an enemy combatant and in any subsequent reviews of that determination, as well as any records, determinations, or reports generated in connection with such proceedings[26]

The CSRT procedures do not define "reasonably available" and the detainee has no right to appeal a determination that certain evidence is either unavailable or "irrelevant." The reasons the Tribunals gave for the refusal to allow detainees to present evidence vary. The three most common reasons were:

1. The evidence/witness was not "reasonably available"
2. The evidence/witness was not relevant, or
3. The request for production of evidence/witness was not made to the personal representative during the D-A meeting and was thus too late.

---

[25] Gordon England, *Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at U.S. Naval Base Guantanamo Bay, Cuba* (Jul. 29, 2004), http://www.defenselink.mil/news/Jul2004/d20040730comb.pdf.
[26] *Id.*

The Tribunals sometimes did not give any reason for denying evidence. The Tribunals sometimes also refused to permit the introduction even of documentary evidence in the possession of the United States Government.

Mohammad Atiq Al Harbi (ISN #333) appeared before a Tribunal and identified documents which he said would exonerate him and explain that he was not an enemy combatant:

> It is important you find the notes on my visa and passport because they show I was there for 8 days and could not have been expected to go to Afghanistan and engage in hostilities against anyone.

During the proceeding for detainee ISN #680, the following exchange took place:

> Questions to Recorder by Tribunal Members
> Q: Are you aware if the passport is in control of the U.S. Government here in Guantánamo?
> A: No, sir, I'm not aware.
> Questions to Detainee by Tribunal Members
> Q: If we were to see a copy of your passport, what are the dates it would say you are in Pakistan?
> A: The date of my entry to Pakistan, the dates I have on my visa, they all exist there. Even in Pakistan, we were received by American investigators. We were interrogated by American interrogators in Pakistan.
> Q: How long have you been here at the camp?
> A: I really don't know anymore, but most likely 2 to 2 1/2 years.

The passport was neither located nor produced and the detainee was promptly found to be an enemy combatant.

For Khi Ali Gul, ISN# 928, the Tribunal President said:

> [W]e will keep this matter open for a reasonable period of time; that is, if we receive back from Afghanistan this witness request, even if we close the proceedings today, with new evidence, we would be open to introducing or re-introducing any witness statements we might receive.

Khi Ali Gul's requested that his brother be produced as a witness and provided the Tribunal with his brother's telephone number and address. Instead of calling the phone number provided, which might have produced an immediate result, the Government instead sent a request to the Afghan embassy. The Afghan embassy did not respond within 30 days and the witness was not produced. The witness was then found not to be reasonably available by the Tribunal, the detainee determined to be an Enemy Combatant, and the hearing was never reopened.

In another case, an Algerian detainee requested court documents from his hearing in Bosnia at which the Bosnian courts had acquitted him of terrorist activities. The Tribunal concluded that these official Court documents were not "reasonably available" even though the Unclassified Summary of the Basis for Decision discussed another document from the same Bosnian legal proceedings. The aspects of the Bosnian proceedings which the Tribunal considered were not the records that the detainee requested. Apparently, according to the Government, some records from a formal Bosnian trial are "reasonably available" but others are not. There was no explanation in the record to explain why the Government did not obtain the requested records. This detainee, like the others, was determined to be an enemy combatant.

In the case of Allal Ab Aljallil Abd Al Rahman Abd, ISN #156, the detainee sought the production of medical records from a specified hospital.

> During the hearing, the detainee requested that the Tribunal President obtain medical records from a hospital in Jordan . . . The Tribunal president denied the request. He determined that, since the detainee failed to provide specific information about the documents when he previously met with his PR, the request was untimely and the evidence was not reasonably available.

CSRT Procedures provide for two reasons to deny requested evidence: that it is irrelevant and that it is "not reasonably available." That the detainee did not mention this request to his personal representative is not a reason to deny the evidence, at least according to the Procedures set forth in the July 29, 2004 memo.

## TRIBUNAL EVALUATION OF THE EVIDENCE

Once the detainee leaves the hearing chamber, the Tribunal is supposed to review and evaluate the classified evidence for the first time. What occurred after each detainee left the hearing is never recorded, or at least no record has been released. While we have no access to the classified evidence, much of the classified evidence is apparently hearsay. The CSRT procedures permit the use of hearsay, but require the Tribunal to first determine the reliability of the hearsay:

> The Tribunal is not bound by the rules of evidence such as would apply in a court of law. Instead, the Tribunal shall be free to consider any information it deems relevant and helpful to a resolution of the issue before it. *At the discretion of the Tribunal, for example, it may consider hearsay evidence,* taking into account the reliability of such evidence in the circumstances. (emphasis added) [27]

---

[27] This language can be found in both the Wolfowitz and England memos at Jul. 7 2004 § G(9) and Jul. 29 2004 § G(7)). Paul Wolfowitz, *Order Establishing Combatant Status Review Tribunal* (Jul. 7, 2004), http://www.defenselink.mil/news/Jul2004/d20040707review.pdf; Gordon England, *Implementation*

33

The Tribunal's Basis for its Decision describes the rationale for determining that a detainee is an enemy combatant. However, the 102 full CSRT returns reviewed, all obtained only through the habeas litigation, show that the Tribinal apparently never questioned the reliability of any hearsay.

This failure to analyze the reliability of the hearsay is all the more serious because three issues arise concerning the reliability of the hearsay. First, the source of the hearsay is usually or always anonymous; second, there is great confusion about the names of the detainees; and third, there is some evidence of the coercion of declarants.

A.    *Hearsay from Anonymous Sources*

Each Tribunal decision was reviewed by a Legal Advisor. It is not possible to definitively analyze the quality of the hearsay evidence since it is unavailable, but the statement of the Legal Adviser reviewing the Tribunal's decision for ISN #552 demonstrates the problem:

> Indeed, the evidence considered persuasive by the Tribunal is made up almost entirely of hearsay evidence recorded by unidentified individuals with no first hand knowledge of the events they describe.

Outside of the CSRT process, this type of evidence is more commonly referred to as "rumor."

In one instance, the personal representative made the following comments regarding the Record of Proceedings for ISN #32:

> I do not believe the Tribunal gave full weight to the exhibits regarding ISN [redacted]'s truthfulness regarding the time frames in which he saw various other ISNs in Afghanistan. It is unfortunate that the 302 in question was so heavily redacted that the Tribunal could not see that while ISN [redacted] may have been a couple months off in his recollection of ISN [redacted]'s appearance with an AK 47, that he was six months to a year off in his recollections of other Yemeni detainees he identified. I do feel with some certainty that ISN [redacted] has lied about other detainees to receive preferable treatment and to cause them problems while in custody. Had the Tribunal taken this evidence out as unreliable, then the position we have taken is that a teacher of the Koran (to the Taliban's children) is an enemy combatant (partially because he slept under a Taliban roof).

---

*of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at U.S. Naval Base Guantanamo Bay, Cuba* (Jul. 29, 2004), http://www.defenselink.mil/news/Jul2004/d20040730comb.pdf.

*B.    Possible False Identities or Misnomers*

It is black letter evidence law in normal settings that, while hearsay may sometimes be admissible, the reliability of hearsay evidence always depends upon the reliability of the hearsay declarant. The problem of reliability in the case of the detainees is apparent because the Government's records of its detainees themselves misidentified the detainees more than 150 times.

On April 19, 2006 the Government published the names of the 558 detainees who have had CSRT proceedings at Guantanamo.[28]  On May 15, 2006 the Government also published a list of 759 names which represents all those ever detained at Guantánamo.[29] The Government has also released transcripts and other documents related to Administrative Review Board hearings that also contain detainee names.[30]

These three records contain more than 900 different versions of detainee names.. Adding other Government documents, such as the full CSRT returns and other legal documents, the number rises to more than 1000 different names.  Yet, according to the Government there only 759 detainees have passed through Guantánamo "between January 2002 and May 15, 2006."[31]  The more 1000 different names does not mean that there were more than 1000 detainees at Guantánamo; but it does establish the difficulty of identifying individuals in these circumstances.

If, after more than four years of interrogation, the Government does not know the names of its own detainees, confusion about the identity of detainees clouds any analysis of the evidence at the CSRT hearings.  In short, there should be considerable concern when a Tribunal relies upon hearsay declarants who may be talking about someone other than the detainee to whom the declaration is supposedly directed.  For example, one detainee responded to the claim that his name was found "on a document."  The detainee states:

> There are several tribes in Saudi Arabia and one of these tribes is Al Harbi. This is part of my names and there are literally millions that share Al Harbi as part of their name.  Further, my first names Mohammad and Atiq are names that are favored in that region. Just knowing someone has the name Al Harbi tells you where they came from in Saudi Arabia.  Where I live, it is not uncommon to be in a group of 8-10 people and 1 or 2 of them will be named

---

[28] Available at: http://www.defenselink.mil/pubs/foi/detainees/detainee_list.pdf
[29] Available at: http://www.defenselink.mil/pubs/foi/detainees/detaineesFOIArelease15May2006.pdf
[30]  The Procedures provide that each prisoner found an Enemy Combatant must go through an Administration Review Board process (ARB) every year following the CSRT conclusion that the detainee is an Enemy Combatant.
[31] This is the language used to describe the list of 759 detainee produced by the Government on May 15, 2006.

Mohammed Al Harbi.  If fact, I know of 2 Mohammed Al Harbis here in Guantánamo Bay and one of them is in Camp 4.  The fact that this name is recovered on a document is literally meaningless.[32]

### 3.   Possible Coercion

No Tribunal apparently considered the extent to which any hearsay evidence was obtained through coercion.   While the effects of torture, or coercion more generally, would obviously apply to inculpatory statements from the detainee himself, the possibility should also have been considered by a Tribunal weighing all statements and information relating to the detainee which may have been, in the words of the Detainee Treatment Act of 2005 "obtained as a result of coercion...."[33] This statute was not the enacted until December 2005, after the CSRT process was complete, but indications of torture or coercion by a detainee should have at least raised hearsay concerns, which the Tribunal is required to consider.[34]  The record does not indicate such an inquiry by any Tribunal.  Instead, the Tribunal usually makes note of allegations of torture, and refers them to the convening authority.   This is less surprising than the fact that several Tribunals found a detainee to be an enemy combatant before receiving any results from such investigation.  While there is no way to ascertain the extent, if any, that witness statements might have been affected by coercion, fully 18% of the detainees alleged torture; in each case, the detainee volunteered the information rather than being asked by the Tribunal or the personal representative. In each case, the panel proceeded to decide the case before any investigation was undertaken.

---

[32] Mohammad Atiq Al Harbi, ISN #333, goes on to state that there are documents available to the United States that will prove that his classification as an enemy combatant is wrong.  He also objects to anonymous secret evidence "It is important you find the notes on my visa and passport because they show I was there for 8 days and could not have been expected to go to Afghanistan and engage in hostilities against anyone. . . . I understand you cannot tell me who said this, but I ask that you look at this individual very closely because his story is false.  If you ask this person the right question, you will see that very quickly.  I am trusting you to do this for me."

[33] The Detainee Treatment Act of 2005 provides in part:

b) CONSIDERATION OF STATEMENTS DERIVED WITH COERCION.--

(1) ASSESSMENT.--The procedures submitted to Congress pursuant to subsection (a)(1)(A) shall ensure that a Combatant Status Review Tribunal or Administrative Review Board, or any similar or successor administrative Tribunal or board, in making a determination of status or disposition of any detainee under such procedures, shall, to the extent practicable, assess--

(A) whether any statement derived from or relating to such detainee was obtained as a result of coercion; and

(B) the probative value (if any) of any such statement.

[34] Gordon England, *Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at U.S. Naval Base Guantanamo Bay, Cuba* (Jul. 29, 2004), http://www.defenselink.mil/news/Jul2004/d20040730comb.pdf.

36

## DECISIONS OF TRIBUNAL WHEN A DETAINEE PREVAILS

Despite all this, the detainees sometimes won, at least initially The orders of July 29, 2004 state that:

> [t]he Director, CSRT, shall review the Tribunal's decision and may approve the decision and take appropriate action, or return the record to the Tribunal for further proceedings. In cases where the Tribunal decision is approved and the case is considered final, the Director, CSRT, shall so advise the DoD Office of Detainee Affairs, the Secretary of State, and any other relevant U.S. Government agencies.[35]

If the Director of the CSRT wishes, he may send any decision back to the CSRT for further proceedings, which means that the detainee can be subjected to multiple Tribunals until the Government is satisfied with the ruling. The additional hearings are always conduced without the detainee himself, who was never notified of his "victory" in the first proceeding.

At least three detainees were initially found not to be enemy combatants and then subjected to multiple re-hearings until they were found to be enemy combatants. This fact is not formally published in any records but was discovered through a careful review of documents produced under court order in the *habeas* litigations.

Several detainees had second hearings and at least one detainee, after his first and second Tribunals unanimously determined him to not be an enemy combatant, had yet a third Tribunal — again *in abstentia* — which finally found him to be properly classified as an enemy combatant. The Government's record for one detainee whose proceeding was returned for a second hearing states:

> On 24 November 2004, a previous Tribunal [unanimously] determined, by a preponderance of the evidence, that Detainee #654 was not properly designated as an enemy combatant.

It continues,

> On 25 January 2005, this Tribunal, upon review of all the evidence, determined that detainee #654 was properly [unanimously] designated as an enemy combatant.

A more egregious record of a detainee twice subjected to Tribunals is that of Detainee #250. The following excerpts present a vivid example of just how little is needed to determine that a detainee is not an enemy combatant. Detainee #250 elected to not appear in person before the Tribunal, but his statement was considered and he was unanimously found *not to have been properly designated as an enemy combatant.*

---

[35] *Id.*

However, that decision did not long stand. The Government's own Legal Sufficiency Review as written by Commander, United States Navy, James R. Crisfield, Jr. synopsizes the processing of Detainee #250's case.

> A letter from the personal representative initially assigned to represent the detainee at Guantanamo Bay, Cuba, reflects the detainee's elections and is attached to the Tribunal Decision Report as exhibit D-b. The original Tribunal proceedings were held *in absentia* outside Guantanamo Bay with a new personal representative who was familiar with the detainee's file. This personal representative had the same access to information and evidence as the personal representative from Guantanamo Bay. The addendum proceedings were conducted with yet a third personal representative because the second personal representative had been transferred to Guantanamo Bay. This personal representative also had full access to the detainee's file and original personal representative's pass-down information. The detainee's personal representatives were given the opportunity to review the respective records of proceedings and both declined to submit post-Tribunal comments to the Tribunal.

Despite the initial finding that the detainee was not an enemy combatant and the obvious difficulties reflected in this tortured process, Commander Crisfield concluded that "The proceedings and decision of the Tribunal, as reflected in enclosure (3), are legally sufficient and no corrective action is required." He recommended approval of the decision of the subsequent Tribunal finding #250 to be an enemy combatant.

The record of the third decision for yet another detainee, ISN #556, whose proceeding was returned twice, states in the memorandum following his third Tribunal:

> On 15 December 2004, the original Tribunal unanimously determined that the detainee should no longer be designated as an enemy combatant.

Following the initial Tribunal, its membership was changed. The record continues:

> Due to the removal of one of the three members of the original Tribunal panel, the additional evidence, along with the original evidence and original Tribunal Decision Report, was presented to Tribunal panel #30 to reconsider the detainee's status. On 21 January 2005 that Tribunal also unanimously determined that the detainee should no longer be classified as an enemy combatant.

The Tribunal was changed again:

Once again, additional information regarding the detainee was sought, found, and presented to yet a third Tribunal. This additional information became exhibits R-23 through R-30. This time, the three members of the second Tribunal were no longer available, but the one original Tribunal member who was not available for the second Tribunal was now available for the third. That member, along with two new members, comprised Tribunal panel #34 and sat for the detainee's third Tribunal. Following their consideration of the new additional information along with the information considered by the first two Tribunals, this Tribunal determined that the detainee was properly classified as an enemy combatant.

The records of other detainees suggest additional instances of rehearings. In these proceedings, the Tribunal reconvenes and considers an issue about the quality of the evidence, but there is no record of what transpired at the first hearing or why the second hearing occurred or the effect of the issues of concern about the quality of the evidence.

## BOTTOM LINE

"And again, to review, the CSRT is a one-time review to determine if a person, a detainee, is or is not an enemy combatant."[36]

Five hundred fifty-eight detainees went through the process of a Combatant Status Review Tribunal. Thirty-eight detainees, or 7% of the total, were released from Guantánamo as a result of the CSRT process. They were labeled either "non enemy combatants" or "no longer enemy combatants." In contrast to these numbers, no detainee in the sample set was ultimately found to be a non/no longer enemy combatant as a result of the CSRT although some were initially found to be either a "non" or "no longer" enemy combatant by a first (or even a second) Tribunal.

The difference between a "non" enemy combatant and a "no longer" enemy combatant is not clear, but the label "non enemy combatant" implies that the Government was mistaken when it detained the prisoners, while "no longer enemy combatant" implies that, while the prisoner was once an enemy combatant, Guantánamo Bay served as a successful rehabilitation program. Despite these connotations, the Government appears to consider the labels interchangeable.

For example, Secretary of the Navy Gordon England used both terms when he described the CSRT process on March 29, 2005. "The Tribunals also concluded that 38 detainees were found to no longer meet the criteria to be designated as enemy combatants. So 520 enemy combatants, 38 non-enemy- combatants…It should be

---

[36] Gordon England, *Defense Department Special Briefing on Combatant Status Review Tribunals* (Mar. 29, 2005), http://www.defenselink.mil/transcripts/2005/tr20050329-2382.html.

emphasized that a CSRT determination that a detainee no longer meets the criteria for classification as an enemy combatant does not necessarily mean that the prior classification as EC was wrong."[37]

## CONCLUSION

This Report lays out the CSRT Process, both as it exists on paper and as it was implemented in Guantánamo. The reader may judge whether that process meets the fundamental requirements of due process. Regardless of the answer, at this point in time, more than two years after the Supreme Court's decisions in *Rasul v. Bush*, and *Hamdi v. Rumsfeld* the CSRT is the only hearing that the detainees have received. The Government is attempting to replace habeas corpus with this no hearing process.

---

[37] *Id.*

Research and Contribution by:
Asim Badaruzzaman, Grace Brown, Jillian Camarote, Edmund Caulfield, Brad Dunn,
Doug Eadie, Paul Elias, Matt Feinstein, Chris Fuller, Brielle Goldfaden, Dan Gottlieb,
Eric Guglielmotti, Jennifer Holt, Colleen Karoll, Molly Moynihan, Mark Muoio, Dave
Pisciotta, Courtney Ray, Heather Siegelheim, Laura Sims, Sarah Wieselgren
Students, Seton Hall University School of Law

# APPENDIX I

| Return & Transcript Sample Set | | % variation | | Original 517 Records | | % variation | | Return Sample Set | |
|---|---|---|---|---|---|---|---|---|---|
| associated with Total | 58% | -2% | | associated with Total | 60% | -1% | | associated with Total | 59% |
| fighter for Total | 7% | -1% | | fighter for Total | 8% | 3% | | fighter for Total | 11% |
| member Total | 32% | 2% | | member Total | 30% | -1% | | member Total | 29% |
| none alleged Total | 3% | 1% | | none alleged Total | 2% | -1% | | none alleged Total | 1% |
| Grand Total | 100% | | | Grand Total | 100% | | | Grand Total | 100% |

| Return & Transcript Sample Set | | % variation | | Original 517 Records | | % variation | | Return Sample Set | |
|---|---|---|---|---|---|---|---|---|---|
| Al Qaeda Total | 31% | -1% | | Al Qaeda Total | 32% | 22% | | Al Qaeda Total | 54% |
| Al Qaeda & Taliban Total | 26% | -2% | | Al Qaeda & Taliban Total | 28% | -4% | | Al Qaeda & Taliban Total | 24% |
| Al Qaeda OR Taliban Total | 6% | -2% | | Al Qaeda OR Taliban Total | 7% | -4% | | Al Qaeda OR Taliban Total | 3% |
| none alleged Total | 3% | 1% | | none alleged Total | 2% | -1% | | none alleged Total | 1% |
| other Total | 1% | 0% | | other Total | 1% | -1% | | other Total | 0% |
| Taliban Total | 23% | 1% | | Taliban Total | 22% | -9% | | Taliban Total | 13% |
| Unidentified Total | 11% | 3% | | Unidentified Total | 8% | -4% | | Unidentified Total | 4% |
| Grand Total | 100% | | | Grand Total | 100% | | | Grand Total | 100% |

| Return & Transcript Sample Set | | % variation | | Original 517 Records | | % variation | | Return Sample Set | |
|---|---|---|---|---|---|---|---|---|---|
| 3-b Present | 44% | -1% | | 3-b Present | 45% | -3% | | 3-b Present | 42% |
| 3-b Not Present | 56% | 1% | | 3-b Not Present | 55% | 3% | | 3-b Not Present | 58% |
| Grand Total | 100% | | | Grand Total | 100% | | | Grand Total | 100% |

# EXHIBIT E

# Guantánamo Habeas Protective Orders Entered Post-DTA

1. Al-Sopai v. Bush, 05-cv-1667 (D.D.C., Jan. 4, 2006) (Walton)
2. Khiali-Gul v. Bush, 05-cv-877 (D.D.C., Jan. 6, 2006) (Robertson)
3. Bostan v. Bush, 05-cv-883 (D.D.C., Jan. 9, 2006) (Walton)
4. Mohammad v. Bush, 05-cv-879 (D.D.C., Jan. 9, 2006) (Walton)
5. Wahab v. Bush, 05-cv-886 (D.D.C., Jan. 10. 2006) (Sullivan)
6. Labed Ahmed v. Bush, 05-cv-1234 (D.D.C., Mar. 2, 2006) (Sullivan)
7. Almerfedi v. Bush, 05-cv-1645 (D.D.C., Mar. 6, 2006) (Friedman)
8. Razakah v. Bush, 05-cv-2370 (D.D.C., Mar. 17, 2006) (Sullivan)
9. Thabid v. Bush, 05-cv-2398 (D.D.C., Mar. 21, 2006) (Huvelle)
10. Ahmed v. Bush, 05cv1234 (D.D.C., Mar. 21, 2006) (Sullivan)
11. Awad v. Bush, 05-cv-2379, (D.D.C. Apr. 11, 2006) (Robertson)
12. Al Shareef v. Bush, 05-cv-2458 (D.D.C., Apr. 12, 2006) (Roberts)
13. Alsaaei v. Bush, 05-cv-2369 (D.D.C., Apr. 12, 2006) (Roberts)
14. Said v. Bush, 05-cv-2384 (D.D.C., Apr. 12, 2006) (Roberts)
15. Zadran v. Bush, 05-cv-2367 (D.D.C., Apr. 12, 2006) (Roberts)
16. Al Salami v. Bush, 05-cv-2452 (D.D.C. Apr. 14, 2006) (Friedman)
17. Faizullah v. Bush, 05-cv-01489 (D.D.C. April 21, 2006) (Urbina)
18. Sohail v. Bush, 05-cv-00993 (D.D.C. April 21, 2006) (Urbina)
19. Al-Ghizzawi v. Bush, 05-cv-02378 (D.D.C., June 2, 2006) (Bates)
20. Amon v. Bush, 05-cv-1493 (D.D.C., June 6, 2006) (Walton)
21. Nasrullah v. Bush, 05-cv-00891 (D.D.C., June 12, 2006) (Walton)
22. Al-Khalaqi v. Bush, 05-cv-999 (D.D.C., June 15, 2006) (Walton)
23. Mohammon v. Bush, 05-cv-2386 (D.D.C., June 27, 2006) (Walton)
24. Haleem v. Bush, 05-cv-2376 (D.D.C., June 30, 2006) (Walton)
25. Al Darby v. Bush, 05-cv-2371 (D.D.C., July 3, 2006) (Lamberth)
26. Al Harbi v. Bush, 05-cv-2479 (D.D.C., July 5, 2006) (Kennedy)
27. Qasim v. Bush, 05-cv-1779 (D.D.C., July 20, 2006) (Bates)
28. Muhibullah v. Bush, 05-cv-884 (D.D.C., Aug. 1, 2006) (Collyer)
29. Nabil v. Bush, 05-cv-1504 (D.D.C., Aug. 1, 2006) (Collyer)
30. Aboassy et al v. Bush, 05-cv-0748 (.D.D.C., Aug. 1, 2006) (Collyer)
31. Bacha v. Bush, 05-cv-2349 (D.D.C., Aug. 4, 2006) (Collyer)
32. Amin v. Bush, 05-cv-2336 (D.D.C., Sept. 18, 2006) (Friedman)
33. Razak v. Bush, 05-cv-1601 (D.D.C., Sept. 25, 2006) (Kessler)
34. Al Subaie v. Bush, 05-cv-2216 (D.D.C., Sept. 28, 2006) (Lamberth)
35. Al Wirghi v. Bush, 05-cv-1497 (D.D.C., Sept. 28, 2006) (Lamberth)
36. Al-Baidany v. Bush, 05-cv-2380 (D.D.C., Oct. 4, 2006) (Kollar-Kotelly)
37. Moosa v. Bush, 06-cv-1686 (D.D.C., Oct. 4, 2006) (Kollar-Kotelly)
38. Al-Nakheelan v. Bush, 06-cv-02201 (D.D.C., Oct. 6, 2006) (Huvelle)
39. Kabir v. Bush, 05-cv-1704 (D.D.C., Oct. 7, 2006) (Robertson)
40. Lal v. Bush, 06-cv-1763 (D.D.C., Oct. 29, 2006) (Kollar-Kotelly)
41. Feghoul v. Bush, 06-cv-00618 (D.D.C., Oct. 31, 2006) (Roberts)
42. Saleh v. Bush, 06-cv-1765 (D.D.C., Nov. 17, 2006) (Kennedy)
43. Hentif v. Bush, 06-cv-1766 (D.D.C., Nov. 21, 2006) (Kennedy)
44. Al-Zarnouqi v. Bush, 06-cv-1767 (D.D.C., Dec. 4, 2006) (Urbina)

# EXHIBIT F

FILED WITH
COURT SECURITY OFFICER
DATE 9.5.06

[ORAL ARGUMENT SCHEDULED FOR SEPTEMBER 11, 2006]

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

|  |  |
|---|---|
| JAMAL KIYEMBA, as Next Friend of ABDUSABUR DOE, *et al.*, | Appeal Nos. 05-5487 and 05-5488 |
| Appellees/Cross-Appellants, |  |
| v. | (Consolidated with Appeal Nos. 05-5489, 05-5490, 05-5491, 05-5492 and 06-5042) |
| GEORGE W. BUSH, *et al.*, | **EMERGENCY MOTION TO SUPPLEMENT RECORD ON APPEAL** |
| Appellants/Cross-Appellees. |  |

Pursuant to Fed. R. App. P. 27 and Circuit Rule 27(f), Appellees/Cross-Appellants hereby move for leave to supplement the record on appeal with the September 1, 2006 Declaration of Sabin Willett ("Willett Decl.").

As grounds for this motion, Appellees/Cross-Appellants state:

1.    These consolidated appeals are fully briefed and oral argument is scheduled for September 11, 2006.

2.    Petitioners' counsel has just learned of facts that bear directly on the propriety of the stays that are the subject of the cross appeal. As set forth below, petitioners' counsel has diligently sought to unearth these facts earlier but has been prevented from doing so by the Government.

3.   The *Kiyemba* habeas petition was filed in approximately August, 2005.  In September, 2005, District Judge Urbina entered the standard form of protective order.  Among other things, it obligated the Government to provide reasonable counsel access to Petitioners.  However, the Government unilaterally refused requests for counsel visits to those Petitioners because, it contended, the "next-friend" authorization was improper.  This contention had not been sustained by any Court, and the protective order had not been modified, but the Government nevertheless blocked our access to any detainee who had not spontaneously written an "authorization" in a form acceptable to the Government.  In late 2005/early 2006, when three such letters arrived, the Government objected to two of them on the ground that they were in English.  Petitioners' counsel promptly sought a negotiated solution through Magistrate Judge Kay.  A cumbersome compromise was reached as to the two, but as to five *Kiyemba* petitioners who had not written to us, the Government made no concession.  Magistrate Kay (who had already decided the same issue in another case) was obliged to decide it again.  The Government then appealed to Judge Urbina, who affirmed in August.  The Government procured further delay by initially denying access to counsel's interpreter, Ms. Rushan Abbas, on the grounds that she lacked adequate security clearance, despite the fact that Ms. Abbas formerly served as an interpreter for Department of Defense interrogators interrogating these very detainees at Guantanamo Bay.

4.   The result of this byplay was that counsel was blocked from meeting five of the petitioners, petitioners Abdusabur Doe, Abdunasir Doe, Khalid Doe, Hammad Doe, and Jalaal Doe, prior to August 29-31, 2006[1].

---

[1] The visit was originally schedule to begin on August 28, 2006, and delayed by one day by Hurricane Ernesto.  As a result of the hurricane, counsel was unable to meet Petitioner Khalid Doe.

5.    As is set forth in greater detail in the Willett Declaration, information learned from, and conduct of three of the foregoing petitioners, together with information learned from petitioners Abdusamad Doe and Hudaifa Doe (whom counsel had met previously), is highly relevant to three serious issues presented by the Appeal.

6.    *First*.  The first issue is the degree to which the indefinite delay caused by the stay has compromised – and perhaps fatally injured – the Petitioners' ability *ever* to proceed with a hearing on the merits of their petition.  The declaration contains evidence that the delays in this case have brought the Petitioners – who were raised under a Chinese legal system in which there is no independent judiciary -- to the conclusion that there simply is no legal process in America, and that the persons visiting them and claiming to be attorneys are likely imposters.  It now appears that certain of the petitioners may never place in American counsel the trust necessary to permit counsel to advance their case.  As the declaration shows, petitioners' conclusion in this regard, although incorrect, is not irrational.  Their access to information is controlled utterly by the Department of Defense, and they have no way to verify that their counsel are who they say they are.  Several Petitioners were advised by the Defense Department more than three years ago that they were "innocent," and would soon be released; all learned, more than two years ago, that the Supreme Court, in *Rasul*, had decided that cases might be heard in the courts; all learned, more than one year ago, that a habeas petition had been filed in their case.  The fact that nothing has happened was cited by all of them as evidence that the legal process either does not exist at all, or is a sham.  In short, the stay in this case is not simply delaying the hearing, it is fundamentally destroying the petitioners' ability ever to trust or participate in it.  The facts supporting this conclusion were not known until three days ago.

LITDOCS/651939.1

7.    *Second*.  The second point, which is related to and contributes to the first, is that the petitioners' living conditions have worsened dramatically during the pendency of the stays, and in particular since May. The stay is causing them a deep and profound hardship. As is shown in the declaration, one of the petitioners articulated in measured and thoughtful tones the view that while the American courts are meaningless, the pendency of the litigation may be antagonizing the military, thus may be rendering his living condition harsher, *and thus should be abandoned.*

8.    *Third*.  The visit uncovered new evidence of Government admissions of innocence of certain of the petitioners, not previously disclosed by the Government, which has never made a return in the *Kiyemba* cases. This evidence points up the urgent need for a hearing.[2]

9.    Petitioners concede that this motion is highly unusual, and a matter for the exercise of the Court's discretion. Petitioners believe the motion should be allowed because (i) the record supplementation sought bears directly on the balancing test advanced by the Government, *see Landis v. North Am. Co.*, 299 U.S. 248, 254-55 (1936)[3], (ii) the information contained in the declaration was not obtained before only because of the Government's manifold attempts to prevent Counsel from learning of it, (iii) Petitioners' counsel learned of and advanced the information as diligently as possible, and (iv) in the unique circumstances of this

---

[2]  Petitioners do not propose that "innocence," (in its broad sense of the status of being inappropriate for detention) which may or may not be contested by the Government, would be resolved by this Court or on this record. Such questions are for the trial court. However, the new evidence of Government admissions, like the other evidence to which the briefs advert, points up the urgent need for that resolution to take place.

[3]As the briefing reflects, Petitioners contend that the stays are absolutely impermissible in light of the mandate of *Rasul v. Bush*, 542 U.S. 466 (2004). The declaration shows, however, that the balancing test necessary to determine "immoderate" stays in ordinary civil litigation, *see* 299 U.S. at 256, even if applicable in these habeas cases, is unmet by the Government.

case, where the Government controls all access to information, the relief sought is equitable and will assist the Court in making an informed decision.

10.   Counsel returned from Guantanamo Bay on September 1, 2006, and prepared and submitted this motion and the attached declaration in the Secure Facility on the evening of September 1, 2006.

11.   In light of the time ordinarily allowed for response and disposition of the motion, it could not be resolved prior to the scheduled September 11, 2006, oral argument. Accordingly, the motion has been styled as an Emergency Motion and the Appellees/Cross-Appellants request expedited action on the motion.

WHEREFORE, Appellees/Cross-Appellants requests that the Court allow this motion and grant leave to supplement the record on appeal with the Willett Declaration.

Dated:  September 1, 2006

COUNSEL FOR
APPELLEES/CROSS-APPELLANTS:

Of Counsel:

Barbara Olshansky
Deputy Director
CENTER FOR CONSTITUTIONAL
RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
Telephone:  (212) 614-6439

Sabin Willett (Bar No. 50134)
Neil McGaraghan (Bar No. 50530)
Jason S. Pinney (Bar No. 50534)
BINGHAM McCUTCHEN LLP
150 Federal Street
Boston, MA  02110-1726
Telephone: (617) 951-8000
Facsimile:  (617) 951-8736

Susan Baker Manning (Bar No. 50125)
BINGHAM McCUTCHEN LLP
1120 20th Street NW, Suite 800
Washington, DC  20036-3406
Telephone: (202) 778-6150

Facsimile: (202) 778-6155

## CERTIFICATE OF SERVICE

I certify that on September 1, 2006, I prepared the foregoing Emergency Motion to Supplement Record on Appeal at the secure facility in Arlington, Virginia, provided a copy of the same to the Court Security Office agent stationed there, and requested that the same be forwarded to Court Security Officers Jennifer Campbell and Christine Gunning for filing in the Court of Appeals and service on the Appellants/Cross-Appellees.

Sabin Willett

FILED WITH
COURT SECURITY OFFICER
~~Mcadl~~
DATE 9.5.06

[ORAL ARGUMENT SCHEDULED FOR SEPTEMBER 11, 2006]

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

JAMAL KIYEMBA, as Next Friend of
ABDUSABUR DOE, *et al.*,

     Appellees/Cross-Appellants,

v.

GEORGE W. BUSH, *et al.*,

     Appellants/Cross-Appellees.

Appeal Nos. 05-5487 and 05-5488

(Consolidated with Appeal Nos. 05-5489, 05-5490, 05-5491, 05-5492 and 06-5042)

**SEPTEMBER 1, 2006
DECLARATION OF SABIN
WILLETT**

     Pursuant to 28 U.S.C. section 1746, I declare under the penalties of perjury that the following is true:

     1.    My name is Sabin Willett. I am a partner of Bingham McCutchen, LLP, counsel to the *Kiyemba* and *Mamet* petitioners in Appeal Numbers 05-5487 and 05-5488. I have practiced law continuously since 1983.

     2.    I visited the Guantánamo Bay Naval Station and met with certain of the Petitioners on August 29-31, 2006. Pursuant to the base regulations, all of our team's interview notes were delivered to our Guantanamo escort for delivery by military pouch to the Secure Facility, and I was not permitted to keep copies.

3.    On September 1, 2006, I traveled from Guantanamo Bay to Washington, D.C., where I prepared this declaration without the benefit of my files in these cases, or of my interview notes from August 29-31. I make this declaration on the basis of my best memory.

4.    The *Kiyemba* habeas petition was filed in approximately August, 2005.  In September, 2005, District Judge Urbina entered the standard form of protective order.  Among other things, that order obligated the Government to provide reasonable counsel access to Petitioners.  However, the Government unilaterally refused our requests for counsel visits to those Petitioners because, as Government attorneys advised me, the "next-friend" authorization was improper.  This contention had not been sustained by any Court, and the protective order had not been modified, but the Government nevertheless blocked base access to any detainee who had not spontaneously written an "authorization" in a form acceptable to the Government.  In (approximately) late 2005 or early 2006, letters arrived from three of the petitioners.  The Government objected to two of them on the ground that they were in English.  I was able to meet one of the petitioners, Saabir Doe, and I sought a negotiated solution through Magistrate Judge Kay as to the other two, Hudaifa Doe and Abdusamad Doe.  A cumbersome compromise was reached as to the latter two, but as to five of the *Kiyemba* petitioners who had not written, the Government made no concession.  Magistrate Kay (who had already decided the access issue in another case) was obliged to decide it again.  In May or June, 2006, he ordered that the Government provide us with access to our clients. The Government then appealed to Judge Urbina, who affirmed.

5.    Throughout this case we have had enormous difficulty securing secret-cleared Uighur speakers to serve as interpreters.  In 2006, we located Ms. Rushan Abbas, an American citizen and Uighur speaker.  The Government initially

denied access to Ms. Abbas, on the grounds that she lacked adequate security clearance.

6.    On information and belief, Ms. Abbas formerly served as an interpreter for Department of Defense interrogators interrogating these very detainees at Guantanamo Bay. Nevertheless, the Government insisted that Ms. Abbas be "re-cleared." This led to further delay of our visit.

7.    The result of this byplay was that our firm was blocked from meeting five of the petitioners, petitioners Abdusabur Doe, Abdunasir Doe, Khalid Doe, Hammad Doe, and Jalaal Doe, prior to August 29-31, 2006[1].

8.    My colleague Jason Pinney, Ms. Abbas, and I met for the first time with Petitioner Hammad Doe on the morning of August 29, 2006.

9.    We met for the first time with Petitioner Jalaal Doe on the afternoon of August 29, 2006.

10.    We met for the first time with Petitioner Abdunasir Doe on the morning of August 30, 2006.

11.    We met Petitioner Abdusamad Doe on the afternoon of August 30, 2006. This was our firm's second meeting with Abdusamad, whom previously I met in April, 2006.

12.    We were scheduled to meet Petitioner Abdusabur Doe for the first time on August 31, 2006. When we arrived on the Windward side of the base that morning, our escort advised that Abdusabur had refused to meet us. Our translator translated into Uighur a letter to Abdusabur, urging him to meet with us. Later that day, we were advised by an officer from the Staff Judge Advocate General's department that the letter was taken in to Abdusabur and that he refused to read it.

---

[1] The Government gave us leave to commence our visit on August 28, 2006, but the visit was delayed by a day by Hurricane Ernesto. As a result of the hurricane, counsel was unable to meet Petitioner Khalid Doe.

13. We met during the late morning and early afternoon of August 31, 2006 with Petitioner Hudaifa Doe, whom previously I had met in April, 2006.

14. What follows is my memory of certain statements and observations from these meetings.

15. *Hammad.* Petitioner Hammad Doe expressed anger and mistrust of us. We had brought food and tea to the meeting, which he declined to accept. He explained that he could not be sure we were interrogators, and that he believed interrogators had drugged detainees before. He advised that initially he had been an admirer of America. He said that he had been patient for two years thereafter, until, in April, 2003, an interrogator had said, "Congratulations, your interrogation is over. You are innocent. You will be leaving here soon." He said he had then been sent to Camp IV, where living conditions were substantially better than the other camps. Later, he became aware that our habeas petition had been filed on his behalf. He said that because he had not been released in the more than three years that have elapsed since he was advised by an interrogator that he was "innocent," since no court hearing had taken place, and since his living conditions had dramatically worsened in 2006, he had reached the conclusion that the American justice system was a sham, and that persons claiming to be American lawyers likely were interrogators who could not be trusted.

16. Hammad advised that conditions in the camp had deteriorated markedly in the last six months. At some point in 2005, the men had been moved out of Camp IV into various other, harsher camps. By mid-2006, most of them had [Classified] been moved to ▓▓▓▓▓▓▓ in Camp III. Each man was housed in a separate wire-mesh cage, about six feet by seven feet in area. Hammad said that tensions had increased, and random searches, beatings by teams of helmeted guards, and punishments (typically being sent to solitary confinement for a period of days) have become much more frequent in the summer of 2006. Each of the other four

men with whom we spoke confirmed that the Uighurs were now living in Camp III and that conditions there had deteriorated markedly during the summer of 2006.

17.    *Jalaal.*   Petitioner Jalaal Doe expressed profound mistrust of us. He would not shake our hands, look directly at us, or accept food or tea. He said that in his view our meeting must be an interrogators' trick, since lawyers had been telling the prisoners for more than two years that the American courts had said there cases could be heard, and yet no cases had been heard.

18.    *Abdulnasir.*   Petitioner Abdulnasir's demeanor was quite different from that of Petitioners Hammad and Jalaal. He was gentle, soft-spoken, and thoughtful in affect. He shook the men's hands warmly, engaged with us pleasantly, smiled and occasionally chuckled. He asked intelligent and probing questions regarding the status of this petition, the *Al Odah* matter, and the American legal process. I asked him whether he trusted us. He then apologized, and asked us not to take us personally, but admitted that he no longer felt he could trust any American. I asked why. He said that he too had been advised by an American interpreter that his "case was closed," and that he was "innocent," that there would be no more interrogations, that he would soon be leaving the camp. (He said he believed this had occurred in the spring of 2003.) He expressed surprise at the "CSRT" proceeding that took place more than a year later, after he had been told of his innocence. He then said the men were surprised by the result, because while eighteen Uighurs had been together in Afghanistan and Pakistan, five had been determined by the military to be non-combatants (he used the word, "innocent"), w███████████rs (including him) were deemed "enemy combatants" for reasons that the Americans never explained. He advised that even after the CSRTs, many of the Uighurs had received assurances from military personnel that they would soon be released, and that these representations had always been false.

19. Abdulnasir asked measured and patient questions about what we thought the benefits of litigation could be given that no court had heard his case for so long. He then asked about what the "downside" of litigation might be. This question puzzled us, but as the discussion progressed his further questions expressed his view that while the court system appeared to be an irrelevancy, the litigation might well be antagonizing the military and contributing to the worsening of his living conditions.

20. At the very end of the meeting, Abdulnasir courteously thanked us for our efforts, and then instructed us to cease pressing litigation on his behalf, as it appeared to be counterproductive to his living conditions. There was no time to discuss this surprising statement, which was made literally as the MPs arrived and ordered us to terminate our meeting and leave, and had to be hastily transcribed in the escort's van outside the camp.

21. As a practicing attorney for more than twenty years, it is my opinion that Abdulnasir's view, expressed under duress and after four and one-half years of imprisonment, and after his first meeting with counsel (which was less than two hours in duration), was not well-informed. Nevertheless, it illustrates profoundly that the delay brought upon by the stay has injured, perhaps irrevocably, his trust in the legal system and in American attorneys, and thus that the stay has profoundly injured his ability to present his habeas case.

22. *Abdusamad.* We had previously met Petitioner Abdusamad in April, 2006. In our first meeting he was extremely warm and genial in affect. On August 30, 2006, his affect had changed. He was courteous but guarded. He advised that his trust had been worn thin by the delay and by the worsening camp conditions.

23. Abdusamad advised that at approximately the time that the five Uighur men were sent to Albania (*i.e.* May, 2006), he was called into an interrogation room by military officers. One of the officers said that he had good

news. Abdusamad was "innocent," and his "file" indicated that he was to be "released and granted asylum by a foreign country." Abdusamad told us that he then asked, "In that case, why did you say I was an enemy combatant two years ago?" He said the interrogator appeared surprised by this question, and after paging through a file, shrugged his shoulders and said, "Oops." (We asked the interpreter to review this conversation with him twice to assure that we had understood it correctly).

24. We met Hudaifa on August 31. Previously we had met him in April, 2006. In this second meeting, he was courteous but candidly expressed that he had serious misgivings about American attorneys. Several times he asked if he could speak "just to the terjiman (interpreter)." I asked him whether he trusted us. He said, "We used to trust you. Maybe, God willing, we could trust you again, but nothing has happened, and so we have lost our trust."

25. We said to each of our clients that the five Uighurs now in Albania had been released literally on the eve of an important hearing. Each of the men advised that the military had told them that was just a coincidence. Hudaifa advised that, in light of the delay since May, he thought the military's explanation was probably correct.

26. I can draw no firm conclusion about petitioner Abdusabur, since I did not meet him, but his reported refusal to meet us or to read our letter suggests a deep injury to the attorney-client relationship, and thus to his practical ability to proceed.

27. On information and belief, all of the Petitioners were born and raised in Communist China. The notion of an independent judiciary is utterly foreign to them. They speak no English, and have limited educations. Their understanding of the American justice system derives largely from rumors they have heard in the camp, and to a limited extent from our brief meetings and correspondence.

28.    Our observations from August 29-31 demonstrate that the delay brought on by the stay in the *Kiyemba* case, in combination with the deterioration of the conditions of their confinement, has created in our clients a deep mistrust for all American lawyers and the American judicial system. I believe that our clients' mistrust, while misplaced (and perhaps difficult to comprehend if one has not been to Guantanamo Bay), nevertheless is rationally based upon the limited evidence available to them, including the facts of long delay and inaction.

29.    As a practicing attorney for more than twenty-two years, I believe that the ability to proceed successfully in any case, no matter how strong the merits, depends on a relationship of trust between attorney and client. I believe this is profoundly true where barriers of language, heritage, culture and education render the legal system unfamiliar to the client. Because delay has caused the petitioners to doubt all American attorneys and to mistrust the process, I believe that delay has profoundly injured their practical ability to present their case should the stay ever be lifted. Based on my observations of the clients, I believe that further delay is highly likely to render that injury irreparable to at least some of the petitioners.

I declare under penalty of perjury that the foregoing is true.
September 1, 2006.


_____
Sabin Willett

## CERTIFICATE OF SERVICE

I certify that on September 1, 2006, I prepared the foregoing September 1, 2006 Declaration of Sabin Willett at the secure facility in Arlington, Virginia, provided a copy of the same to the Court Security Office agent stationed there, and requested that the same be forwarded to Court Security Officers Jennifer Campbell and Christine Gunning for filing in the Court of Appeals and service on the Appellants/Cross-Appellees.

_____
Sabin Willett